UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

------------------------------------------------------------

UNITED STATES OF AMERICA,      )
                               )
    Government,                )  Case No. 18-CR-129
                               )
                               )
    vs.                        )
                               )
IONEL MURESANU,                )  September 10, 2018
                               )
    Defendant.                 )

------------------------------------------------------------

**VOLUME I OF II**

**TRANSCRIPT OF JURY TRIAL**

BEFORE THE HONORABLE J.P. STADTMUELLER

UNITED STATES DISTRICT JUDGE

Official Court Reporter:
Richard Derrick Ehrlich, RMR, CRR
richard_ehrlich@wied.uscourts.gov
414.290.2642

Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S

 2

 3      For the Government:

 4                          Carol L. Kraft
                            Karine Moreno-Taxman
 5                          United States Department of
                            Justice (ED-WI)
 6                          Office of the U.S. Attorney
                            517 E. Wisconsin Avenue
 7                          Milwaukee, WI 53202
                            414.297.1775
 8                          carol.kraft@usdoj.gov
                            karine.moreno-taxman@usdoj.gov
 9

10      For the Defendant:

11
                            Joshua D. Uller
12                          Federal Defender Services
                            of Wisconsin, Inc.
13                          517 E. Wisconsin Avenue
                            Room 182
14                          Milwaukee, WI 53202
                            414.220.9900
15                          joshua_uller@fd.org

16

17      Ionel Muresanu, defendant, present in person.

18

19

20

21

22

23

24

25
```

1          <u>I N D E X</u>

2                                              <u>Page</u>

   <u>Opening Statements</u>
3
   Ms. Moreno-Taxman ......................   4
4
   <u>April Hinke</u>
5
   Direct Exam by Ms. Moreno-Taxman .........  16
6  Cross-Exam by Mr. Uller ..................  63

7  <u>Dean Artus</u>

8  Direct Exam by Ms. Kraft .................  66

9  <u>Matthew Palmieri</u>

10 Direct Exam by Ms. Moreno-Taxman .........  88
   Cross-Exam by Mr. Uller ..................  94
11 Redirect Exam by Ms. Moreno-Taxman .......  95

12 <u>Erika Borg</u>

13 Direct Exam by Ms. Moreno-Taxman .........  96

14 <u>Shawna Edwards</u>

15 Direct Exam by Ms. Moreno-Taxman ......... 100

16 <u>Brandon Ansell</u>

17 Direct Exam by Ms. Kraft ................. 106

18 <u>Brandi Woodard</u>

19 Direct Exam by Ms. Kraft ................. 119

20 <u>John Milotzky</u>

21 Direct Exam by Ms. Kraft ................. 145
   Cross-Exam by Mr. Uller .................. 165
22
   <u>Zachary Hoalcraft</u>
23
   Direct Exam by Ms. Moreno-Taxman ......... 170
24

25

1      (Jury present.)

2           MS. MORENO-TAXMAN:  Good morning.  It is still

3      morning, right?  Yes, good morning.

4           My name is Karine Moreno-Taxman, and I will be

5      trying this case on behalf of the United States along with

6      my colleague, Carol Kraft, and also the special agent,

7      Zachary Hoalcraft, who is seated here, who you've met

8      earlier.

9           As the judge told you, opening statements are not

10     meant to be evidence but they are basically to give you an

11     overview of what we'll be talking about.

12          We expect this to be a short trial, but there's

13     certain things I want to talk to you about.  Some people

14     will watch TV, and on TV they will say things like, "Oh,

15     that's circumstantial evidence," and suddenly, because they

16     still think it's circumstantial, it's not admissible.

17          In this case, as the judge instructed you,

18     actually, when we were doing our work, the judge instructed

19     you that you can use circumstantial evidence as well as

20     direct evidence, and that sometimes circumstantial evidence

21     can be stronger than direct evidence.

22          In addition, the witnesses in this case will not

23     necessarily come forward in the order of how the case

24     developed.  And as you could imagine, unlike TV where we can

25     script and make sure the actors are in place, these are real

1   people with real lives, so sometimes we have to accommodate
2   their schedules.  We will try to do it as much a
3   chronological order as we can, but you may be hearing things
4   out of order.  Also, some of the law enforcement officers
5   did various parts of this investigation, so you will hear
6   from each officer what they did from beginning to end on the
7   case.  So I'm hoping that my overview today will help you
8   know where that's coming from.
9           So the defendant is charged with four crimes in
10  this case.  The defendant is sitting right there,
11  Mr. Muresanu.
12          So what are the charges?  The first charge has
13  four elements, those are four parts of the charge, and that
14  charge is the defendant knowingly and with the intent to
15  defraud possessed 15 or more access devices, which were
16  counterfeit access devices.
17          So you're probably wondering what in the world is
18  an access device, right?
19          So, you know, leave it to lawyers to come up with
20  these terms that when they pass laws and they make things
21  complicated, and so something that you might use every day
22  you would never have thought was an access device.
23          So what is an access device?  Let's talk about
24  that because the defendant is charged with having 15 or more
25  of those.  It can be any card, any code, any account number,

1  like a bank account number, any personal identification

2  number -- a pin number is what we often call it -- where you

3  go to an ATM or a time machine, and you put that number in,

4  that's a pin number.  It can be any other means that an

5  account can be accessed.  A bank account can be accessed,

6  that can be used alone or in conjunction with something

7  else, is an access device.  Okay?  And it has to be used to

8  obtain goods, services, or to transfer funds.  Okay?

9        And you're probably thinking, Is she talking about

10  my debit card or my credit card?  Yes.  Okay?  So you can

11  see that that is an access device, it's a card, it's got a

12  pin code, right, and it goes and puts your money -- you can

13  get money out of your account.  So that is what we're

14  talking about.  Okay?

15        So now what makes an access device counterfeit?

16  Because he's charged with having 15 or more counterfeit

17  access devices.  Okay.  So now here we come with a little

18  bit more of a legal definition.  Okay?  It's any access

19  device that is counterfeit -- that's not very helpful -- but

20  fictitious, altered, forged, fake.  Okay?  That's really

21  what it means.  It's an access device that a counterfeit one

22  is one that is not what it actually looks like it is.

23        So an access device is something that was

24  fraudulent or fakely made.  And in this case, these are some

25  of the over 80 access devices recovered in this case.  Okay?

And you will see this in evidence.  And as you can see, they say -- I think most of them say they're gift cards.  And some of you may have had experience with gift cards that you can go to a bank or a store.  You can go to Starbucks and say, "I want to buy my niece $25 worth of coffee."  And you put that on a card, and you pay for it, and that's what the card has.

All right.  In this case, what the defendant had were cards that looked like those gift cards, but, in fact, on the back there's that magnetic strip, right?  What was encoded in that magnetic strip was not what was written on the front of the card, not the account, not the bank, not the fact that it's a gift card.  But what it is is the information from somebody else, a real person who this defendant knew had their account information stolen.  Okay. So that's what makes it counterfeit.

And the second element -- sorry -- the third element is that he possessed these with the intent to defraud.  Okay?  Again, another big turn, but basically to take money that wasn't his.  Okay?  That's what it was.  And his conduct affected interstate commerce.

Man, these lawyers are crazy, right?

Okay.  So interstate commerce involves business, trade, travel between states.  Almost everything affects interstate commerce.  In fact, the instruction will tell you

that it is anything that can have the effect between two

states no matter how minimal. And examples that you will

hear and the evidence here is that this defendant himself

moved across state lines with access devices that banks were

involved. Okay? And banks obviously are interstate. They

affect commerce. That's how we get sort of a pure version

of what banks do, and there's businesses who cash some of

these cards. So you're not going to have any problem, I

don't think, with this element. I think the hardest part of

it is just understanding what it's talking about.

So now that we've talked generally about the first

count, which is possessing 15 or more counterfeit access

devices, now we're going to drill down a little bit and talk

about three of those access devices. Okay? Three of those

debit cards that don't look like debit cards, they look like

gift cards, right? And these cards -- so the first element

for those three counts, which are Counts 2, 3, and 4, okay?

Count 1 was the 15 or more general, everything he's got on

him, and then Counts 2 to 4 are the specific counts

regarding three of those cards.

So, first of all, it had to be done in relation to

Count 1, and you will see that those three cards were among

those recovered from him. But unlike what we normally have

on gift cards, these are actually, what you're going to

find, are going to have the information, for example, for

Count 2, the magnetic strip will have the information of the actual cardholder.  So it looks like a gift card, but it's not a gift card.  It actually has Matthew Palmieri's information on that card so that someone can use that card, even though it looks like a gift card, to take out money from Matthew Palmieri's account.  Okay?

Count 3 is also an actual account holder, and that is Shawna L. Edwards, and Count 4 is Erika Lee Borg.

Three people, three ordinary people who had no idea, you will learn during this trial that this defendant was using their information to take money from their accounts.

So now part of Counts 2, 3, and 4 is that he has to have taken a means of identification.  Okay?  So now we're back to, okay, what is a means of identification?  And the law specifically says that an access device itself is a means of identification, but it can also be any name, any number, any pin, all those things.  A big part of our credit cards are debit cards.

So this is the card.  This is Mr. Palmieri's card. It doesn't look like a debit card, right?  But what you will learn in this trial, and what the evidence will show you is that, although it says it's a gift card for you, and it has that account number, when law enforcement read the magnetic strip on the back, it's actually Matthew Palmieri's account,

1    and that little yellow sticker is his pin number.  Okay?

2           Here is Shawna Edwards' card.  Again, it looks

3    like a gift card, but in reality that number is her pin

4    number.  It even has what bank she banks at.

5           And then Count 3 is Ms. Erika Borg's card.  Again,

6    it's not her card.  It's her identifying information that

7    has been put on to this gift card, and that is what makes

8    someone guilty of aggravated identity theft.  So, again, it

9    looks like a gift card, but it has actually her pin number

10   on it.

11          So the first element is that he committed this

12   offense in relation to the 15 or more cards that were taken.

13   Okay?

14          The next element is that in the relation of --

15   part of this crime -- oops, there we go.

16          So first that it was related to the 15 or more

17   cards and then that he acted knowingly; that he knew that

18   these cards had other people and other persons' real

19   identification information on it; that he did that without

20   lawful authority.  And you will hear from the victims who --

21   the alleged victims -- that they had never given this

22   defendant authority to take money from their accounts; that

23   they belong to another person, and you will meet those

24   people, and that he knew they belonged to another person.

25          So banking has changed.  Okay?  There was a time

1    when we would go to a bank, and everybody knew each other.

2    You would go to the front teller. There would be the teller

3    window. You would show your face. You would fill in a

4    signature card to open an account, and pretty much the

5    teller knew who you were, and you knew who the tellers were

6    in your bank. So banking was very personal.

7           Well, then we all decided that we wanted to have a

8    more convenient life, and we didn't like the hours of banks,

9    right? And so if you're from Wisconsin, you might call it a

10   time card or a time machine or an ATM machine. And we all

11   liked that, right? We liked the idea that we can go there.

12   It doesn't matter what time the bank is open or when it's

13   closed. There you go. You can get money.

14          So what we do, in case someone here hasn't done

15   this, is you put your card in and you press your pin. You

16   tell them how much money you want, right? And, voila, it

17   comes out, right? And it's because you have the card --

18   that's your card with your identifying information because

19   you know your pin and those two pieces together allows you

20   to get your money.

21          Well, we've also changed how we get gifts, right?

22   Remember when you used to put a $10 or a $20 bill in a card?

23   Right? Well, we don't do that anymore. Well, some of us

24   still do, but we now have gift cards, and gift cards are

25   cards that you can use to put on a certain amount of money.

And, of course, the amount that you put on that card is
encoded, should be encoded by the person who you're giving
your $10 to or your $20 gift at the store.

So now we get to what's called ATM skimming.
Okay?  And what ATM skimming is is that when an unknowing
account holder puts their card into the machine, there's
actually a device in there that is getting the information
off the magnetic strip.  Okay?  So you put the card in.  You
think everything is fine.  You looked around like you
usually do to make sure no one is there, put the card in.
What the cardholders don't know is that there is a little
piece of equipment that has been put in there that will
steal the information on the card.  That's not enough,
though, right?  What else do you need?  You need the pin
number.  So they use a pinhole camera which will film you
putting in your four-digit code.  All right?

So you're done with the bank, stick your card in
your pocket, no one was around.  You go back, and you think
everything is good.  Little do you know that while that was
going on, someone else, which the defendant knows very well
how that's done, was taking and stealing that information,
both the magnetic strip information and the pin number.

And then they take the gift cards and put onto the
magnetic strip that information, and then as you saw, put a
little sticker on the front with a pin number.

1          So this case -- let's talk a little bit about what

2     the evidence will show you with regard to the facts.  This

3     case started when the Oshkosh Police Department received

4     information that there was a car that they should

5     investigate that was at the Motel 6 in Oshkosh, and they

6     were told further that the car had Tennessee plates.

7          So as any good law enforcement can do, they went

8     to the Motel 6 and did surveillance.  Lo and behold, a car

9     with Tennessee plates, that's a white minivan just as was

10    described, leaves the hotel, and it goes to the Kwik Trip.

11         So once they get to the Kwik Trip, you will hear

12    that Detective Hinke, who is an Oshkosh police detective,

13    she was one of the people doing the surveillance.  And when

14    they went into the Kwik Trip, she wasn't sure yet what they

15    were doing in there, so she took off -- she was wearing

16    plain clothes, but she took off her gun.  She took off her

17    badge, and she went in and acted like she was a customer.

18         When she first walked into the Kwik Trip, she

19    doesn't see anyone, but then she sees the defendant and two

20    others coming out of the bathroom, and guess where they go?

21    They go right to the ATM machine at the Kwik Trip.  And

22    she's watching that the defendant has a satchel on his

23    person, and he's pulling out cards and putting them in and

24    out of the machines.  She decides to get a closer look,

25    right?  So what does she do?  She pretends that she's a

customer wanting to use the ATM machine.  She goes over to
them, makes them move over and says, "Hey, can I use the
machine, too?"

          And there she gets a closer look and sees that
they are doing several transactions.

          At this point, she knows something is not right.
Right?  Who does several transactions with different cards
at an ATM machine?

          She goes outside and waits for them.  When she's
outside waiting for them, the defendant walks out, and she
says, "Police.  I would like to talk to you," or something
like that.

          And what does he do?  He runs.  Runs so fast
trying to get away, and she is grabbing onto his satchel,
and she manages to get that satchel.  He runs.  She runs
after him.  She gets him down.  Actually, a citizen came and
helped her because it was a little chaotic what was going
on, and the defendant was arrested.

          Okay.  Also with him were two juveniles.  You'll
hear that their names are Surdo and Florin, and you'll hear
a little bit more about what happened with them.

          So the defendant then gives a statement to law
enforcement.  Okay.  So now we have the cards, we have the
defendant, and in his very own words he admits.  So he
admits under videotape, under audiotape, and in his own

1    handwriting what he was involved with.  And you will hear

2    from this defendant in his own words that he knew what he

3    was doing, that this was something he knew how to do well.

4    He had done it for a while, and what he basically did was he

5    would go from different cities with these cards knowing full

6    well that they belonged to someone else and tried to get the

7    money out as quickly as possible.

8              So, really, what his goal was was to make money on

9    the backs of people who are legitimate account holders.

10             You're going to find that there's overwhelming

11   evidence in this case.  You're going to see that the

12   officers were very thorough, professional, and did an

13   outstanding investigation.

14             MR. ULLER:  Judge, I'm going to object and ask

15   that the statement be confined to the evidence.  It's

16   argumentative.

17             THE COURT:  The jury has been instructed, so your

18   objection is noted.

19             You may continue, Ms. Moreno-Taxman.

20             MS. MORENO-TAXMAN:  You're also going to see

21   surveillance video in this case that's going to show you the

22   defendant, not only at the Kwik Trip store at the machines,

23   but also him running away from the detective.

24             You're going to see what evidence was collected,

25   and then you're going to hear from the defendant's own

words, his written words, his videotaped words and his
audiotaped words that he was involved, and that he knew
exactly what he was doing.

At the end of this case, we will ask you to find
the defendant guilty of all four counts, and I believe that
the evidence will show you beyond a reasonable doubt that he
is guilty of all four counts.

Thank you.

THE COURT:  Thank you, Ms. Moreno-Taxman.

Mr. Uller, do you wish to make an opening
statement?

MR. ULLER:  No, Your Honor.  Thank you.

THE COURT:  Very well.

Ms. Moreno-Taxman, Ms. Kraft, you may call your
first witness.

MS. MORENO-TAXMAN:  Detective Hinke.

APRIL HINKE, WITNESS, SWORN

DIRECT EXAMINATION

BY MS. MORENO-TAXMAN:

Q    Detective Hinke, we still have one minute for this
morning, so I will start off by saying "good morning."

A    Good morning.

Q    And how are you employed, Detective Hinke?

A    I am a detective with the City of Oshkosh Police
Department here in Wisconsin.

1      Q     And how long have you been a detective with the

2   Oshkosh Police Department?

3      A     I have been a detective for about 14 1/2 years.

4      Q     Okay.  And how long have you been a police

5   officer, or at least involved with the Oshkosh Police

6   Department?

7      A     I have been a police officer with the City of

8   Oshkosh for about 22 1/2 years.

9      Q     And before being a detective, what positions did

10  you hold?

11     A     I was a school resource officer for about three

12  years, and then I was a patrol officer for about five.

13     Q     Okay.  And what are your duties as a detective?

14     A     My duties as a detective include working cases

15  that require more follow-up.  Sometimes those cases take us

16  outside of our jurisdiction.  I also work cases that are a

17  little bit more serious in nature, like burglaries or

18  homicides or sexual assaults.

19     Q     Okay.  I want to direct your attention to

20  May 16th, 2018.  Were you working that day?

21     A     Yes, I was.

22     Q     Okay.  And did you receive any information

23  regarding a white van from Tennessee?

24     A     I did at some point, yes.

25     Q     And did that cause you to go anywhere?

1       A       It did.

2       Q       And where did you go?

3       A       I went to the area of the Motel 6 that's in our

4  city on Washburn Street.

5       Q       And in addition to yourself, did other detectives

6  go there?

7       A       Yes.  There were several of us.

8       Q       And were you dressed in uniform or in plain

9  clothes?

10      A       I was in plain clothes.

11      Q       And were any of the detectives in uniform?

12      A       No, they were not.

13      Q       Were any of them in police cars, cars that are

14  marked as police cars?

15      A       We were in unmarked police vehicles.

16      Q       And what were you doing there?

17      A       We were basically doing some surveillance based on

18  the information that we were provided just looking for

19  suspicious activity at this location as it relates to this

20  white van.

21      Q       Okay.  I'm going to ask to please have you look at

22  the screen.  Look at Exhibit 5A.  Do you recognize that car?

23      A       Yes.

24      Q       And can you look at Exhibit 5B?  Can you tell us

25  what that is?

1      A      This is the same van that we saw at the Motel 6

2  bearing this Tennessee license plate.

3              MS. MORENO-TAXMAN:  Your Honor, at this time, I

4  would move into evidence Exhibits 5A and 5B.

5              THE COURT:  All right.  The Court will receive

6  Exhibits 5A and 5B.

7  BY MS. MORENO-TAXMAN:

8      Q      At some point, what time about did you get there,

9  did the detectives get to the Motel 6?

10     A      Maybe 5:30 p.m. or so.  Something.  Late

11  afternoon.

12     Q      Okay.  And how long did the surveillance last

13  about?

14     A      Well, I came in contact with this vehicle around

15  8:15ish.  So we were at the motel for almost three hours at

16  that point.

17     Q      Okay.  And did you see that vehicle at a specific

18  store in Oshkosh?

19     A      Yes, I did.

20     Q      Can you please look at Exhibit 6?  Can you tell us

21  what that is?

22     A      This is a Kwik Trip convenience store located on

23  West 9th Avenue in the City of Oshkosh.

24              MS. MORENO-TAXMAN:  Your Honor, I move Exhibit 6

25  into evidence.

1          THE COURT:  All right.  The Court will receive

2     Exhibit 6.

3     BY MS. MORENO-TAXMAN:

4          Q    What happened once you got to the Kwik Trip?

5          A    Well, Detective Artus and I, along with Sergeant

6     Ansell, had been surveilling this vehicle when it arrived at

7     the Kwik Trip.  Detective Artus and I had coordinated that I

8     was going to go inside the store and determine if there was

9     anything going on with the potential occupants of this

10    vehicle.

11         Q    And before you went into the store, did you take

12    off anything that you were wearing at that point?

13         A    I did.  Although I was still wearing my plain

14    clothes, I still wear my department-issued weapon and my

15    handcuffs and badge.  So I removed those items before I went

16    into the store so I looked like the average citizen walking

17    in there.

18         Q    Okay.  And where was your vehicle at that point?

19         A    My vehicle, at that point, was parked to the far

20    west side of this business, which would be to the right of

21    these doors.

22         Q    Okay.  And when you went in, what did you see?

23         A    Initially, I didn't see anything that caught my

24    attention, so I started walking around the store.  And as I

25    got to the back of the store, there were three male subjects

1    that came out of the bathroom together.

2         Q    Okay.  And did you see where they went?

3         A    I did.

4         Q    Where did they go?

5         A    I watched them walk over to two ATM machines that

6    are located near the front doors of the business.

7         Q    And what happened?

8         A    They were using the ATMs for a few minutes.  I was

9    trying to gather what exactly they were doing.  So I decided

10   that I would walk up to one of the ATMs and see if I could

11   squeeze in and use the one that was being used less

12   frequently.

13        Q    And do you see one of those three here in court

14   today?

15        A    I do.

16        Q    And can you please point him out?

17        A    Yes.  He is seated at the table behind you in a

18   light gray suit jacket and vest.

19        Q    And were there two other people with him?

20        A    There were.

21        Q    Okay.  And I would like you to look at Exhibit 8.

22   Can you tell us who that is?

23        A    Yes.  That was one of the individuals that was

24   with the defendant.

25        Q    Okay.  And did you later determine that he was a

1   juvenile?

2           A    Yes, I did.

3                MS. MORENO-TAXMAN:  Your Honor, I would move

4   Exhibit 8 into evidence.

5                THE COURT:  All right.  The Court will receive

6   Exhibit 8.

7   BY MS. MORENO-TAXMAN:

8           Q    So now you see them at the ATM machine.  Can you

9   tell what's going on?

10          A    As I'm next to them at the ATM on the right, the

11  defendant is using an ATM to my left, and I could see that

12  there are multiple transactions taking place at this ATM,

13  and it appears that different cards are being used to make

14  these transactions.

15          Q    Okay.  Did you do anything to get a closer look?

16          A    I did.  I was right next to them trying to use my

17  peripheral vision and not draw attention to myself.  So I

18  stayed at the ATM for a period of time even pretending to

19  use the ATM with my own debit card.

20          Q    You didn't use it, though, did you?

21          A    I was actually afraid to.

22          Q    Okay.  After you observed that, what happened?

23          A    After I observed the activity going on, I

24  telephoned my partner, Detective Artus, and I advised him of

25  what I believed was taking place with the multiple

1    transactions with multiple cards.  And I left the store and

2    went back outside and put on my duty gear and moved my

3    vehicle.

4         Q    Now, did you notice from where the cards were

5    being taken out of?

6         A    Yes.  The defendant had a satchel, so kind of like

7    a purse that was around his neck, and it was in the front,

8    and he was reaching into the satchel to take these cards

9    out.

10        Q    I'm showing you what's been marked as Exhibit 19.

11   Can you tell us what that is?

12        A    This is the satchel that I recovered from the

13   defendant.  It's kind of grayish-black.  It resembles a

14   purse.

15        Q    Is that a picture of it?

16        A    Yes, it is.

17             MS. MORENO-TAXMAN:  Your Honor, I would move into

18   evidence Exhibit 19 and 19B.

19             THE COURT:  All right.  The Court will receive

20   Exhibits 19 and 19B, as in "boy."

21   BY MS. MORENO-TAXMAN:

22        Q    All right.  So when you talk about him taking

23   something out of the satchel, can you show us what you saw,

24   or where you saw the items that he was taking out?

25        A    In the top part of this is a zipper, and in the

front there's also a zipper.  So somewhere -- I can't tell
you which zipper it was coming out of because I couldn't see
because he had it wearing on the front of him like this and
reaching down.  So I'm to the side, but it's coming from one
of these two compartments.

Q    Could you see what he was pulling out?

A    They were cards, debit cards, or financial
transaction cards like a debit card.

Q    Where did you move your card to after you decided
to go outside and talk to the other detectives?

A    Well, after I talked to Detective Artus and
Sergeant Ansell, we decided that I would move my car next to
this van that I pointed out previously and park right next
to the van.

Detective Artus was in a different position
surveilling the store, and he pulled his vehicle into the
lot.  So our plan was to basically make contact with these
individuals when they exited the store.

Q    And what happened?

A    The individuals, after being in the store for
several minutes, did exit the store.  I got out of my
unmarked car and advised them that I was police and to
please stop so that I could talk with them.  They briefly
stopped before one took off running in an easterly
direction, I believe.  And he was kind of chased by

Detective Artus and Sergeant Ansell, and the defendant took

off running in a westerly direction, and I chased him.

Q    And when you chased him, did you grab anything

that he had on?

A    When I made contact with him, he had this satchel

in his hand, and we basically -- I wouldn't say struggle.

We both kind of grabbed at it at the same time.  So it came

over the top of his head as he ran.  So I maintained control

of that satchel as I chased after him around the corner of

the store.

Q    And then did it become in your possession?

A    Yes, it did.

Q    Okay.  Was it easy to get the defendant?

A    He did try climbing a wrought iron fence -- it's

about six feet tall -- but he was not successful, so he was

taken into custody.

Q    And did a citizen come to help you?

A    Yes, he did.

Q    And once he was taken into custody, where did you

take him?

A    I did not take him anywhere, but he was later

transported to the police department, the Oshkosh Police

Department.

Q    Before he was taken to the Oshkosh Police

Department -- can you please look at Exhibit No. 7?  Can you

1    tell us what that picture is?

2        A    That is the defendant as I observed him on the

3    night of May 16th.  He's actually sitting on a curb there,

4    and he is waiting to be transported by a marked unit, a

5    marked squad unit.

6        Q    So when you saw him at the ATM machines, he had

7    that white jacket, that cap on, and that gold and black

8    shirt?

9        A    Yes, he did.

10        MS. MORENO-TAXMAN:  Your Honor, I move Exhibit 7

11    into evidence.

12        THE COURT:  All right.  The Court will receive

13    Exhibit 7.

14        MS. MORENO-TAXMAN:  Your Honor, the parties have

15    stipulated that Exhibit 17 is a true and correct -- 17A

16    through 17G are a true and correct copy of videotaped

17    surveillance footage captured on May 15th, 2018 and

18    May 16th, 2018 by cameras located inside and outside the

19    Kwik Trip store at 1725 West 9th Avenue, Oshkosh, Wisconsin.

20        The parties also stipulate that the time stamp on

21    the video is accurate.

22        THE COURT:  All right.  Thank you.

23    BY MS. MORENO-TAXMAN:

24        Q    Were you able to review surveillance video of what

25    happened in the store when you were in there?

1      A   I was.

2      Q   Okay.  So I'm going to ask -- first I'm going to

3 ask you, did you -- before you did that, once you had the

4 satchel, did you look inside?

5      A   I did.

6      Q   What did you find inside?

7      A   I believe there was some identification that

8 matched the information that the defendant provided us as

9 far as his identity.  There was also 80 reloadable -- or

10 debit cards, gift card type cards that have a magnetic

11 stripe on the back.

12      Q   I'm showing you what is marked as Exhibit 1A.  Can

13 you identify that for us?

14      A   In this bag is an evidence property envelope that

15 I completed at the time of this incident.

16      Q   Can you just please hold that up for the jury?

17      A   Oh, okay.  Sure.

18      So this is the evidence envelope that I completed

19 that night.  And in this envelope, I had placed these

20 reloadable debit cards with the magnetic stripes.  These

21 were all found in the defendant's satchel.

22      Q   Okay.  Obviously, on the screen we only have two,

23 four, six.  I would ask that we just move forward so that

24 you can look at them and identify them as being the same

25 cards.

1          Your Honor, at this time, I would move Exhibit 1C

2     into evidence, and 1A.

3          THE COURT:  All right.  The Court will receive

4     Exhibits 1A and 1C.

5     BY MS. MORENO-TAXMAN:

6     Q     When you looked at the cards, did any of them have

7     anything on them?

8     A     Yes.  Many of the cards, if not all of them, have

9     a colored sticker on them much like you might see on a

10    garage sale that are round and different colored, neon

11    colored.  On those stickers was generally a four-digit

12    number and an abbreviation for something that I determined

13    later to be names of banks.  Some of the cards also had

14    paper receipts wrapped around them, and these paper receipts

15    generally were balance inquiries that were being conducted

16    at ATMs on the card itself.

17    Q     Now, what you're seeing on the screen are pictures

18    of those same cards; is that right?

19    A     Correct.

20    Q     So is 1C the same cards that you recovered?

21    A     Well, without going through this entire page

22    comparing card to card, they appear to be the same.  They're

23    all vanilla gift cards that also double as debit cards.

24    Q     Could you please go to the third page?  And do you

25    see a card that ends in the number 4793?

1    A    Yes, I do.

2    Q    I'll give you a pen.  Could you please circle that

3  card?

4    A    On the paper here?

5    Q    Yes, please.

6    A    (Indicating.)  Okay.

7    Q    So that's the card that ends in 4793?

8    A    Yes.

9    Q    And on page 5, do you see a card that has the

10  numbers 4424?

11    A    Yes, I do.

12    Q    Can you please circle that card?

13    A    I did.  I'm sorry.

14    Q    Is that the card you circled?

15    A    Yes, it is.

16    Q    Okay.  And now on the ninth page, can you circle

17  the card that ends in 6370?

18    A    I found it here.

19    Q    Now, looking at those three cards, what do they

20  look like on their face?

21    A    On the face of the card it says "Gift."  I believe

22  each one of them does.  They have the words "Debit."  I

23  believe two of them are Visa and one of them is a

24  Mastercard.  They're vanilla cards that are reloadable cards

25  that you could purchase or put money on, and they each have

1    an expiration date, and they each have a colored sticker on

2    them.

3        Q    Looking at that card, does it look to you, just

4    from looking at it, that the first card you circled, the one

5    that ended in 4793, actually belonged -- had the information

6    of Shawna Edwards on that card?

7        A    No.  By looking at the card, you cannot tell who

8    the card belongs to.

9        Q    It looks like a regular gift card, right?

10       A    A gift card, correct.

11       Q    When you look at the card that ends in 4424, can

12    you tell whether that card has anything that lets you know

13    that it actually has Erika Borg's information on the

14    magnetic strip?

15       A    No.  It offers nothing of that sort.  It just says

16    "Gift Card Recipient" on the front.  There's no name.

17       Q    And when you look at the third card that ends in

18    6370, again, can you tell if that card belongs to a person

19    by the name of Matthew Palmieri?

20       A    You cannot tell by looking at the card.

21       Q    And when the defendant and the two others were at

22    the ATM machine, were any of the people there Matthew

23    Palmieri?

24       A    I don't believe --

25       Q    Those three people?

1      A      I don't believe so.  I don't know who they are.  I

2    can't answer that, but I don't believe that they were.

3      Q      What were the names of the three people that were

4    at the ATM machine?

5      A      There was an individual by the name of Florin,

6    there was an individual by the name of Surdo, and there was

7    an individual who identified himself later as

8    Ionel Muresanu.

9      Q      So no one identified themselves as Shawna Edwards?

10     A      Correct.

11     Q      And no one identified themselves as Erika Borg?

12     A      Correct.

13     Q      Now, when you looked at those cards, did some of

14   them have anything wrapped around them?

15     A      Yes.  Some of the cards did have a receipt which

16   came from an ATM.  And like I stated earlier, a lot of them

17   have balancing inquiries that are being conducted, so the

18   receipt kind of shows the available balance on the card, per

19   se, or on the account.

20     Q      Okay.  Could you please put up 1B?

21            Can you identify -- it's a several page exhibit.

22   Four pages.  Can you identify what those are?

23     A      These, again, appear to be receipts from various

24   banks, Bank of America, U.S. Bank.  Some of these are just

25   names -- Allpoint and Cartronics is more than likely the

1    name of the ATM that is in the facility where they're

2    positioned.  These are balance inquiry receipts.  As you can

3    tell, for instance, at the top right one, the Allpoint says

4    there's a negative balance here.  There's an available

5    balance of $242 on this particular card.  So these are all

6    balance inquiry receipts.

7         Q    Okay.  So let's go back to the beginning of this

8    exhibit and look at the first Bank of America card.  What is

9    the date on that?

10        A    The date on this card is May 12th, 2018.

11        Q    And where does it say that receipt came from?

12        A    It appears that it came from Belleville, Illinois.

13        Q    Okay.  And what does that receipt show was done

14   with that card?

15        A    There was an inquiry to this account on the

16   checking account for this particular card.

17        Q    And did it show a balance?

18        A    It does of $162.28.

19        Q    Okay.  Moving to the next card -- the next

20   receipt.  Sorry.

21             Can you tell us what date is on that one?

22        A    This is also May 12th, 2018.

23        Q    And where's the location on it?

24        A    The city looks like O'Fallon, Illinois.

25        Q    Okay.  And what information is on that receipt?

1        A    Bank of America is the issuing bank, or the

2   sponsor for the ATM.  And there's a checking account inquiry

3   showing a balance of just over $3,200 on this receipt.

4        Q    And then let's look at the third one.  Okay.

5   What's the date on that one?

6        A    This is also May 12th, 2018.

7        Q    Okay.  And what does that look like to you?  Where

8   is that from and what does it show?

9        A    This is actually a withdraw that is made at an ATM

10  in Caseyville, Illinois, and it appears that $200 was

11  requested from this account, but the transaction was

12  declined.

13       Q    Okay.  And then on the back, did you notice any of

14  the receipts had the words "No Good" written on them?

15       A    I did.  As you can see in this particular example,

16  this is the back of one of the transaction inquiries for the

17  balance on the checking, and it's handwritten "No good."

18            MS. MORENO-TAXMAN:  Your Honor, I move Exhibit 1B

19  into evidence.

20            THE COURT:  All right.  The Court will receive

21  Exhibit 1B.

22  BY MS. MORENO-TAXMAN:

23       Q    Now, at some point did you collect videotape?  Did

24  your law enforcement agency collect videotape from the

25  Kwik Trip store?

1    A    Yes.  The surveillance that's from the store was

2    collected by our agency.

3    Q    At some point also did you search the defendant?

4    A    Yes.  He was searched when he was taken into

5    custody.

6    Q    And did you find any receipts in his pockets?

7    A    I don't believe I found any receipts in his

8    pockets.

9    Q    Okay.  Did you find any wallet on his person?

10   A    There was a wallet.

11   Q    Okay.  Would you please put up Exhibit 19A?

12        I would like to show you what's been marked as

13   19C.  Can you tell us what that is?

14   A    This is a black Guess bifold men's wallet, and

15   there is a green sticker stuck to a portion of this wallet

16   that is similar to those found on the bank cards with a

17   four-digit number and an abbreviation.

18   Q    Okay.  So that number is 8225?

19   A    Correct.  8225 is the four-digit number, and then

20   the letters say "NAVIF."

21        MS. MORENO-TAXMAN:  Your Honor, I would move

22   Exhibit 19 and 19A into evidence.

23        THE COURT:  All right.  Exhibits 19 and 19A will

24   be received.

25   \\\

1    MS. MORENO-TAXMAN:  And 19C as well, Your Honor.

2    THE COURT:  And what is 19C?

3    MS. MORENO-TAXMAN:  Can you please put up 19C?

4    Isn't that --

5    THE WITNESS:  The wallet says "19C."

6    THE COURT:  That's the physical exhibit?

7    MS. MORENO-TAXMAN:  Yes.

8    THE COURT:  All right.  The Court will receive

9    Exhibit 19C.

10   BY MS. MORENO-TAXMAN:

11       Q    When you were watching them at the ATM, did you

12   notice anything being put at the top of the ATM machine?

13       A    At the time, there was a lot going on at the ATM

14   machine, and I have since also looked at the video

15   surveillance.  There were receipts that are being tossed up

16   on the top of this ATM machine.

17       Q    Okay.  And were those eventually recovered?

18       A    They were.

19       Q    Could you please put up Exhibit 1E1?

20       1E is the photos of those receipts.  And I'll show

21   you the actual receipts.  Can you tell us what those are?

22       A    These are four ATM receipts that came from that

23   Kwik Trip machine or machines.  They are dated May 16th,

24   2018.  They have the time stamp on them as well, which is

25   shortly before 8:30, which was when I was in the store.  It

1    has the City of Oshkosh phone number on there with the

2    Kwik Trip location.

3        Q    And are they all dated on May 16th?

4        A    Yes, they are.

5        Q    And are they all dated approximately 8:30, 8:28 to

6    8:30 that day?

7        A    Yes, they are.

8        Q    And do those times and dates match when you saw

9    them at the ATM machine?

10       A    Yes, they do.

11       Q    Okay.  Could you please look at the first one?

12   All right.  Can you tell us what is happening, what that

13   transaction shows?

14       A    Well, it looks like that a balance inquiry was

15   being conducted on a card that had been swiped at that

16   location ending in the numbers of 5766, and that this

17   transaction took place on May 16th at 8:28 p.m.  The

18   balance does not show on this particular card.

19       Q    Can you take a look at the next receipt?

20       A    This has similar information.  It also is a second

21   swipe of this same card.  It's just about, I don't know, 30

22   seconds, maybe later, or a minute at most.  It's at 5-16 at

23   8:29 p.m.  I believe it's probably the same number.  5766

24   are the last four digits, and it's a balance inquiry, but,

25   again, the balance does not show.

1      Q      And from your memory of what they were doing at

2    the ATM, would these receipts be consistent with them

3    checking balances rather than withdrawing money at that

4    time?

5      A      At that time, yes.

6            MS. MORENO-TAXMAN:  Your Honor, I move into

7    evidence 1E and 1E1.

8            THE COURT:  All right.  The Court will receive

9    Exhibits 1E and 1E1.

10   BY MS. MORENO-TAXMAN:

11     Q      Now, you've reviewed the surveillance tapes from

12   the Kwik Trip?

13     A      I have.

14     Q      Could you please play for us Exhibit 17E?

15            All these videos are part of the stipulation that

16   I've already read to the Court.

17            Can you play that for us, and then we'll talk

18   about it?  Just stop it there for a second.

19            Now, you obviously are not in this video yet,

20   right, from what you can tell?

21     A      Correct.

22     Q      But there were three individuals at the ATM

23   machine that you observed on this videotape?

24     A      Yes.

25     Q      And they are the same three people we're talking

1    about?  The defendant, Surdo, and Florin?

2        A    Correct.

3        Q    Okay.  Please continue.

4             And you're not picking any bananas either, right?

5        A    No.

6        Q    And the date on this is May 16th, correct?

7        A    Correct.  It's right down here at the bottom.

8        Q    Can you stop it right there, please?

9             Okay.  Now, you're not there yet, right?

10       A    I believe I actually have entered the store.  I'm

11   probably out of view, and I'm around the back corner here by

12   the bathrooms because when I entered, they came out and kind

13   of went this direction.

14       Q    Okay.  So that would be the directions from the

15   bathrooms?

16       A    Correct.

17       Q    And the person that we see at the ATM machine, who

18   is that?

19       A    That is the defendant.

20       Q    And is he wearing the satchel?

21       A    Yes.  You can only see the back strap, the black

22   strap going across his back how he has it crisscrossed

23   across his body there.

24       Q    Okay.  Please continue.

25            Please stop it there.

1          Who is that with the soda?

2     A    That's me.  I'm wearing a gray V-neck T-shirt and

3     a pair of lighter colored pants and carrying a drink in my

4     hand.

5     Q    And what were you doing at that time?

6     A    At that time, I was trying to understand exactly

7     what they were doing at the ATM and just get a better look

8     in general.

9     Q    Would you please continue?

10         Where did you go at this time?

11    A    I believe I was standing at the front counters by

12    the clerks at that point, turned around looking back toward

13    them.

14    Q    Did you make a decision to get a closer look?

15    A    I did.

16    Q    Is that you again?

17    A    That's me.

18    Q    Can you stop it there?

19         Okay.  So is this when you asked to use the ATM

20    machine?

21    A    Yes, I did.

22    Q    Please continue.

23         In that video, who is handling the cards?

24    A    That's the defendant that's still standing at the

25    ATM still using it.

1     Q     At this point, where have you gone?

2     A     I have gone back up towards the front of the

3 store, and I believe at that point either I was on the phone

4 or about to call my partners outside to alert them as to

5 what I believed was going on.

6     Q     Now, you've used an ATM machine before, right?

7     A     Correct.

8     Q     And when you watch this video, is that anywhere

9 the amount of time that you would take to do just a personal

10 withdraw?

11     A     No.  And, actually, as we're watching it, this is

12 fast forwarded a little bit, so they're actually there

13 longer than what it's appearing to us right now.

14     Q     And that's the defendant still at the ATM machine?

15     A     That's correct.  You just saw him throw a receipt

16 or something on top of that ATM.

17     Q     Is that another receipt he put up there?

18     A     I believe so.  And he just placed another card in

19 there.

20     Q     Okay.  Could you please play now Exhibit 17D?

21 That's also part of the stipulation.

22           When you testified earlier that you recovered

23 video from the date before and from the surveillance, is

24 that an example of some of the video that was recovered?

25     A     Yes.  This is actually probably about, I don't

1    know, 18 hours before.  It's actually the 15th going into

2    the 16th.  So early morning hours of the 16th just after

3    midnight.  That was some surveillance from that time frame.

4         Q    Okay.  Now, could you please show us 17G?

5              Who came in on that video?

6         A    One of the individuals was the defendant.  He was

7    wearing a red T-shirt, and the other individual was the

8    person we identified later as Florin, and he was wearing

9    black.

10        Q    Was he carrying the same satchel?  Do you want to

11   see it again?

12        A    I would have to see it again.

13        Q    It was 17D.

14        A    Okay.  This is the defendant right here.  He's

15   wearing the satchel with the red shirt (indicating).

16        Q    All right.  As long as we're looking at the early

17   morning hours of the day before, could you please show us

18   Exhibit 17A, which was pursuant to stipulation videotaped on

19   May 16th at 12:09 in the morning.

20              Okay.  Who was that?

21        A    That was also the defendant wearing the same

22   clothes.

23        Q    Okay.  Could you please show us Exhibit 17B?

24              What is the date on that one?

25        A    It's hard to read on the bottom of this screen,

1    but I know that this is the early morning hours of

2    May 16th.

3         Q    Okay.  And do you recognize the defendant in

4    there?

5         A    I do.

6         Q    Okay.  And what is he wearing?

7         A    He's the individual that keeps coming back up to

8    the front here wearing the red T-shirt with it looks like a

9    jean jacket over the top and, again, though, with the black

10   satchel.

11        Q    Can you tell what he's doing?

12        A    Well, he's stockpiled a bunch of items that looks

13   like he's paying for at the front of the clerk there.

14        Q    Can you identify what some of those items are?

15        A    I believe that they're drinks and food and snacks.

16        Q    Okay.  Can you please show us now Exhibit 17D?

17             Can you identify that for us?  What are you seeing

18   there?

19        A    Well, that's the defendant along with Florin, and

20   they have left the check-out area.  And the direction that

21   they're walking and crossing in front of those doors into

22   that path, the ATMs are to the left of that.

23        Q    Okay.  And can you please look at Exhibit 17C?

24             What are we seeing here?

25        A    This is a surveillance view of the Kwik Trip

cameras.  This is the clerk here.  You can't see the person

right here, but you can see all the items.  There's several,

like, it looks like four packs of Red Bull and Coke and a

couple of sandwiches.  He's continuing to pile these items

onto the countertop there.

Q    And is this image consistent with that being the

defendant who is purchasing those items?

A    It is.

Q    Okay.  Now, going back to the day that you saw

them at the ATM --

THE COURT:  Ms. Moreno-Taxman, I think this will

be a good place to break for lunch.  We'll pick up with the

balance of the detective's testimony at 1:30.

Members of the jury, I'm going to leave you with

the admonition that I've given you throughout the morning,

and it's please do not discuss the case among yourselves nor

with anyone with whom you might have contact before we

reconvene.

Once again, I want each of you to continue to keep

the open mind that you've pledged to keep until you've heard

the balance of the evidence and testimony to be offered

together with the Court's instructions on the applicable law

and the closing arguments of counsel.

Please leave your notebooks on your chair, and

please be back in the jury room shortly before 1:30.  Since,

1    as you can appreciate, without each of you present we are

2    unable to proceed.

3            Have a great lunch, and we'll see you at 1:30.

4    The Court stands in recess.

5        (Lunch recess.)

6        (Jury present.)

7            THE COURT:  Good afternoon, members of the jury.

8    Good afternoon, Counsel.  Mr. Muresanu.

9            Detective Hinke, you're under the same oath that

10   you took when we began your testimony this morning with

11   Ms. Moreno-Taxman.

12           You may continue with your questions.

13                DIRECT EXAMINATION (Continued)

14   BY MS. MORENO-TAXMAN:

15       Q    Good afternoon.

16       A    Hello.

17       Q    Did you, at some point, go through the satchel of

18   the defendant, that satchel?

19       A    Yes, I did.

20       Q    Okay.  And did you identify some loose receipts

21   that were in there as well?

22       A    There were receipts in there, I believe.  I don't

23   know if it was in his wallet or the satchel, but there were

24   some receipts, and there were some balance inquiry receipts.

25       Q    I would like you to take a look at what's been

marked as 1D1.  Can you please identify those?

    A    These are ATM card receipts.  I believe I might've already talked about these in previous testimony.  Maybe not.  These are different.

         Okay.

    Q    Did you recover those?

    A    Yes, I did.

    Q    And where did you recover them from?

    A    From the best of my recollection, it would either have been from the satchel or the wallet.  So I can't tell you which.

    Q    Okay.  But from the defendant's satchel or his wallet?

    A    Correct.

    Q    Okay.  And can you tell us if 1D is a photocopy of 1D1?

    A    It is with the exception of -- I think there's a couple of receipts, Kwik Trip Wal-Mart receipts on the back here that are not included with this.

    Q    Can you take off those pages, please?

    A    Sure.

         MS. MORENO-TAXMAN:  Your Honor, I move into evidence Exhibit 1D and 1D1.

         Your Honor, I'd like to move into evidence Exhibits 1D and 1D1.

1           THE COURT:  All right.  The Court will receive

2   Exhibits 1D and 1D1.

3           MS. MORENO-TAXMAN:  Thank you.

4   BY MS. MORENO-TAXMAN:

5       Q    Now, looking at that exhibit that's up there, is

6   that a copy of one of the receipts that was found?

7       A    Yes.

8       Q    Okay.  And can you tell us the date on that?

9       A    The date is May 12th, 2018.

10      Q    And which location is that?

11      A    This is in Caseyville, Illinois.

12      Q    Okay.  Can you tell us the dates of all the

13  receipts in that?

14      A    The dates on these receipts are May 12th, 2018.

15  This one as well, I believe, the top left, May 12th, 2018.

16      Q    And how much is the available balance on that?

17      A    On this particular card, the ledger balance is

18  showing as over $6,200 and available balance at 6,150.19.

19      Q    Thank you.

20           Can you show the next one, please?

21           And what's the date on this one?

22      A    May 12th, 2018 at about 7:33 p.m.  It's also a

23  receipt indicating that the available balance for this

24  account is nearly $1,500.

25      Q    Okay.  Thank you.

1                    At this time, I would like to go through, show you

2       Exhibit 16.

3                    Your Honor, with regard to Exhibit 16, the parties

4       have stipulated that Exhibit 16 is a three-page exhibit that

5       contains true and correct copies of purchase transactions at

6       the Oshkosh Kwik Trip store on May 16th, 2018.

7                    I would like them to be received into evidence,

8       Your Honor.

9                    THE COURT:  All right.  The Court will receive

10      Exhibit 16.

11                   MS. MORENO-TAXMAN:  Okay.

12      BY MS. MORENO-TAXMAN:

13           Q    Do you have a copy of it in front of you, or no?

14           A    No.

15           Q    Can you tell us what Exhibit 16 is?

16           A    Okay.  Exhibit 16 is a receipt from Kwik Trip on

17      9th Avenue in Oshkosh, and it is dated May 16th, 2018,

18      shortly after midnight at 12:24 a.m.

19           Q    So is that around the time that you previously

20      testified to seeing the video of him going into the

21      Kwik Trip and buying items and buying them at the counter?

22           A    Correct.  The time that he was wearing the red

23      T-shirt with the jean-looking jacket over the top, correct.

24           Q    And how much did the defendant spend at this time?

25           A    This receipt shows he spent $67.63.

1      Q    Okay.  And what does the next receipt show?

2      A    I just have one receipt here, I believe.  There's

3 just one receipt in here.

4      Q    Okay.  Can you look at Exhibit 16?  Here.  Here's

5 Exhibit 16.  Are those all the receipts that were recovered

6 from the Kwik Trip for that date?

7      A    These are copies of three receipts from Kwik Trip

8 showing transactions that took place all within a very short

9 period of time.

10      Q    Okay.  And were all those transactions at the same

11 time or approximate time as the videos that we watched where

12 the defendant entered the store and then put things on the

13 counter and then purchased them?

14      A    Correct.

15      Q    So the first one you said was for 64?

16      A    64.41, and then with tax the total is 67.63.

17      Q    And what card was used for that, the last four

18 digits?

19      A    It looks like it might be 3654 are the last four

20 digits on this card.

21      Q    Okay.  And then the next transaction?

22      A    The next transaction takes place about 20 minutes

23 after the first one.  It's for a total of $178.43.

24      Q    Okay.  And what items were purchased at that time?

25      A    There it looks like all cigarettes that are

1   purchased with that.

2        Q    Okay.  And then can you tell from this receipt how

3   it was paid?

4        A    Yes.  There's a debit card that's used, and

5   there's -- actually, it looks like two cards are maybe

6   swiped in this particular transaction, one ends in 3654,

7   which was just like the first one, and then another card is

8   swiped, and it ends in 0574.

9        Q    All right.  Can you look at the third receipt,

10  please?  How much were the purchases the defendant made on

11  this receipt?

12       A    This receipt totaled $196.52.

13       Q    Okay.  And what kind of items did it include?

14       A    Again, cigarettes, snacks like Pringles, chips,

15  mints, cheeseburger, chicken sandwich.  Same items that we

16  saw on the counter.

17       Q    Okay.  And how was that paid?

18       A    This was paid by a debit card as well, the same

19  four digits, last four 3654.

20       Q    Okay.  Can you look at the next receipt, please?

21       A    I just have three receipts.

22       Q    Okay.  I'd now like you to look at Exhibit 17G,

23  which is a video.  Let's start at the beginning.

24            (Video played to the jury.)

25  \\\

BY MS. MORENO-TAXMAN:

Q    Again, that went pretty fast.  What are we seeing here?

A    This is the front of the Kwik Trip store with vehicles parked in the parking lot.  The front door is at the top right of the screen.  This is me right here (indicating).  This is the defendant running from me.

Q    Okay.  Let's just wait a minute, please.

At this time, you're at the back of the store, right, what we're not seeing?

A    Correct.  You cannot -- there's no camera there.

Q    Who was that running?

A    That was Sergeant Ansell that was coming back to check on me behind the building.

Q    So all this time that we're waiting right now, you're still trying to apprehend him?

A    Correct.  Part of the problem here was I dropped my handcuffs in the process of this, and so we were waiting for somebody else to come back there with some handcuffs.

Q    Who are those two people?

A    Sergeant Ansell on the left right here, and this individual was a citizen that had kind of seen what was going on and had seen the other officers dealing with the other two people while I was running around the corner, and he intervened and basically offered to help us.

1      Q    Can you please stop it there?

2      Okay.  Where is the defendant at this time?

3      A    I believe that Detective Robertson had responded.

4 He's the one that came with handcuffs, and I believe he has

5 grabbed the defendant.  And you can't see

6 Detective Robertson's car because there's a driveway on this

7 side of the parking lot that's for semi trucks.  I really

8 don't know exactly where his car was parked, but it's my

9 belief that he was with Detective Robertson at that point

10 being placed in that car until he was then brought up here

11 where the other two people are by this squad car now.

12      Q    Okay.  If you just back it up a little bit.

13 Agent Hoalcraft, if you can just back it up a little bit

14 where she starts coming back into the scene.  Okay.  Can you

15 stop it?

16      Is that you?

17      A    That's me.

18      Q    And what do you have in your hand?

19      A    In my left hand is the satchel that I pointed out

20 earlier that the defendant had been wearing and retrieving

21 these cards from.

22      MS. MORENO-TAXMAN:  Your Honor, at this time, I

23 would move into evidence Exhibits 17A through 17E that were

24 also stipulated to.

25      THE COURT:  All right.  The Court will receive

1     Exhibit 17A through 17E inclusive.

2     BY MS. MORENO-TAXMAN:

3          Q    Now, could you please play for us Exhibit -- did

4     you search the vehicle that had the Tennessee plates?

5          A    Yes.

6          Q    Okay.  And did you find a receipt in that vehicle?

7               Let me show you a receipt.  You can tell me if it

8     looks familiar to you.  Do you recognize this?

9               MR. ULLER:  What exhibit is this?

10              MS. MORENO-TAXMAN:  18.

11              MS. KRAFT:  18B.

12              THE WITNESS:  Yes.  This is a receipt --

13              MR. ULLER:  Judge, I'm going to object.  We've

14    talked about this previously.  Relevance.

15              THE COURT:  All right.  I'll see counsel at

16    sidebar.

17         (Bench conference.)

18              MS. MORENO-TAXMAN:  Judge, this is a receipt that

19    was found in the vehicle.  It was purchased with one of the

20    cards that are the counterfeit access devices, and it shows

21    that $649.22 was charged on that card.

22              I know that we had talked -- the Court had not

23    ruled on this, and having heard the Court's admonitions, we

24    will not be putting in the Versace shoes or the shoebox.  We

25    just want to show the receipt that shows that the defendant

1   who was charged is an aider and abettor.

2            One of the items purchased was a $649.22 item, and

3   it was using one of the counterfeit access devices.

4            THE COURT:  Mr. Uller.

5            MR. ULLER:  I don't think they've demonstrated

6   that this is one of the counterfeit access devices that was

7   in my client's possession.

8            THE COURT:  Subject to the Government tying it up,

9   the Court will receive and allow testimony and the exhibit,

10  but it remains subject to the tying up.

11           MS. MORENO-TAXMAN:  What the evidence will show is

12  that this was one of the cards recovered from the

13  co-defendant, Florin.

14           THE COURT:  All right.

15           MR. ULLER:  Recovered from?

16           MS. MORENO-TAXMAN:  Florin.

17           MR. ULLER:  Okay.  So it's not one of the cards

18  that the defendant possessed?

19           MS. MORENO-TAXMAN:  Well, we would argue that he

20  possessed all of them as an aider and abettor.  Possession

21  doesn't have to be one -- only the person holding them.

22  Throughout his statements, he indicates that Florin was a

23  juvenile; that he paid him for his services and gave him a

24  percentage for helping him.  And so it is --

25           MR. ULLER:  That's interesting.

1          MS. MORENO-TAXMAN:  It is part and parcel of the

2     case.

3          THE COURT:  All right.  Again, subject to tying it

4     up, the objection is overruled.

5          MS. MORENO-TAXMAN:  Thank you, Your Honor.

6       (In open court.)

7          MS. MORENO-TAXMAN:  May I approach the witness,

8     Your Honor?

9          THE COURT:  You may.

10    BY MS. MORENO-TAXMAN:

11       Q    So back to Exhibit 18B and 18B1; can you tell us

12    what those are?

13         THE COURT:  Members of the jury, we've got a

14    technical issue, and as soon as we're ready to proceed,

15    we'll invite you back.

16         Again, I want to remind you, as I have throughout,

17    please do not discuss the case among yourselves.  I want

18    each of you to continue to keep an open mind that you've

19    pledged to keep until you've heard the balance of the

20    evidence and testimony to be offered together with the

21    Court's instructions on the law.

22         The Court stands in recess.

23       (Break.)

24       (Jury present.)

25         THE COURT:  Members of the jury, I believe we've

1    solved our technical issue, and as I'm sure you've all heard

2    many times, technology is a wonderful thing, but it has to

3    work.

4            So, Ms. Moreno-Taxman, you may continue.

5    BY MS. MORENO-TAXMAN:

6        Q    Detective Hinke, looking at Exhibit 18B and B1,

7    what are those?

8        A    It's an original and a photocopy of the same

9    receipt from the Neiman Marcus Department Store in

10   St. Louis.

11       Q    And when you look at that receipt, was it paid

12   with a credit card?

13       A    Yes, it was, with a Visa.

14       Q    Okay.  And is there an account number identified

15   on this?

16       A    It appears like the last four digits might be

17   1255.

18       Q    Can you blow that up for us, please?

19            Does that look like that to you?

20       A    Correct.

21       Q    Okay.  And was this a receipt that you found in

22   the white minivan with the Tennessee plates?

23       A    Correct.  It was located actually inside of a

24   shoebox in that van.

25            MS. MORENO-TAXMAN:  All right.  Your Honor, I move

```
 1      in Exhibits 18B and B1.
 2                THE COURT:  All right.  The Court will receive
 3      Exhibits 18B and 18B1.
 4                MS. MORENO-TAXMAN:  Your Honor, just for
 5      completion of the record, I would also move into evidence
 6      Exhibits 17A through 17G.
 7                THE COURT:  All right.  The Court will receive
 8      Exhibit 17A through Exhibit 17J.
 9                MS. MORENO-TAXMAN:  Thank you, Your Honor.
10                THE COURT:  I believe I misspoke.  It's "G," not
11      "J."
12                MS. MORENO-TAXMAN:  Thank you, Your Honor.
13      BY MS. MORENO-TAXMAN:
14          Q    After the defendant was apprehended, where was he
15      taken?
16          A    He was taken to the Oshkosh Police Department.
17          Q    And did any other law enforcement agents meet you
18      there?
19          A    Yes.  Agents from the United States Secret Service
20      were there.
21          Q    Okay.  And do you recognize anybody in this
22      courtroom as being one of those agents?
23          A    I do.
24          Q    And where is he seated?
25          A    He's to your left, and that's Agent
```

1    Zach Hoalcraft.

2         Q    Okay.  And what were they there for?

3         A    Well, they were there for assistance.  We had

4    requested their assistance in this matter, and they were

5    somewhat aware, I believe, of the information we were

6    following up on as well.

7         Q    And which room was the defendant taken to at

8    first?

9         A    I wasn't there, but it's my understanding he was

10   placed in a conference room.  I did see him there very

11   briefly.

12        Q    And from there where was he placed?

13        A    He was placed in a downstairs interview room at

14   our police department shortly thereafter.

15        Q    Did you end up going into that interview room?

16        A    I did.

17        Q    And is that a video and audiotaped room?

18        A    Yes.

19        Q    And prior to going in, did you ask Special Agent

20   Hoalcraft if the defendant had been advised of his rights?

21        A    Yes.

22        Q    And you reviewed Exhibits 12A and 12B, the two

23   videotapes of the -- two of the videotapes in which you were

24   involved?

25        A    In the downstairs interview room?

```
 1        Q    Yes.

 2        A    Yes.

 3        Q    Okay.  And can you tell us -- well, let's first

 4   look at Exhibit 12A, please.

 5             Can you just stop that a second, please?

 6             Okay.  So where are you in this video?

 7        A    We're in an interview room, which clearly is video

 8   and audiotaped.  We're in the downstairs portion of the

 9   Oshkosh Police Department, and the person I was speaking to

10   was an officer that was in the hallway just before I sat

11   down here.

12        Q    Okay.  And who are you talking to?

13        A    This is the defendant.

14        Q    And he's still wearing the clothes he was arrested

15   in, right?

16        A    That's correct.

17        Q    Okay.  Please continue.

18        (Video played to the jury.)

19   BY MS. MORENO-TAXMAN:

20        Q    When you're referring to "Florin," that's the

21   juvenile that was with him?

22        A    Yes.

23        Q    And what are you talking about with regard to him

24   lying about the van?

25        A    Florin told me that the van belonged to the
```

defendant, and the defendant stated, no, that the van

belonged to Florin.  So they were both pointing the fingers

at each other as to who owned the van or who had possession

of the van.

        Q    Please, continue.

        (Video played to the jury.)

BY MS. MORENO-TAXMAN:

        Q    I would like you to look at Exhibit 14, please.  I

have a copy for you so you can see it better.  Can you tell

us what that is?

        A    This is a photocopy of an Oshkosh Police

Department permission to search form.

        Q    Who filled that out?

        A    I filled it out with the defendant.

        Q    Okay.  And was that before you went into his

phone?

        A    Yes.

        Q    And did he approve and agree to have his phone

searched?

        A    Yes, he did.

             I want to correct myself.  I don't know if it was

before -- I can't remember if it was before where he was

being cooperative here or just afterwards.  I want to think

that I filled this out after we did this here, but he had

already told me that he wanted me to bring his phone.

1     Q    Okay.  So he had already consented to you?

2     A    Yes.  He had already consented.  I think we filled

3  this out at the end because we were going to -- he was going

4  to leave, and we were going to leave, and I still wanted to

5  look at his phone after the fact, and he said it was okay.

6          MS. MORENO-TAXMAN:  Okay.  Your Honor, I move into

7  evidence Exhibit 14.

8          THE COURT:  All right.  The Court will receive

9  Exhibit 14.

10  BY MS. MORENO-TAXMAN:

11     Q    And now could you please look at Exhibit 15?  Can

12  you tell us what that is?

13     A    This is a copy of my evidence envelope that I

14  completed that contains the defendant's cell phone, which is

15  a Boost Mobile iPhone, and I wrote down the passcode number

16  or numbers.  He provided that to me so I could unlock it.

17          MS. MORENO-TAXMAN:  Your Honor, I would move into

18  evidence Exhibit 15.

19          THE COURT:  All right.  The Court will receive

20  Exhibit 15.

21          MS. MORENO-TAXMAN:  You can continue.

22      (Video played to the jury.)

23  BY MS. MORENO-TAXMAN:

24     Q    I would like to show you Exhibit 13.  Can you

25  identify that for us?

1          A      This is a screenshot of the individual that the

2    defendant pointed out as being his boss.  This is -- I

3    believe it's a Facebook Messenger contact screen card.

4                MS. MORENO-TAXMAN:  Your Honor, I would move

5    Exhibit 13 into evidence.

6                THE COURT:  The Court will receive Exhibit 13.

7                MS. MORENO-TAXMAN:  Thank you.

8          (Video played to the jury.)

9    BY MS. MORENO-TAXMAN:

10         Q      So during this interview, was he handcuffed?

11         A      No.

12         Q      And it looks like it was a pretty casual

13   interview?

14         A      Very casual.

15               MS. MORENO-TAXMAN:  Your Honor, at this time, I

16   would move in video 12A into evidence.

17               THE COURT:  All right.  The Court will receive

18   Exhibit 12A.

19   BY MS. MORENO-TAXMAN:

20         Q      And were you present for the beginning of the

21   second interview as well?

22         A      I believe the Secret Service may have come in, and

23   they wanted to talk to him some more.  And I was in the room

24   briefly, but I left pretty much right away.

25         Q      Okay.  I would like you to listen to 12B, please.

1       A    Okay.

2       (Video played to the jury.)

3  BY MS. MORENO-TAXMAN:

4       Q    What are you showing him there?

5       A    So in my right hand is my work cell phone, and on

6  that phone were some photographs that were sent to me and

7  other detectives that was part of the information we were

8  working on.  And I had shown him a photograph and asked him

9  to identify who was in it because he had agreed that he

10  would do that.  And in here he admits that it was him and

11  also Florin, and it was three or four months ago.

12       Q    Okay.  And were those photographs actually stamped

13  during January of 2018?

14       A    I honestly can't remember off the top of my head.

15       Q    When he told you it was three or four months ago,

16  did that appear consistent to you with the time frame?

17       A    It was close.  If I remember correctly, it was,

18  like, maybe a month off or something like that, but it was

19  pretty close.

20       Q    Okay.  And what kind of photos were you showing

21  him?

22       A    They were surveillance photos, I believe.

23       MR. ULLER:  Objection.  Relevance.

24       THE COURT:  The objection is overruled.

25       You may answer the question.

1          THE WITNESS:  The photographs were surveillance

2    photos that were from other financial institutions or banks.

3    BY MS. MORENO-TAXMAN:

4          Q    Okay.  And what state were they from?

5          A    Tennessee.

6          Q    And what did the picture -- the pictures that you

7    show depict him doing?

8          A    He was in front of an ATM machine.

9          Q    And he identified himself as being that

10   individual?

11         A    Yes, he did.

12         Q    All right.  Please continue.

13         (Video played to the jury.)

14         MS. MORENO-TAXMAN:  Your Honor, at this time, I

15   would move Exhibit 12B, subject to connection, with regard

16   to the rest of the videotape.

17         THE COURT:  All right.  Exhibit 12B will be

18   received subject to tying it up.

19         MS. MORENO-TAXMAN:  I have no further questions at

20   this time for this witness.

21         THE COURT:  All right.  Thank you.

22         Mr. Uller, you can cross-examine.

23                          CROSS-EXAMINATION

24   BY MR. ULLER:

25         Q    When you interviewed Mr. Muresanu, did you obtain

1  background information?  You call it sometimes pedigree

2  information?

3      A     No.

4      Q     Were you able to determine his age?

5      A     I believe we were with his identification.

6      Q     And how old was Mr. Muresanu when you arrested

7  him?

8      A     I believe he's 18.

9      Q     He was cooperative with you in your

10 interrogations, or your conversations with him?

11     A     During my interrogation -- obviously, he ran from

12 me in the beginning, but after that he was very cooperative

13 with me.

14     Q     You've talked a little bit about the receipt from

15 the department store?

16     A     Yes.

17     Q     That evidence, or that receipt was connected to

18 one of the other individuals arrested; is that correct?

19     A     Well, that's the defendant's information that he

20 provided me, that it belonged to Florin.

21     Q     Did you tie up the cards at all?  Were you able to

22 determine whether that receipt was connected to any of the

23 cards that Mr. Muresanu possessed?

24     A     I don't know that any follow-up was done with

25 that, per se.

1          MR. ULLER:  That's all, Your Honor.

2          THE COURT:  Anything further?

3          MS. MORENO-TAXMAN:  No, Your Honor.

4          MS. KRAFT:  The next witness is Detective Dean

5     Artus.

6          THE COURT:  Thank you, Detective.  You're excused.

7     You may step down.  You may give counsel all the exhibits

8     that are before you.

9          MR. ULLER:  Judge, while we're waiting for the

10    witness, can we have a brief sidebar?

11         THE COURT:  Certainly.

12      (Bench conference.)

13         MR. ULLER:  You know, one statement has come in.

14    That statement involved Mr. Muresanu admitting putting the

15    devices on, taking them off, and knowing how it all works.

16         Again, I think at this point, any putting on

17    testimony or evidence of the other statements where he says

18    the exact same thing is cumulative at this time, and under

19    403, I'm going to move to exclude any further evidence of

20    that as a waste of time.  Obviously, I didn't put on a

21    vociferous cross-examination of that witness about that.

22         That would be my position.

23         THE COURT:  It is the Government's case.  If you

24    want Ms. Kraft and Ms. Moreno-Taxman to ask me to enter into

25    a stipulation that he essentially said the same things to

1    other law enforcement, that corroborates his own statements,

2    corroborates evidence as testimony, that's fine, but absent

3    that, it's their case.

4            MS. MORENO-TAXMAN:  We decline, Judge.

5            THE COURT:  Certainly.

6            MS. MORENO-TAXMAN:  Thank you.

7        (In open court.)

8               DEAN ARTUS, WITNESS, SWORN

9                   DIRECT EXAMINATION

10   BY MS. KRAFT:

11       Q    Good afternoon, Detective Artus.  Will you please

12   tell the ladies and gentlemen of the jury how you're

13   employed.

14       A    I'm a detective with the City of Oshkosh Police

15   Department.

16       Q    How long have you worked for the Oshkosh Police

17   Department?

18       A    I've worked approximately 26 1/2 years.

19       Q    And how long have you been a detective?

20       A    Approximately 23 years.

21       Q    Can you tell us whether or not you were involved

22   in an investigation that started at a Motel 6 in the City of

23   Oshkosh on May 16th, of 2018?

24       A    I was involved.

25       Q    And can you tell us at what point you became

1    involved in that investigation?

2         A    My involvement began with the surveillance of a

3    suspicious vehicle at the Motel 6 parking lot.

4         Q    You passed Detective Hinke as she was leaving

5    today?

6         A    Yes.

7         Q    Was she involved in that investigation as well?

8         A    Yes, she was.

9         Q    Do you recall approximately what time it was that

10   you began your involvement in the investigation?  What time

11   of day?

12        A    I probably became involved around 5:00 p.m. that

13   afternoon.

14        Q    And do you typically wear a uniform, or do you

15   work in plain clothes?

16        A    I work in plain clothes.

17        Q    And you were in plain clothes on May 16th; is

18   that correct?

19        A    That is correct.

20        Q    Were you working with any other individual when

21   you started your part in that investigation on May 16th?

22        A    Yes.  Sergeant Ansell, a sergeant in the detective

23   division, was also with me in my vehicle.

24        Q    And he also was there basically to conduct

25   surveillance of the activity at the motel; is that correct?

1      A      That is correct.

2      Q      Did you have information about any particular

3  vehicle that was perhaps involved in suspicious activity at

4  the motel that day?

5      A      Yes.

6      Q      What type of vehicle was that?

7      A      It was a white van with Tennessee license plates.

8      Q      Were you, from the vantage point of your

9  surveillance, able to see such a vehicle at the motel on

10  May 16th?

11      A      Where I was parked, I could not see where it was

12  parked, but as it left, I did see the vehicle.

13      Q      Okay.  And how is it that you first -- were you

14  alerted by another detective that it was leaving, or did you

15  actually see it leaving the parking lot from the motel at

16  some point?

17      A      I saw it leaving.

18      Q      What did you do when you saw it leave the motel?

19      A      Once I saw the vehicle leave the motel lot, we

20  followed that vehicle.

21      Q      And "we" is you and Sergeant Ansell?

22      A      Yes.

23      Q      Okay.  Was it your vehicle or Sergeant Ansell's

24  vehicle that you were in that day?

25      A      It was my vehicle.

1      Q    So were you driving?

2      A    Yes.

3      Q    Okay.  How far did you follow that vehicle?

4      A    The vehicle only went a short distance, probably

5  half a mile, and immediately pulled into a Kwik Trip parking

6  lot.

7      Q    Okay.  In front of you is a folder that has some

8  exhibits in it.  Could you open it up, please?  Can you find

9  the top exhibit?  It should be marked "Exhibit 5C."  Do you

10  recognize that?

11      A    Yes.

12      Q    What do you recognize that to be?

13      A    That is an aerial photograph of a map of the City

14  of Oshkosh depicting the route that van took.

15      Q    Okay.  And does that aerial look on that map as

16  you recall it looking on May 16th of 2018?

17      A    Yes.

18      Q    And on the map, is the location of the Motel 6

19  visible?

20      A    Yes, it is.

21      MS. KRAFT:  Your Honor, at this point, I would

22  move into evidence Exhibit No. 5C, and I would like to --

23  well, obviously, it's published already.

24      THE COURT:  The Court will receive Exhibit 5C.

25  \\\

BY MS. KRAFT:

Q    Mr. Shepherd, can we have the pointer maybe?  Is it up there?  Oh, okay.

Can you take that pointer, Detective Artus, and show us where the Motel 6 was located -- or is located on that map?

A    Motel 6 is right here (indicating).

Q    Okay.  And there's a blue line that's been, I guess, created on that.  What does that blue line show?

A    That is the traffic path that the van took to get to Kwik Trip where he went into the lot and into the store.

Q    Okay.  And the record should reflect that Detective Artus has used a pointer to locate both the Motel 6 and the Kwik Trip; is that correct?

A    Yes.

Q    All right.  Approximately, what is the distance between those two locations?

A    I would estimate maybe half a mile.

Q    Okay.  And how long did it take you to get to the Kwik Trip when you observed the white van pull into the Kwik Trip parking lot?

A    Probably two or three minutes.

Q    Okay.  What did you do when you got to that area? Did you pull your vehicle into the Kwik Trip lot?

A    No.  As the van pulled into the Kwik Trip lot, I

1   continued eastbound on 9th Avenue passed the lot, and a

2   short distance down the road, I was able to turn around and

3   come back.

4       Q    Okay.  And where did you then locate your vehicle

5   when you returned?

6       A    When I returned, we pulled into the lot across the

7   street, which is a CVS Pharmacy, which gave us a vantage

8   point and a viewpoint of the front of the Kwik Trip store.

9       Q    Okay.  Now, I believe these exhibits have already

10  been received, but you should have in front of you 5A and

11  5C.  Are those in your folder?

12      A    5A and 5B.

13      Q    5A and 5B.  I apologize.  5C was the map.

14      A    Yes, I have 5A and 5B.

15      Q    And do you recognize what is depicted in those two

16  photographs?

17      A    Yes.  That is the van that we were following.

18      Q    All right.  Did you see where the van located

19  itself in the Kwik Trip parking lot when you took the

20  position that you took upon returning back to the area?

21      A    Yes.  They parked directly in front of the store

22  just to the east of the front doors of the Kwik Trip.

23      Q    And were you able to make any observations from

24  your vantage -- can you show us on the map where it is that

25  you parked your vehicle initially?

1        A       I parked my vehicle right in this general area

2   right here.   And the Kwik Trip is right here directly across

3   the street (indicating).

4        Q       What were you able to observe from your vantage

5   point at that time?

6        A       From that vantage point, I was able to see through

7   the front Kwik Trip windows using binoculars and could see

8   activity inside the store.

9        Q       What type of activity did you see?

10        A       Once I had arrived at CVS, I could not see the

11   three individuals that had been in the van that we saw leave

12   the Motel 6 lot.   As I continued to watch the store, I can

13   see those three individuals come out of an area that is

14   familiar to me in that Kwik Trip to be the bathroom area.

15        Q       Were you in radio communication with

16   Detective Hinke at that point in time?

17        A       Yes.

18        Q       And did she provide any information to you that

19   caused you to change your location?

20        A       Yes.

21        Q       What information caused you to change your

22   location?

23        A       Detective Hinke had gone into the gas station and

24   indicated to us, as she exited, that she observed suspicious

25   activity with the three males at the ATM machine and looked

1    like they were using counterfeited cards.

2        Q    So what did you do then?

3        A    So, at that point, myself and Detective Ansell

4    repositioned our vehicle, drove into the Kwik Trip lot and

5    parked and were waiting for those three individuals to come

6    out of the store.

7        Q    Did they do that?

8        A    They did.

9        Q    And what happened when the three individuals came

10   out?

11       A    Once they came out, Detective Hinke initially

12   tried to make contact, and almost immediately there was a

13   foot chase.  One individual had run around the front of my

14   vehicle towards the east.  Myself and Detective Sergeant

15   Ansell followed him and ultimately arrested him.

16            Detective Hinke had run to the west direction and

17   ultimately arrested the defendant.

18            After the first individual that myself and

19   Sergeant Ansell had arrested was in custody, I then got up

20   and went to the front door area and made contact with the

21   third individual and detained him.

22       Q    Okay.  And who is the first individual who was

23   detained that you helped Sergeant Ansell with?  What was his

24   first name?

25       A    He was a juvenile identified as Florin.

1      Q    And how about the second juvenile?

2      A    Another juvenile identified, first name as Surdo.

3      Q    Okay.  And do you see the third individual who was

4 at that Kwik Trip in court today?

5      A    Yes, I do.

6      Q    And where is that person sitting, and what is he

7 wearing?

8      A    He's seated at the table behind you wearing a gray

9 suit.

10      MS. KRAFT:  I would request the record reflect the

11 identification of the defendant, Your Honor.

12      THE COURT:  The record will so reflect.

13 BY MS. KRAFT:

14      Q    And by who was he apprehended?

15      A    Detective Hinke.

16      Q    Now, did you, before today, have an opportunity to

17 review some video surveillance footage that was recovered

18 from the Kwik Trip store which recorded the events that

19 happened outside the Kwik Trip store on May 16th?

20      A    Yes, I did.

21      Q    And when you reviewed that video, were you able to

22 see yourself and Detective Ansell and Detective Hinke

23 engaged in activity?

24      A    Yes.

25      MS. KRAFT:  Okay.  Your Honor, at this point, I

1    would like to publish Exhibit No. 17.  It's already been

2    received in evidence.

3              THE COURT:  All right.  The request is granted.

4              MS. KRAFT:  Thank you.

5    BY MS. KRAFT:

6         Q    Do you see yourself in that video, Detective?

7         A    Yes, I do.  This is me.

8         Q    And who is the individual next to you?

9         A    That is Sergeant Ansell.

10        Q    Would you continue?

11             What are you doing at that point?

12        A    At that point, we were approaching the three

13   individuals as they were coming out of the store.

14        Q    Okay.  And can you just stop and back up a minute,

15   Agent Hoalcraft?

16             Who is that at the lower left-hand corner of the

17   screen?

18        A    That is Detective Hinke.

19        Q    And what is she doing?

20        A    She is chasing this individual, who is the

21   juvenile identified as Florin.

22        Q    Now what is she doing?

23        A    She is going back to the front door area

24   approaching the other two individuals that had come out of

25   the store.

1      Q      The defendant and the second juvenile?

2      A      That is correct.

3      Q      Continue on.

4            Okay.  Do you see what's happening behind that car

5      that's furthest to the left of the screen as we're looking

6      at it?

7      A      Yes.  That was me coming back to the front door

8      area and making contact and detaining the third individual.

9      Q      And at some point, do you get all three of the

10     subjects in custody?

11     A      Yes.

12           (Video played to the jury.)

13     BY MS. KRAFT:

14     Q      Now, did you have an opportunity to search any of

15     those individuals?

16     A      Yes, I did.

17     Q      Who did you search?

18     A      The juvenile identified as Florin.

19     Q      And did you recover any items from him?

20     A      Yes, I did.

21     Q      I'm handing you what's been marked for

22     identification as 2A.  Do you recognize what that is?

23     A      Yes.  This is our evidence envelope of which I had

24     documented two cards that I had recovered from Florin out of

25     his wallet.

Q    And in front of you there should be a photograph
that's marked "2B" for identification purposes.  Do you
recognize that?

A    Yes.

Q    What do you recognize it to be?

A    Those are the two cards that I had recovered from
the juvenile Florin's wallet.

MS. KRAFT:  Okay.  I would move into evidence at
this point, Your Honor, Exhibit Nos. 2A and 2B, and I would
request permission to publish.

THE COURT:  All right.  The Court will receive
Exhibits 2A and 2B, and you may publish.

MS. KRAFT:  Mr. Hoalcraft, would you bring up 2B?
BY MS. KRAFT:

Q    Now, if we can focus on the top card.

Detective Artus, are you able to see on the
screen -- or if you have to look at the card itself -- the
last four digits that are on that card that was recovered
from Florin?

A    The last four digits are 8540.

Q    Thank you.

Now, did you locate any other items of evidence on
the person of the juvenile who was identified as Florin?

A    Yes, I did.

Q    What else did you locate?

1          A     I recovered 12 gift cards from his pocket as well

2     as 6 receipts in his pocket as well.

3          Q     Okay.  And now I'm going to hand you an exhibit

4     that's been marked 3A for identification purposes.  Can you

5     tell me whether or not you recognize that?

6          A     Again, this is an evidence envelope that I had

7     used to document the 12 cards that I had taken from the

8     pocket of the juvenile Florin along with the 12 cards.

9          Q     And in front of you in the folder should be an

10    exhibit that's marked "3B."  Do you see that?

11         A     Yes.

12         Q     Can you tell me whether or not that is a

13    photograph of the 12 cards that are in Exhibit 3A?

14         A     It is.

15         Q     We should have a 3C.

16              Let's do this.  There is an exhibit in the folder

17    in front of you that's marked "3C."  Do you know what those

18    are?

19         A     Yes.  These are photocopies of the six receipts

20    that I took off of the juvenile Florin that were in his

21    pocket.

22              MS. KRAFT:  Okay.  I would move into evidence

23    Exhibit No. 3C, which is a photograph of the six receipts,

24    Your Honor.

25              THE COURT:  All right.  The Court will receive

1    Exhibit 3C.

2              MS. KRAFT:  May I publish?

3              THE COURT:  You may.

4    BY MS. KRAFT:

5         Q    Detective Artus, I would like to direct your

6    attention to the receipt that's in the upper left-hand

7    corner of the screen as we are looking at it.  Can you tell

8    us, what is the date on that receipt?

9         A    5-12-2018.

10        Q    Now, that appears to be an ATM receipt; is that

11   correct?

12        A    Yes.

13        Q    Okay.  And is there an address where that ATM

14   would've been located?

15        A    Yes.  753 West Highway 50, O'Fallon, Illinois.

16        Q    Are there digits that represent the last four

17   digits of the card number on that receipt?

18        A    Yes.  9973.

19        Q    And can you tell us what type of transaction by

20   looking at that receipt -- what type of transaction that

21   receipt reflects?

22        A    That appears to be a balance inquiry of that

23   account.

24        Q    Okay.  And what is the available balance on that

25   receipt at that time?

1        A    $196.80.

2        Q    All right.  Now, can we look at the receipt that's

3  on the lower right-hand side of the screen?

4          And can you tell us the date on that receipt?

5        A    5-12-2018.

6        Q    Is that the same location as the receipt that we

7  looked at a minute ago?

8        A    Yes, it is.

9        Q    And what is the card number?

10       A    It's the same last four, 9973.

11       Q    And what does that receipt reflect -- what about

12  the transaction does that receipt reflect?

13       A    That receipt reflects a withdraw from the account

14  of $180 with a $3 terminal fee.

15       Q    For a total of $183?

16       A    Yes.

17       Q    From that $196 balance?

18       A    That is correct.

19       Q    Now, Detective Artus, can we look at the receipt

20  that is on page 2 of this exhibit on the left-hand side?

21  And what is the date on that receipt?

22       A    5-12-2018.

23       Q    And does that receipt reflect the same location as

24  the other two receipts we looked at?

25       A    Yes, it does.

1      Q      And what is the card number, the last four digits
2  of the card number on that receipt?
3      A      That card number is 0708.
4      Q      And what type of transaction does this receipt
5  reflect?
6      A      Again, this is a balance inquiry on that account.
7      Q      And then if we go back to the first page, and we
8  look at the receipt that's at the upper right-hand corner,
9  what is the date on that receipt?
10     A      5-12-2018.
11     Q      Is it the same address?
12     A      Yes, it is.
13     Q      What is the card number?
14     A      0708.
15     Q      And what type of transaction does that receipt
16  reflect?
17     A      This reflects a $300 withdraw with a terminal fee
18  of $3, for a total of $303 from that account.
19     Q      Okay.  And then, finally, the second receipt, the
20  one on the right-hand side of page 2, what is the date on
21  that?
22     A      5-12-2018.
23     Q      And is it the same address?
24     A      It is not.
25     Q      What address is this one?

1     A    1803 North Illinois Street, Swansea, Illinois.

2     Q    And is there a card number?  Are the last four

3  digits of the card number there?

4     A    Yes.  6891.

5     Q    And what type of transaction does that receipt

6  reflect?

7     A    This is a balance inquiry for that account.

8     Q    All right.  And then if we can go back to page 1,

9  the receipt that's in the lower left-hand corner of this

10  exhibit, what is the date of that?

11     A    5-12-2018.

12     Q    Is this also at the Swansea, Illinois, address?

13     A    It is.

14     Q    What are the last four digits of that card?

15     A    6891.

16     Q    What type of transaction is reflected on this

17  receipt?

18     A    This is a withdraw of $100 plus a $3 service -- or

19  a terminal fee for a total of $103 withdraw from that

20  account.

21     Q    Okay.  So would it be fair to say on this date a

22  total of about $598 was withdrawn from three cards, using

23  three cards?

24     A    Yes.

25     Q    Now, in front of you should also be an exhibit

1    that's marked 8C, which I believe has already been received

2    into evidence.  Would you see if you can locate that?

3         A    I have it.

4         Q    Okay.  Do you recognize that?

5         A    Yes.

6         Q    Do you recognize the person who is depicted in

7    that?

8         A    Yes.  This is the juvenile we identified as

9    Florin.

10        Q    The juvenile from whom you recovered the two cards

11   that you testified were in his wallet, the 12 cards that

12   were in his pocket and the 6 receipts we just looked at; is

13   that correct?

14        A    That is correct.

15        Q    Now, were you part of the team that conveyed these

16   actors down to the Oshkosh Police Department?

17        A    Yes.  I conveyed the defendant to the police

18   department.

19        Q    Did you have any further interaction with him that

20   day?

21        A    Much later in the day, not that night.

22        Q    Okay.  At some point, did you participate in an

23   interview of the defendant?

24        A    Yes.

25        Q    All right.  Do you recall what date and time of

1    day that was?

2        A    I interviewed him on 5-17-2018 and again on

3    5-18-18.  Both would've been in the afternoon hours.

4        Q    On either of those dates, were you the person who

5    advised him of what those things that are commonly referred

6    to as the Miranda warnings?

7        A    Yes, I was.

8        Q    On which date?

9        A    I believe it was both dates, but I'm not 100% sure

10    on 5-17.

11        Q    In front of you, there should be an exhibit that

12    is marked "14A."  Do you see that?

13        A    I do.

14        Q    Okay.  What is that?

15        A    This is the Miranda form that we use, and this is

16    the Miranda form I read to the defendant on 5-18-2018 at

17    approximately 2:22 p.m.

18        Q    And were you aware that he had been interviewed by

19    others prior to that day?

20        A    Yes, I was.

21        Q    Why is it that you sought to interview him further

22    on that day?

23        A    Just to gather more information about the overall

24    operation of what he was involved in.

25        Q    Okay.  What rights did you advise the defendant

1    that he had?

2         A    I advised him he had the right to remain silent.

3    Anything he said could and would be used against him in a

4    court of law.  He had the right to consult with a lawyer

5    before any questioning and have a lawyer present with him

6    during questioning.  If he cannot afford to hire a lawyer,

7    one would be appointed to represent him at public expense

8    before or during any questioning if he wished.  If he

9    decided to answer questions without a lawyer present, he had

10   the right to stop the questioning and remain silent at any

11   time he wished and the right to ask for and have a lawyer at

12   any time he wished including during the questioning.

13        Q    In your mind, did he understand those rights when

14   you advised him?

15        A    Yes.

16        Q    Did he say or do anything to indicate to you that

17   he did not understand?

18        A    He did not.

19             MS. KRAFT:  Your Honor, at this time, I would move

20   into evidence Exhibit No. 14A and ask to publish.

21             THE COURT:  You may.

22   BY MS. KRAFT:

23        Q    And that's the form that you just read to us; is

24   that correct?

25        A    Yes, it is.

1      Q     And is your signature on that form?

2      A     Yes, it is, as the officer giving the rights.

3      Q     And you were with another officer at that time; is

4  that correct?

5      A     Yes.  I was with Detective Robertson.

6      Q     Who is also an Oshkosh police detective?

7      A     Yes.

8      Q     Did Mr. Muresanu sign the form?

9      A     Yes, he did.

10     Q     Where is his signature on the form?

11     A     His signature is on the signature line right there

12  (indicating).

13     Q     And is he the person who also wrote "yes," saying

14  that he understood the rights and was willing to talk?

15     A     Those were questions I asked him, and I wrote the

16  responses.

17     Q     Now, have you had an opportunity to listen to

18  excerpts of that interview that you and Detective Robertson

19  had with him that day?

20     A     Yes.

21           MS. KRAFT:  Okay, Your Honor, at this time, I

22  would offer into evidence Exhibit No. 12F, along with the

23  transcript 12F1.

24           THE COURT:  All right.  I believe the exhibit has

25  been received.  You may play it.

1          MS. KRAFT:  Thank you.

2      (Video played to the jury.)

3  BY MS. KRAFT:

4      Q    Can you stop it there?

5          Now, when you and Detective Robertson are asking

6  about skimmers, why are you asking that?

7          MR. ULLER:  Objection.  Relevance.

8          THE COURT:  The objection is overruled.

9          You may answer.

10         THE WITNESS:  To be able to get card numbers to

11 put on gift cards, they would need a skimmer on an ATM

12 machine to recover those cards from unknowing victims and

13 get the pin numbers.

14 BY MS. KRAFT:

15     Q    So do you understand he's telling you that he's

16 the one who is putting the skimmers on?

17     A    Yes.

18     (Video played to the jury.)

19         MS. KRAFT:  Those are all my questions for

20 Detective Artus.

21         THE COURT:  All right.  Thank you.

22         Mr. Uller, you may cross-examine.

23         MR. ULLER:  No, Your Honor.

24         THE COURT:  All right.  Thank you, Detective.  You

25 are excused.

1          You may call your next witness.

2          MS. KRAFT:  The next witness is Sergeant Brandon

3     Ansell -- not Sergeant Ansell.

4          MS. MORENO-TAXMAN:  We're calling Matthew

5     Palmieri.

6               MATTHEW PALMIERI, WITNESS, SWORN

7                     DIRECT EXAMINATION

8     BY MS. MORENO-TAXMAN:

9          Q    Can you please state your first and last name

10    spell your last name for the record?

11         A    Matthew Palmieri.  Last name is P-A-L-M-I-E-R-I.

12         Q    And how old are you, sir?

13         A    I'm 35.

14         Q    And other than for this trial, have you ever been

15    in Wisconsin?

16         A    No, I have not.

17         Q    And do you know the defendant, the person sitting

18    right there in the gray suit?

19         A    I do not.

20         Q    Okay.  Where did you bank in 2018, between January

21    and May of 2018?

22         A    Chase Bank.

23         Q    Okay.  And did you have a credit card or a debit

24    card for that?

25         A    Debit card.

1    Q    And did you have also a pin number for that debit

2    card?

3    A    Yes.

4    Q    And had you used that card in Nashville,

5    Tennessee?

6    A    Yes.

7    Q    And do you remember by any chance what your pin

8    number was?

9    A    I do.

10    Q    And what was that?

11    A    7884.

12    Q    Okay.  And did you at some point learn that your

13    card information had been stolen?

14    A    Yes.

15    Q    And how did you learn that?

16    A    I had tried to use the card, and it wasn't

17    accepting, so I called my bank, and then they told me.

18    Q    Mr. Palmieri, there's a folder in front of you

19    with your name; is that right?

20    A    Yes.

21    Q    And in there there's parts of your banking record;

22    is that correct?

23    A    Yes, that's correct.

24    Q    And can you tell us in whose name this account is?

25    A    Matthew Palmieri.

1      Q    Okay.  And was it a debit card?

2      A    Yes, that's correct.

3      Q    And what are the last four digits of your debit

4 card?

5      A    1014.

6      Q    Okay.  And is that the debit card that you were

7 talking about that wasn't working anymore for you?

8      A    Yes, that's correct.

9      Q    Okay.  And can you please look at the fourth page

10 of that exhibit?

11      MR. ULLER:  What exhibit is this?

12      MS. MORENO-TAXMAN:  I'm sorry.  This is Exhibit

13 22.

14      Your Honor, I would move into evidence Exhibit 22.

15      THE COURT:  All right.  With no objection, the

16 Court will receive Exhibit 22.

17 BY MS. MORENO-TAXMAN:

18      Q    Okay.  It's going to be a little hard for you to

19 see it, but you've got a hard copy in front of you.

20      Can you please highlight for us where the account

21 number is?  It says "Chase debit card."

22      We'll have the agent -- that's the account that

23 you mentioned?

24      A    Yes.

25      Q    Okay.  And that was the debit card that didn't

1    work anymore for you, right?

2         A    Yes, that's correct.

3         Q    Okay.  And can you please look at the fourth page

4    of that exhibit?

5         A    Uh-huh.

6         Q    And what is that?

7         A    This is --

8         Q    Is that your signature card?

9         A    Yes, that's correct.

10        Q    Okay.  And is that your signature?  You can see it

11   better up there, maybe.

12        A    I don't believe so.  I don't know.  My signature

13   is a little sloppier, but, yes.

14        Q    Could it be your signature?

15        A    Could it be?  Yeah, it could be.

16        Q    Did you open up that account?

17        A    Yes, I did open this account.

18        Q    Okay.  And when you opened this account, were you

19   the sole owner of this account?

20        A    Yes.  Yeah.

21        Q    Okay.  Did you at any time give permission to this

22   man sitting right here, Ionel Muresanu, to take anything

23   from your account?

24        A    No, I did not.

25        Q    Did you ever give him permission to use your

1    number, the number on your card that will connect directly

2    to your account?

3        A    No, I did not.

4        Q    Did you ever tell him or give him your pin number?

5        A    No.

6        Q    Now, I would like you to look at page numbers 5

7    and 6, please.  If you can go through those.

8            Looking at those records, is it fair to say that

9    you were in Nashville, Tennessee, between December 29th

10   and February 5th?

11       A    Yes, that's correct.

12       Q    So February 5th of this year and December 29th

13   of last year, right?

14       A    Yes.

15       Q    Okay.  And at the time that you used that card

16   without telling us where you lived, were you living in

17   Nashville, Tennessee at that time?

18       A    Yes.

19       Q    Okay.  And had you been traveling to other places?

20       A    Within that time frame?

21       Q    Yes.

22       A    No.

23       Q    Okay.  Now, I want to show you -- can you please

24   put up Exhibit 2A?

25            Okay.  I would like you to -- do any of those gift

1    cards look familiar to you?

2         A    No, they don't.

3         Q    Okay.  And I would like you to look at the

4    penultimate page, before the last page of this exhibit,

5    which is a copy Exhibit 1C.

6              Do you see a card down in the left-hand corner

7    that has the end number 6370?

8         A    Yes, I do.

9         Q    Okay.  Do you recognize that card?

10        A    No, I do not.

11        Q    Now, I'll show you the actual card -- that actual

12   card.  What kind of card is it?

13        A    This is a vanilla gift card.

14        Q    Okay.  Does it have your account number on it?

15        A    Let's see.

16        Q    Does your account end in 6370?

17        A    Yes, I believe so.

18        Q    You can go back and look at your account.  You had

19   testified earlier that it ended in 1014?

20        A    Yes, that's correct.

21        Q    Do you see that number anywhere on that card?

22        A    No, I don't.

23        Q    Okay.  And so did you give this defendant

24   permission to put on this vanilla card, on the magnetic

25   strip, the account number that would allow him to get into

1    your account?

2        A    No, I did not.

3        Q    And did you give him permission to put or use the

4    little yellow sticker on there with a pin number?

5        A    No, I did not.

6        Q    Now, are you a real person, sir?

7        A    Yes.

8        Q    Okay.  Sometimes we have to ask questions that

9    seem a little strange.

10       A    That's fine.

11       Q    And as we sit here today, you're saying you never

12   consented to this defendant taking your identity and using

13   it to get money -- trying to get money out of your account?

14       A    No.

15            MS. MORENO-TAXMAN:  I have no further questions.

16            THE COURT:  All right.  Thank you.

17            Mr. Uller, do you have any cross?

18                      CROSS-EXAMINATION

19   BY MR. ULLER:

20       Q    Mr. Palmieri, you don't know whether this

21   individual ever used your card, do you?

22       A    I don't know what that question -- can you be more

23   specific?

24       Q    You don't know whether the gentleman sitting next

25   to me ever used your card, do you?

1    A    Well, I was told by my bank that I wasn't able to

2  use my card, so, I don't, no.

3    Q    Thank you.

4         Your card wasn't used without your permission

5  May 16th of 2018, was it?

6    A    My card was not used without permission, no.  I

7  don't -- I don't know what the question is.

8    Q    Do you know whether your card was used without

9  your permission May 16th, 2018?

10   A    I do not, no.

11        MR. ULLER:  Okay.  Nothing further, Judge.

12                  REDIRECT EXAMINATION

13  BY MS. MORENO-TAXMAN:

14   Q    So, Mr. Palmieri, if the defendant possessed your

15  card, the identifying information on your card on May 15th

16  or 16th of this year, would he have had your permission to

17  possess it and have the information that identifies you?

18   A    No, he would not have.

19        MS. MORENO-TAXMAN:  Thank you, Your Honor.  No

20  further questions.

21        THE COURT:  All right.  Thank you, Mr. Palmieri.

22  You're excused.

23        You may call your next witness.

24        MS. MORENO-TAXMAN:  Erika Borg.

25

1      ERIKA BORG, WITNESS, SWORN

2              DIRECT EXAMINATION

3  BY MS. MORENO-TAXMAN:

4      Q    Ms. Borg, please state your first and last name

5  and spell your last name -- well, first and last name since

6  it's a little unusual spelling of your name.

7      A    Erika Borg, E-R-I-K-A and B-O-R-G.

8      Q    And do you have a middle initial?

9      A    L.

10     Q    Okay.  And do you see an exhibit in front of you

11  in that folder that is marked as Exhibit 23?

12     A    Yes.

13     Q    And are those some of the pages from your bank

14  account?

15     A    Yes.

16          MS. MORENO-TAXMAN:  Your Honor, at this time, I

17  would move into evidence Exhibit 23.

18          THE COURT:  All right.  The Court will receive

19  Exhibit 23.

20          MS. MORENO-TAXMAN:  I ask for it to be published.

21          THE COURT:  You may.

22  BY MS. MORENO-TAXMAN:

23     Q    Okay.  So, Ms. Borg, in your bank account, can you

24  tell us what the last four digits were -- this was an ATM

25  debit card account?

1          A     Yes.

2          Q     And what were the last four digits of your

3    account?

4          A     1829.

5          Q     Okay.  And can you please look at the fourth page

6    of this exhibit?

7          A     Yes.

8          Q     Okay.  What is that?

9          A     That's my signature on the personal signature

10   card.

11         Q     Okay.  And so that's how you opened up this

12   account?

13         A     Yes.  Yes.

14         Q     And you were the sole signator to that account?

15         A     Yes.

16         Q     Ms. Borg, do you know this man over here, the

17   defendant?

18         A     No, I do not.

19         Q     Okay.  Did you ever authorize him to get into your

20   account?

21         A     No.

22         Q     He's not one of the people you listed as your

23   authorized signatures?

24         A     No.

25         Q     Have you ever met him before?

1          A     No, I have never seen him.

2          Q     Have you ever been in Wisconsin before?

3          A     This is my first time.

4          Q     Okay.  In what area do you live in right now?

5          A     Nashville, Tennessee.

6          Q     Okay.  And if we look at those bank records in

7     front of you, it looks like you travel quite a bit; is that

8     right?

9          A     I do.  I travel for work.

10          Q     And so looking at those bank records, on the

11     seventh page, the eighth and ninth page --

12          A     Okay.

13          Q     Is it fair to say that you were in Nashville,

14     Tennessee, between January 18th and February 2nd?

15          A     Yes.  January 18th through February 2nd, yes,

16     I most definitely was.

17          Q     Okay.  And you remember those times?

18          A     I do because I had just quit my job and started a

19     new job.

20          Q     Okay.  And do you use ATM machines?

21          A     I do.

22          Q     Okay.  And when you use an ATM machine, what do

23     you do?

24          A     Well, I mean, the only reason to use an ATM

25     machine is to get cash, so I put in my pin and get cash.

1      Q    Did you do that when you were in Tennessee?

2      A    Yes, I did.

3      Q    Okay.  I would like you to now look at Exhibit 1C.

4      A    Is it up there?

5      Q    Yes, it's up there.  That's 1C.  Okay?

6           If we could please go to the fifth page.

7           Okay.  Do you see at the bottom left, that card

8 that has the number that ends in 4424?

9      A    Yes.

10     Q    Have you ever had that card before?

11     A    No, I have not.

12     Q    Okay.  And can you tell us what the pin number was

13 of your card, your debit card?

14     A    My debit card was 1130.

15     Q    Okay.  And do you see that number up there, 1130?

16     A    I do.

17     Q    Okay.  Did you give the defendant your pin number?

18     A    I did not.

19     Q    Okay.  You didn't put that sticker on there?

20     A    No, I did not.

21     Q    You've never seen this before?

22     A    I've never seen that before, no.

23     Q    I have to ask this question:  Are you a real

24 person?

25     A    I believe I'm pretty real.

1          Q     Okay.  So here, you can look at the card itself.

2          A     Okay.

3          Q     So if your information, your account number and

4    identifying information is on that magnetic strip, is that

5    with your permission?

6          A     No.

7          Q     And you've said that's your pin number, and that's

8    also without your permission?

9          A     Yeah, that's without my permission.

10               MS. MORENO-TAXMAN:  I have no further questions.

11               THE COURT:  All right.  Thank you.

12               Mr. Uller, any questions?

13               MR. ULLER:  No, Judge.

14               THE COURT:  All right.  Thank you.  You may step

15    down.

16               THE WITNESS:  Thank you.

17               THE COURT:  You may call your next witness.

18               MS. MORENO-TAXMAN:  I will call Shawna Edwards.

19                    SHAWNA EDWARDS, WITNESS, SWORN

20                         DIRECT EXAMINATION

21    BY MS. MORENO-TAXMAN:

22          Q     Ms. Edwards, can you please state and spell your

23    first and last name?

24          A     Yes.  Shawna Edwards.  First name S-H-A-W-N-A,

25    last name E-D-W-A-R-D-S.

1       Q    And do you have a middle initial?

2       A    Yes.

3       Q    Okay.  Ms. Edwards, do you see in front of you a

4  folder with your name on it?

5       A    Yes.

6       Q    Could you please look at what's been marked as

7  Exhibit 24 and tell me if you recognize it?

8       A    Yes.

9       Q    What is it?

10      A    My account.

11      MS. MORENO-TAXMAN:  Your Honor, I would move into

12  evidence Exhibit 24.

13      THE COURT:  All right.  The Court will receive

14  Exhibit 24.

15  BY MS. MORENO-TAXMAN:

16       Q    So, Ms. Edwards, did you have a debit card for

17  this account?

18       A    Yes, I did.

19       Q    And what was the account number, the last four

20  digits?

21       A    8856.

22       Q    Okay.  And do you know this man right here, the

23  defendant, Mr. Muresanu?

24       A    No, I do not.

25       Q    Have you ever seen him before?

1      A      No.

2      Q      Did you ever give him permission to take

3  information from your account and put it on a different card

4  so that he could access it and take money from your account?

5      A      No.

6      Q      Okay.  I want to ask you about -- have you used an

7  ATM before?

8      A      Yes.

9      Q      And have you used them in Kentucky?  Louisville,

10  Kentucky?

11      A      Yes.

12      Q      And as well as in Indiana; is that correct?

13      A      Yes.

14      Q      Okay.  And I would like you to look at -- on that

15  exhibit, the fourth page, please.  Do you see that signature

16  card?

17      A      Yes.

18      Q      Okay.  Whose signature is that?

19      A      That is mine.

20      Q      And you're the one who opened up this account?

21      A      Yes.

22      Q      And you're the only person on this account?

23      A      Yes.

24      Q      And did you ever put in or go to your bank and

25  say, "Excuse me.  I would like Mr. Muresanu to have access

1   to my account"?

2       A    No.

3       Q    And did you bring with you today your actual card

4   to that account?

5       A    I did, yes.

6       Q    I'm going to have you look at what's been marked

7   as Exhibit 1F1 and 1F.  Can you tell us, is one the actual

8   card and another a copy of the card?

9       A    Yes.

10      Q    Okay.  And what are the four numbers on that card,

11  the last four numbers?

12      A    8856.

13      Q    Okay.  So that's your actual card?

14      A    Yes.

15      Q    Okay.  And what is your pin number, if you

16  remember?

17      A    7149.

18      Q    Okay.

19      A    Wait.

20           MR. ULLER:  Ms. Moreno-Taxman, do you have a copy

21  of that exhibit for the Defense?

22           MS. MORENO-TAXMAN:  This is the one we showed you.

23           MR. ULLER:  Do you have a copy of it?

24           THE WITNESS:  Do you need this?

25           MS. MORENO-TAXMAN:  Yeah, I'll take the copy.

1          Your Honor, I move into evidence Exhibit 1F and

2    Exhibit 1F1.

3          THE COURT:  All right.  The Court will receive

4    Exhibits 1F and 1F1.

5    BY MS. MORENO-TAXMAN:

6    Q    Okay.  Now, looking at the bank records, is it

7    fair to say that you were in Louisville, Kentucky during the

8    January of this year?

9    A    Yes.

10   Q    Okay.  And when you brought this card with you

11   today, is this a card that you still can use?

12   A    No.

13   Q    Why is that?

14   A    I canceled that card.

15   Q    Because what?

16   A    I've canceled the card.

17   Q    Okay.  And why did you cancel that card?

18   A    I canceled the card due to the information that

19   was brought to my attention, that an unauthorized person had

20   access to the card.

21   Q    Okay.  And, Ms. Edwards, are you a real person?

22   A    Yes.

23   Q    And have you ever been in Wisconsin other than for

24   this case?

25   A    No.

```
 1              MS. MORENO-TAXMAN:  I have no further questions.

 2              THE COURT:  Thank you.

 3              Mr. Uller?

 4              MR. ULLER:  No questions, Your Honor.

 5              THE COURT:  All right.  Thank you.

 6              Ms. Edwards, you may step down.  You are excused.

 7              Members of the jury, we've reached that point for

 8    our afternoon recess this afternoon.  Again, I want to leave

 9    you with the admonition that I've given you throughout the

10    day, and that is please do not discuss this case or anyone

11    who has anything to do with it during the recess.

12              Once again, I want each of you to continue to keep

13    the open mind that you've pledged to keep until you've had

14    the benefit of the balance of the evidence and testimony to

15    be offered together with the Court's instructions on the law

16    and the closing arguments of counsel.

17              We'll stand in recess for 15 minutes.

18         (Break.)

19         (Jury present.)

20              THE COURT:  Ms. Moreno-Taxman, you may call your

21    next witness.

22              MS. KRAFT:  The next witness is Sergeant Brandon

23    Ansell, and he's in the courtroom.

24

25
```

BRANDON ANSELL, WITNESS, SWORN

DIRECT EXAMINATION

BY MS. KRAFT:

Q     Good afternoon, Sergeant.  Can you tell the ladies and gentlemen of the jury how you're employed?

A     Yes.  I am currently employed with the City of Oshkosh Police Department.

Q     And how long have you worked for the City of Oshkosh Police Department?

A     Approximately 17 years.

Q     And how long have you been a sergeant?

A     Maybe 10.

Q     And what are your general duties as a police sergeant for the Oshkosh Police Department?

A     Generally, I'm first-line supervisor for the criminal investigation division of the Oshkosh Police Department, supervisor for detectives, school resource officers.

Q     And do you supervise Detective Hinke and Detective Artus who have testified for us here this afternoon?

A     Yes, I do.

Q     Can you tell us whether you were involved with them in an investigation that occurred on May 16th of 2018 in Oshkosh, Wisconsin?

A     Yes, I was.

1       Q    And Oshkosh, of course, is in the Eastern District

2  of Wisconsin?

3       A    Yes, it is.

4       Q    How is it you became involved in that

5  investigation?

6       A    I was notified by those two detectives and several

7  others that they were surveilling Motel 6 in the City of

8  Oshkosh specifically looking for a group of people involving

9  a white minivan with Tennessee license plates.

10      Q    Okay.  And did you personally go to that location

11  with some of the other detectives in your department?

12      A    I did.  I was actually sitting with Detective

13  Artus in his vehicle.

14      Q    Okay.  And you were -- at that time, were you in

15  uniform or plain clothes?

16      A    Plain clothes.

17      Q    So were you sitting at the Motel 6 with

18  Detective Artus?

19      A    I was sitting across the street, which would be

20  east across from Motel 6 in the parking lot of the Perkins

21  restaurant.

22      Q    Okay.  And at some point, you saw some activity

23  involving that white minivan; is that correct?

24      A    Yes, we did.

25      Q    And what did you see?

1    A    We saw three individuals get in the white minivan

2    and proceed to leave the parking lot of Motel 6 going

3    northbound on Washburn and eastbound on 9th Avenue.

4    Q    And did you and Detective Artus do something to

5    respond to that?

6    A    We followed the vehicle to see where the occupants

7    were going.

8    Q    And were you able to see where the occupants were

9    going?

10   A    We did.  They went to a Kwik Trip gas station in

11   the City of Oshkosh on 9th Avenue near Koeller, which isn't

12   very far; maybe half a mile or even less from the location

13   where we were.

14   Q    Okay.  What did you do when you followed them --

15   when you got to that location that you had followed them to?

16   A    Initially, when we saw them pull into the Kwik

17   Trip gas station, we drove by not to alert them that

18   somebody was following.  We quickly turned around back and

19   parked across the street from the Kwik Trip gas station,

20   which would be on the north side of 9th Avenue in the CVS

21   Pharmacy lot.

22   Q    And, approximately, what time of day was this?

23   A    I would say evening.

24   Q    You don't remember specifically?

25   A    Maybe around 8:00.

1      Q   Okay.  How long did you remain at that stationary

2  location across from the Kwik Trip?

3      A   I would be estimating that we were there maybe

4  half hour to maybe 45 minutes.  Something like that.

5      Q   What, if anything, happened that made you leave

6  that location?

7      A   Detective Hinke was also assisting.  She had -- in

8  the meantime, while we were sitting in the CVS lot, she had

9  entered the Kwik Trip gas station and saw individuals inside

10  that she suspected were committing criminal acts and

11  explained to us that she felt she had enough information to

12  make a stop on these people; at least identify them and find

13  out what, in fact, they were doing.

14      Q   Okay.  Well, what did you do when you got that

15  information?

16      A   Detective Artus was driving.  He decided to pull

17  over into the Kwik Trip gas station.  So we essentially

18  crossed 9th Avenue into the parking lot of the Kwik Trip.

19      Q   Okay.  What happened then?

20      A   Shortly after we were notified by Detective Hinke

21  that they were going to be coming out of the gas station,

22  Detective Artus and I got out of our vehicle and went to

23  make contact with the three male subjects that were in the

24  gas station that Detective Hinke had notified us of.

25      Q   Did you do that?

1        A    Yes, we did.

2        Q    What was your role in the contact with those three

3   individuals?

4        A    Well, almost immediately, upon making contact --

5   we didn't even really make contact.  Detective Hinke

6   identified herself as a police officer and said, "Hey, I

7   want to talk to you."

8        Some of the subjects looked back towards

9   Detective Artus and I.  I was wearing a badge at the time in

10  plain clothes, but the badge was hanging approximately right

11  here where you could see it (indicating).

12       MS. KRAFT:  The record should reflect that the

13  witness has basically pointed to his tie, mid-chest.

14       THE WITNESS:  And I saw one of the individuals

15  look at me, their eyes got big, and immediately all three

16  subjects took off running in different directions.

17  BY MS. KRAFT:

18       Q    What did you do?

19       A    I chased the first person that took off running.

20  The agents kind of, like, one, two, three, they all took off

21  running.  The first one that took off I chased after.

22       Q    Okay.  And were there two juveniles and another

23  person who was not a juvenile?

24       A    Yes.

25       Q    And which individual -- were you able to apprehend

1    one of them?

2         A    One of the juveniles, yes.

3         Q    And can you just tell us the first name of the

4    individual that you apprehended initially?

5         A    I believe, if I pronounce it correctly, it was

6    Florin, or something similar to that.

7         Q    Okay.  And what did you do with Florin or to

8    Florin at the time you apprehended him?

9         A    I held him in custody.  Eventually, I believe

10   myself, maybe Detective Artus, ended up placing handcuffs on

11   him.  I asked Detective Artus to stay with him because I was

12   concerned.  Detective Hinke was in a foot pursuit with

13   another subject that ran behind the store in the dark, and I

14   wanted to make sure there was somebody to assist her as

15   well.

16        Q    Did you then go to assist her?

17        A    I did.

18        Q    What did you see?  What did you encounter when you

19   got to the location that she was?

20        A    Detective Hinke was behind the Kwik Trip gas

21   station near a fenced-in area.  She had one subject that was

22   on the ground, and there was a citizen that was there

23   assisting her as well.

24        Q    Okay.  And was that individual then taken into

25   custody?

```
1       A    Yes, they were.

2       Q    Do you see him in court today?

3       A    I do see him in court today.

4       Q    Where is he sitting and what is he wearing?

5       A    He's behind you in a gray suit with a gray vest

6   and white dress shirt, no tie.

7            MS. KRAFT:  Your Honor, I would ask the record to

8   reflect the identification of the defendant by

9   Sergeant Ansell.

10           THE COURT:  The record will so reflect.

11           MS. KRAFT:  Thank you.

12  BY MS. KRAFT:

13      Q    Now, was the third individual who was with the

14  defendant and the juvenile Florin that you had initially

15  apprehended also apprehended?

16      A    Yes, he was.

17      Q    Do you recall the first name of that individual?

18      A    I do not.  I never dealt with that person after

19  they were taken into custody, and I don't know their name

20  off the top of my head.

21      Q    Okay.  Did you do anything further at that scene

22  that night after the three individuals were apprehended?

23      A    Yes, I did.  I had been told by Detective Hinke

24  that she felt the three individuals had been in the male's

25  bathroom at the gas station.  I went inside the gas station
```

1  to see if there was any evidence or anything left behind

2  that would lead me to believe it would be part of the

3  investigation that we were doing.

4      Q   Did you locate anything in the bathroom?

5      A   Yes, I did.

6      Q   What did you locate?

7      A   I located some -- I guess you call them -- they

8  looked like gift cards or credit cards.  They were on the --

9  do you want me to explain everything right away?

10      Q   I want you to tell me what you saw.  You saw gift

11  cards or --

12      A   Out on the vanity area where there were some

13  sinks, there was a plastic, like, grocery sac, white in

14  color.  I think they had some red lettering.  There was what

15  I would call, like, a headlamp that you would wear on your

16  head with a strap that was, I believe, black and red in

17  color, and there were, if I remember correctly, five gift

18  cards or some sort of debit cards laying next to or inside

19  those bags, and then there was one individual gift card or

20  financial type card in the garbage of that gas station.

21      Q   Okay.  In front of you is a folder that has some

22  exhibits in it.  Can you open it up, please?

23          Okay.  Do you see some photographs that are marked

24  Exhibits Nos. 9A through 9C?

25      A   Yeah.

1          Q    Do you recognize what's depicted in those

2    photographs?

3          A    I do.  These are the items that I was talking

4    about that I photographed and found in the --

5          Q    Those are photographs that were taken in the

6    bathroom of the items that you just described?

7          A    They are.

8               MS. KRAFT:  Your Honor, I would move into evidence

9    Exhibit Nos. 9 through 9C.

10              THE COURT:  All right.  The Court will receive

11   Exhibits 9A through 9C.

12              MS. KRAFT:  May I publish them?

13              THE COURT:  You may.

14              MS. KRAFT:  Could we see 9A, Agent Hoalcraft,

15   please?

16   BY MS. KRAFT:

17         Q    Okay.  What is it that's depicted in this

18   photograph, Sergeant?

19         A    Again, this is the bathroom at the Kwik Trip gas

20   station on 9th Avenue near Koeller Street in the City of

21   Oshkosh.  There's the grocery sac that I'm talking about,

22   the red lettering that you can start to see.  On the end

23   there, it looks like some sort of financial cards coming

24   over to the end of that, and then the light that I was

25   discussing that could be placed, like, on somebody's head.

1     Q     And is that the way those items looked when you
2 initially entered the bathroom that day?

3     A     Yes.  They were located right there.

4     Q     Okay.  Could we see 9B, Agent Hoalcraft?

5           And now one of the cards appears to be coming out
6 of the bag.  Is that the way it looked at the time you got
7 there?

8     A     Yeah.  I think it's just basically a different
9 angle.

10    Q     Of the same photograph?

11    A     Yes.

12    Q     Now can we see 9C, please?

13          What does that depict?

14    A     This is basically what I had done is pulled the
15 cards out so I could photograph to show exactly what was
16 inside the grocery bag.

17    Q     Okay.  And then could you look -- do you have an
18 exhibit in front of you that's labeled, I believe, 4C?

19    A     Yes.

20    Q     What does that depict?

21    A     That shows a garbage can, white garbage can with a
22 clear plastic bag in it.

23    Q     And is that the way that plastic bag in that
24 garbage can looked when you went into that bathroom that
25 night?

1      A     Yes, it is.

2             MS. KRAFT:  Your Honor, I would move into evidence

3      Exhibit No. 4C.  Ask to publish, please.

4             THE COURT:  The Court will receive Exhibit 4C, and

5      you may publish.

6             MS. KRAFT:  Thank you.

7      BY MS. KRAFT:

8      Q     And, again, what does it depict, Sergeant Ansell?

9      A     This one you can see the photo in front of me is a

10     little darker, but down inside, if you look right here, you

11     can see the edge of a financial transaction card.

12     Q     Okay.  Did you recover those items that were in

13     the bathroom that night?

14     A     I did, yes.

15     Q     And would you look at Exhibit No. 4A, which is a

16     physical exhibit that's on the witness stand in front of

17     you, and tell me whether or not you recognize that exhibit?

18     A     I do.

19     Q     What do you recognize it to be?

20     A     I recognize this to be an evidence envelope from

21     the Oshkosh Police Department.  It indicates what's inside,

22     which would be six what I have listed as financial cards

23     that has my name and the date of 5-17-2018.

24     Q     And is 5-17 the day that you inventoried them?

25     A     That would be the day that I entered them in this

```
1    envelope and had them placed into evidence, yes.

2           MS. KRAFT:  All right.  I would move into evidence

3    Exhibit No. 4A, Your Honor.

4           THE COURT:  All right.  The Court will receive

5    Exhibit 4A.

6    BY MS. KRAFT:

7    Q    Now, those are all six of the cards, is that

8    correct, the five that were on the sink and then the one

9    that was in the garbage?  Are there six in there?

10   A    It appears that there are six in here, yes.  You

11   probably want to take them out, but --

12   Q    You can open it up.

13          All right.  And now in the folder in front of you

14   is Exhibit No. 4B.  It's a photograph of some cards.  Are

15   those the same cards that are in Exhibit No. 4A that you

16   recovered?

17          You can open it up and look.

18   A    I'm looking off the documentation I wrote down

19   here, and it does appear that these are, yes, indeed, the

20   same cards.

21   Q    Okay.  Now, I want to ask you whether or not --

22   and you can look at the photograph if you're certain they're

23   the same cards.

24          Is there, in that group of cards, a card that ends

25   with the numbers 3132?
```

1    A    Yes.

2         MS. KRAFT:  Your Honor, I can't remember, did I

3    move in Exhibit 4B?  If not, I would move it in and ask to

4    publish.

5         THE COURT:  All right.  The Court will receive

6    Exhibit 4B, and you may publish.

7         MS. KRAFT:  Thank you, Your Honor.

8    BY MS. KRAFT:

9    Q    All right.  Now, do you see a card, in that group

10   of photographs of those cards, that ends with the number

11   3132?

12   A    Yes.  Right up here in the upper right-hand

13   corner.

14   Q    Can you blow that one up, Agent Hoalcraft?

15        Okay.  And I'm going to ask you, Sergeant Ansell,

16   if you will, just take a pen, and on the paper Exhibit 4B,

17   if you will just circle that card for me, please?

18   A    (Witness complies.)

19   Q    Okay.  And upon the recovery of those items of

20   evidence, was that pretty much the extent of your

21   involvement in this investigation?

22   A    Yes.

23        MS. KRAFT:  All right.  I don't have any further

24   questions for Sergeant Ansell at this time.

25        THE COURT:  All right.  Thank you.

 1              Mr. Uller, any cross-examination?

 2              MR. ULLER:  No, Your Honor.

 3              THE COURT:  Very well.  Thank you, Sergeant.

 4    You're excused.  You may step down, and you can return the

 5    exhibits to Ms. Kraft.

 6              You may call your next witness.

 7              MS. KRAFT:  Thank you, Your Honor.  The next

 8    witness is Brandi Woodard.

 9                   BRANDI WOODARD, WITNESS, SWORN

10                        DIRECT EXAMINATION

11    BY MS. KRAFT:

12         Q    Good afternoon.  Can you tell us, please,

13    Ms. Woodard, how it is that you're employed?

14         A    I am a senior risk investigator for First Horizon

15    National Corporation and its subsidiaries, which include,

16    like, First Tennessee Bank headquartered in Memphis,

17    Tennessee; recently acquired Capital Bank, which is now

18    headquartered in Memphis, Tennessee; FTM Financial that's

19    headquartered in New York.

20         Q    And where are you located?

21         A    I am located in Nashville, Tennessee.

22         Q    Okay.  And can you tell us what your general

23    duties are as a senior risk investigator for First Horizon

24    National Corporation and its subsidiaries?

25         A    Yes.  Essentially, I investigate all activity that

1  encompasses bank fraud for First Horizon National

2  Corporation and its subsidiaries.

3      Q    And does that include the investigation of both

4  internal fraud and external fraud?

5      A    Yes, that's correct.

6      Q    How long have you had that position?

7      A    Since May of 2007.

8      Q    And can you tell me whether or not you have any

9  specific training to become the senior risk investigator for

10  First National Corporation?

11      A    Absolutely.  I do a lot of training through the

12  Association of Certified Fraud Examiners, which would

13  include various types, you know, financial exploitation,

14  skimming activity, credit card activity, debit card

15  activity, loan fraud.  I attend conferences on various forms

16  of bank fraud.  We're required to do and maintain training

17  for our compliance within our company.

18      Q    Okay.  And so with that training and your

19  experience, can you tell me whether or not you have a

20  familiarity with an activity that involves ATM skimming?

21      A    Yes.

22      Q    What, can you tell us, are we talking about when

23  we talk about ATM skimming?

24      A    ATM skimming essentially is where they take a

25  device that has a -- it essentially harvests data, card data

that's utilized at an ATM.  So any card that's swiped during
that time that a skimmer is on there, it harvests the data,
and essentially what goes on that is what we refer to as a
pinhole camera unit which maintains when someone is entering
their pin simultaneously as the card data that's being
harvested on the skimmer.  So the video obtains the pin
number while the skimmer retains the card.

Q    So are you telling us that people who are involved
in this activity actually put devices on ATM machines to do
those things, to harvest the data and capture the pin
number?

A    Yes, that's correct.

Q    All right.  Now, did there come a time in January
of this year that you discovered that multiple skimming
devices and pinhole cameras had been placed on ATMs
associated with First Tennessee financial institutions?

A    Yes, that's correct.

Q    And how did you become aware of that?

A    There was an instance at the Parkway Commons
location, which is 3038 Columbia Avenue.  It's located in
Franklin, Tennessee.  And a part of the training that we do
with the personnel is to check out the ATMs every morning
before opening and closing, and an employee identified that
the machine -- there was something off.  He couldn't
necessarily tell.

1          I was contacted.  I went on scene, examined the

2    ATM, confirmed the skimmer, subsequently removed it as well

3    as the pinhole camera unit.

4          Q     Okay.  In front of you is a folder that has a

5    number of exhibits in it.  Can you open that up and look at

6    them, please?

7          A     Yes.

8          Q     Okay.  The first exhibit that you should have in

9    front of you should be marked "20I."  Do you recognize what

10   that is?

11         A     Yes.

12         Q     What is that, please?

13         A     This was what I created from the skimming insert

14   skimming device and the pinhole camera unit that was placed

15   on that ATM that I just described in Franklin, Tennessee.

16              MS. KRAFT:  Okay.  Your Honor, I would move into

17   evidence Exhibit No. 20I.  I would ask to publish it,

18   please.

19              MR. ULLER:  Judge, I'm going to object on

20   relevance.

21              THE COURT:  The objection is overruled.

22              The Court will receive Exhibit 20I, and you may

23   publish it.

24   BY MS. KRAFT:

25         Q     Now, Ms. Woodard, are you the person who created

1    this exhibit?

2         A    Yes, I am.

3         Q    Okay.  And what is depicted on this?  Let's start

4    at the top.  What are the things that we are looking at on

5    the two top pictures of this exhibit?

6         A    So you'll see where I have labeled the "false

7    fossa" of the ATM; that is, like, the screen of the ATM.

8    The one where you see it's pointed -- the arrow is pointing

9    down where it's "Debold," that's actually the pinhole camera

10   unit that was placed to capture the pin numbers entered by

11   individuals utilizing that ATM.

12        Q    Okay.  And you removed that from that particular

13   ATM?

14        A    Yes, that's correct.

15        Q    And can we see what's at the bottom portion of the

16   exhibit, please?

17             What is this?

18        A    So that is the actual pinhole camera unit that I

19   was referring to, the battery that powers it, the memory

20   card that retains the video where individuals enter their

21   pin numbers, the actual pinhole camera, and then another

22   battery and the controller board which helps to power and

23   retain data on the machine.

24        Q    Okay.  On the same day -- let me ask you this

25   question.  Look at Exhibit No. 20J and tell us if you

1    recognize that?

2         A    I do, yes.

3         Q    And what is that?

4         A    That is the deep insert skimming device that was

5    placed on the ATM in Franklin, Tennessee.

6         Q    Okay.  That was recovered by you on the same day?

7         A    Yes, that's correct.

8         Q    And you also created this exhibit by taking

9    photographs of the items that you recovered?

10        A    Yes, that's correct.

11             MS. KRAFT:  All right.  Your Honor, I move into

12   evidence Exhibit No. 20J and ask to publish.

13             MR. ULLER:  Same objection, Your Honor.

14             THE COURT:  The Court will receive Exhibit 20J,

15   and you may publish.

16             MS. KRAFT:  Can you enlarge that, Agent Hoalcraft?

17   BY MS. KRAFT:

18        Q    Let's start at the top.  Can you tell us, as we're

19   looking at these pictures, what is depicted here?

20        A    Yeah, absolutely.  So the device that you see to

21   the right is the actual card reader that was retrieved out

22   of the ATM.  The skimming device was inserted so deeply that

23   we had to take out the card reader in order to get the

24   skimming device out of the card reader itself.  So it almost

25   looks like a really wide -- do you see the two parts that go

1    up and the part that goes down here?  And you can see it as

2    well to the left.

3         Q    There should be a pointer in front of you.  No?

4         A    Okay.  Yep.  So this is what I'm talking about,

5    what I'm referring to, the actual device itself.  You see

6    the USB here, and that's it as well there (indicating).

7         Q    And can we see the bottom photographs,

8    Agent Hoalcraft?

9              And what are these showing, Ms. Woodard?

10        A    So the two left photographs are the actual deep

11   insert skimmer that was removed from the card reader.  And

12   then this is a picture depicting the actual -- as it was

13   being retrieved out of the card reader itself.  You can see

14   the antenna, the controller board which is utilized to

15   capture data.  When I say "data," I'm referring to card

16   information.

17        Q    Are you referring to the information that's on the

18   magnetic strip or stripe on the back of the card?

19        A    Yes, that's correct.

20        Q    All right.  So this device was actually placed

21   deep into the same slot that a customer would place their

22   card if they wanted to take money out of the ATM machine.

23   Is that what you're telling us?

24        A    Yes, that's correct.

25        Q    And not necessarily visible or findable by the

1    customer themselves?

2         A    Right.  Absolutely.

3         Q    Okay.  Now, you located that ATM skimmer on the

4    deep insert skimmer and the pinhole camera on the ATM at

5    3038 Columbia Avenue in Franklin; is that correct?

6         A    Yes, that's correct.

7         Q    Did you do anything to attempt to determine who

8    had placed these there?

9         A    Yes.  So I went through surveillance video imaging

10   of that actual ATM to identify the time and date in which it

11   was placed, and that's subsequently what I did.  I reviewed

12   the surveillance video and determined when it was placed.

13        Q    Okay.  So just to backup.  You discovered the

14   skimmer and pinhole camera at this particular ATM on what

15   day?

16        A    January 25th.

17        Q    Were you able to determine the date that this

18   skimmer had been placed on that ATM machine?

19        A    Yes.  A review of the surveillance video imaging

20   determined that it was placed on January 24th.

21        Q    All right.  And would you look at Exhibits Nos.

22   20G and 20H, please, and tell me if you recognize those?

23        A    I do.

24        Q    And what do you recognize them to be?

25        A    They are still photographs that I retrieved from

1    the actual surveillance video imaging of the individual that

2    placed the deep insert skimmer and pinhole camera unit at

3    that ATM location.

4              MS. KRAFT:  Your Honor, I would move into evidence

5    Exhibit Nos. 20G and 20H and ask to publish.

6              MR. ULLER:  Same objection, Your Honor.

7              THE COURT:  The objection is overruled.  The Court

8    will receive both Exhibits 20G and 20H.

9              You may publish.

10             MS. KRAFT:  Thank you, Your Honor.

11   BY MS. KRAFT:

12        Q    Agent Hoalcraft, can we have 20G, please?  And can

13   you just enlarge the photograph on the left upper corner as

14   we're looking at the screen?

15             Have you ever seen that person before?

16        A    That person is in this courtroom today.

17        Q    Before you located his -- or clipped his

18   photograph out of the surveillance video, had you ever seen

19   him before?

20        A    Yes.

21        Q    Where had you seen him?

22        A    In surveillance video imaging on a previous ATM

23   deep insert skimmer and pinhole camera unit that was placed

24   on a First Tennessee Bank ATM.

25        Q    Okay.  So this is the second time that you had

1    seen this photograph.

2            Do you see him in court today?

3        A    I do.

4        Q    Where is he sitting and what is he wearing,

5    please?

6        A    He is wearing a gray suit behind Agent Hoalcraft.

7            MS. KRAFT:  Could the record reflect the

8    identification of the defendant by Ms. Woodard?

9            THE COURT:  The record will so reflect.

10   BY MS. KRAFT:

11       Q    And, Ms. Woodard, let's look at the next

12   photograph.

13           Were you able to tell from the surveillance camera

14   not only the date but the time of day that the skimmer was

15   placed on the ATM machine at Franklin, Columbia Avenue in

16   Franklin?

17       A    Yes.  It was placed on January 24th at

18   approximately 8:42 p.m. Central Standard Time.

19       Q    After the bank had actually closed?

20       A    Yes, that's correct.

21       Q    Then let's look at the other two remaining

22   photographs on this exhibit number.  That's the same

23   individual.

24           And then what is in the lower right-hand corner?

25       A    That is the individual and the vehicle that was

1 utilized at the time that the deep insert skimmer and

2 pinhole camera unit were placed on the ATM.

3   Q Now could we see Exhibit 20H, Agent Hoalcraft?

4   And can you tell us what this individual is doing

5 at the point that this photograph was captured?

6   A Placing the pinhole camera unit that we previously

7 showed.

8   Q Now, did there come a time in January -- actually,

9 probably the same date -- that you discovered that there was

10 a pinhole camera and skimmer that had been placed on a

11 different First Tennessee ATM machine?

12   A Yes.

13   Q And how did you become alerted to that occurrence?

14   A There was a First Tennessee Bank customer that was

15 utilizing the ATM located at what we call our Mount Juliet

16 Providence location, and that is located in Mount Juliet,

17 Tennessee, at 401 South Mount Juliet Road, and called and

18 advised that she was experiencing difficulty with the card

19 reader on that ATM and wanted to report it to First

20 Tennessee.  As a result, I was contacted and notified and

21 went on scene there in Mount Juliet.

22   Q All right.  And would you look at Exhibit Nos. 20L

23 and 20K, please?  What is depicted in Exhibit No. 20L?

24   A It is the pinhole camera unit as well as the deep

25 insert skimmer that were placed on the Mount Juliet

1     Providence ATM location.

2         Q    And are those items that you removed when you went

3     to that location to investigate?

4         A    Yes, that's correct.

5         Q    And did you take these photographs and produce

6     this exhibit yourself?

7         A    I did, yes.

8             MS. KRAFT:  Your Honor, I would move into evidence

9     Exhibit No. 20L and ask to publish.

10            THE COURT:  Yes.  The Court will receive Exhibit

11    20L, and you may publish.

12            MS. KRAFT:  Thank you, Your Honor.

13    BY MS. KRAFT:

14        Q    Now, can you tell us, as Agent Hoalcraft expands

15    that portion of the picture, what's depicted here?

16        A    That is the pinhole camera unit.  The piece of

17    equipment that was utilized is the -- the camera unit was

18    placed over the dispensing where you receive your receipt on

19    the ATM.  It was actually a piece that matches the ATM, and

20    so you are still receiving receipts while it was recording.

21        Q    And can we see the bottom portion of that exhibit?

22             What is depicted there?

23        A    That is the deep insert skimmer that was placed on

24    the Mount Juliet Providence ATM.

25        Q    Okay.  Thank you.

1    And would you look at -- let me back up.  Did you

2  also attempt to determine when that skimmer and pinhole

3  camera were placed on the Mount Juliet Providence ATM?

4    A    I did.  I reviewed surveillance video imaging and

5  determined the date and time that the deep insert skimmer

6  and pinhole camera unit were placed on the ATM.

7    Q    And what is depicted in Exhibit No. 20K, please?

8    A    Still photographs from the surveillance video

9  imaging that I retrieved of the deep insert skimmer and

10  pinhole camera unit that were placed on the First Tennessee

11  Bank, Mount Juliet Providence ATM location.

12    Q    And are these still photographs in Exhibit No. 20K

13  clips from the surveillance video that you recovered?

14    A    Yes.

15    MS. KRAFT:  I would move into evidence and seek

16  permission to publish Exhibit No. 20K, Your Honor.

17    MR. ULLER:  Same objection, Your Honor.

18    THE COURT:  Thank you.

19    The objection is overruled.  The Court will

20  receive Exhibit 20K, and you may publish the same.

21  BY MS. KRAFT:

22    Q    Were you able to tell from the surveillance video

23  what time this ATM skimmer was placed by the individual who

24  is depicted in these photographs?

25    A    Yes.  It was placed on January 24th at

1     approximately 9:31 p.m. Central Standard Time.

2         Q    Again, after the bank was closed?

3         A    Correct.

4         Q    And do you recognize the person who -- let's look

5     at the top left-hand photograph.

6              Do you recognize the person that's depicted in

7     that photograph?

8         A    Yes.

9         Q    Is that the same person who's depicted in Exhibit

10    No. 20G?

11        A    Yes.

12        Q    And is that person in court today?

13        A    Yes.

14        Q    Is that the person, the defendant, who you

15    identified before?

16        A    Yes.

17        Q    What are these other photographs that you've

18    clipped from your surveillance video from January 24th of

19    2018 at the Mount Juliet Providence ATM?

20        A    That was during the deep insert skimmer placement

21    as well as the pinhole camera unit placement on that ATM.

22        Q    Okay.  What is shown in the right top photograph?

23        A    That is the person operating the vehicle.

24        Q    Okay.  And the bottom photograph?

25        A    That would be the individual that was operating

1     the vehicle as well as placed a deep insert skimmer and

2     pinhole camera unit on that ATM.

3          Q     Okay.  And then what is depicted in the remaining

4     picture?

5          A     That is a still photographic image of the

6     individual as well as the vehicle that was driven.

7          Q     All right.  Now, during your investigation, did

8     you observe any surveillance video that included a white

9     minivan with Tennessee plates?

10         A     Yes.

11         Q     Okay.  What did you do with the information that

12    you obtained from the surveillance video that you secured

13    after finding that ATM skimmers and pinhole cameras had been

14    placed on ATMs in your institutions?

15         A     I determined that there were deep insert skimmers

16    and pinhole camera units that were unrecovered.  As a

17    result, those card numbers were harvested and later used to

18    facilitate ATM withdraws on First Tennessee Bank clients'

19    accounts without their knowledge or authorization.

20         Q     Did you notify law enforcement --

21         A     Yes.

22         Q     -- about the discovery of these ATM skimmers and

23    the suspect, or the person that you opined to be a suspect

24    based on your surveillance video?

25         A     I did, yes.

```
 1        Q    Now, did there come a time in January, in addition
 2   to the times that you -- or did there come a time, actually
 3   later than January, that you became concerned about ongoing
 4   activity involving ATM skimmers on your institutions?
 5        A    Yes.
 6        Q    And when did that occur, and how did that occur?
 7        A    That was in March 24th through the 27th where
 8   ATM withdraws that were transacted at First Tennessee Bank
 9   ATM locations, were determined as unauthorized card numbers.
10   From that I did a data analysis and identified unrecovered
11   skimming devices that were placed on multiple ATM locations
12   that resulted in a significant number of unauthorized ATM
13   withdraws and subsequent loss to First Tennessee Bank.
14        Q    Did you receive information that had been provided
15   by customers who felt that their cards had been compromised?
16        A    Absolutely.  So we have what we refer to as the
17   card claim center, which is essentially customer service for
18   unauthorized card activity or ATM withdraws.  Clients call
19   in.  They report it.  They complete an affidavit, or what we
20   refer to as a statement of facts.  The card claim center
21   received a significant number of card claims involving
22   unauthorized ATM withdraws at First Tennessee Bank ATM
23   locations located throughout middle Tennessee.
24             As a result, I received the phone call and began
25   data mining through those card numbers, identified
```

1    unrecovered ATM skimmers and pinhole camera units that were

2    what we referred to as the common point of purchase or the

3    common point of compromise that resulted in the data being

4    harvested and subsequent ATM withdraws that were

5    unauthorized.

6         Q    And what were the common points of compromise, if

7    you can tell us?

8         A    They were ATM deep insert skimmers.  They were

9    placed on the First Tennessee Bank Parkway Commons Financial

10   Center in Franklin, Tennessee.

11        Q    Is that the same ATM that you had recovered the

12   ATM skimmer and pinhole camera on January 24th?

13        A    Yes, that's correct.

14        Q    Okay.  And where else?

15        A    An additional location is the First Tennessee Bank

16   Brentwood ATM location.  It's located at 202 Franklin Road.

17   That's in Brentwood, Tennessee.

18        Q    Okay.  And when you identified those as locations

19   that were a common point of compromise, what, if anything,

20   did you do to attempt to determine whether or not ATM

21   skimmers had been placed on those locations?

22        A    I reviewed surveillance video imaging of the time

23   period, and from that I was able to identify the deep insert

24   skimmers and pinhole camera units that were placed at the

25   Parkway Commons ATM and the Brentwood ATM that were

1    unrecovered.

2         Q    Okay.  And in front of you should be Exhibit Nos.

3    20A and 20B.  Can you tell me whether or not you recognize

4    those?

5         A    Yes.

6         Q    What do you recognize those to be?

7         A    These are still photographic images that I

8    retrieved from the surveillance video of the unrecovered

9    skimming device, the deep insert skimmer, as well as the

10   pinhole camera unit that were placed at the Parkway Commons

11   ATM that I referenced in Franklin, Tennessee.

12            MS. KRAFT:  Okay.  I would move into evidence

13   Exhibit Nos. 20A and 20B and ask to publish these.

14            MR. ULLER:  Same objection, Your Honor.

15            THE COURT:  All right.  Thank you.

16            The objection is overruled.  The Court will

17   receive both Exhibits 20A and 20B, and you may publish.

18            MS. KRAFT:  Thank you.

19   BY MS. KRAFT:

20        Q    Do you want to, Agent Hoalcraft, please, enlarge

21   the photograph on the right-hand side of the page at the

22   bottom?

23            And what does this depict?

24        A    It's a still photographic image retrieved from the

25   surveillance video of the deep insert skimmer and pinhole

1    camera unit that were placed on the Parkway Commons ATM.

2        Q    And on the surveillance video, could you actually

3    see this individual placing the devices?

4        A    Yes, that's correct.

5        Q    And is this the same individual that we observed

6    in these previous exhibits, Exhibit Nos. 20G, H, and K?

7        A    Yes, that's correct.

8        Q    And on what date was this skimming device and

9    pinhole unit placed?

10       A    January 13th at approximately 8:15 p.m. Central

11   Standard Time.

12       Q    And what is 20B?

13       A    20B is the removal of the deep insert skimmer and

14   pinhole camera unit from the Parkway Commons Financial

15   Center ATM in Franklin, Tennessee.  So that's the time that

16   the actual deep insert skimmer was removed from the card

17   reader and the pinhole camera unit was removed from the ATM.

18       Q    And do you recognize the person who's depicted in

19   that photograph?

20       A    Yes.

21       Q    And is it the same person who we've seen in these

22   other photographs that we've been looking at?

23       A    Yes, that's correct.

24       Q    So in this case, what date was it removed?

25       A    January 15th.

1      Q     Of 2018.

2           So in this case, the individuals involved in this

3      had actually captured the data of the customers who had used

4      their ATM cards during the period of time that the skimmer

5      was placed on, or we assume they had?

6      A     Yes, that's correct.

7      Q     Would you look at Exhibit No. 20C, please, and 20D

8      and tell me whether or not you recognize these exhibits?

9      A     Yes.  This is another common point of compromise.

10     It was an unrecovered deep insert skimmer and pinhole camera

11     unit that were placed on the Brentwood ATM location, First

12     Tennessee Bank ATM location located in Brentwood, Tennessee.

13     Q     And what date does 20C show that this skimmer was

14     placed?

15     A     It was placed on January 20th, 2018.

16     Q     And did you also recover video surveillance

17     footage that showed you when it was removed?

18     A     Yes, that's correct.  The surveillance video

19     imaging, the still photographic images from it were shown

20     that the deep insert skimmer and pinhole camera unit were

21     removed on January 21st, 2018.

22     Q     Okay.  And is the placement Exhibit No. 20C and

23     the removal Exhibit No. 20D?

24     A     Yes, that's correct.

25           MS. KRAFT:  All right.  Your Honor, at this time,

1   I would move into evidence Exhibit Nos. 20C and D and ask to

2   publish them.

3                THE COURT:  All right.  The Court will receive

4   Exhibits 20C and 20D, and you may publish.

5                MS. KRAFT:  Thank you, Your Honor.

6   BY MS. KRAFT:

7        Q    And then if we could just --

8                MR. ULLER:  For the record, Judge, just the same

9   objection.

10                MS. KRAFT:  If we can maybe enlarge one of these.

11   Maybe the one at the bottom of the --

12                THE COURT:  The objection is noted and overruled.

13                MS. KRAFT:  The left bottom, yes.

14   BY MS. KRAFT:

15        Q    Ms. Woodard, is this the same individual that is

16   depicted in the other surveillance clips that you obtained

17   from your ATM?

18        A    Yes, that's correct.

19        Q    And could we see Exhibit No. 20D, please?

20                Again, is this the same person?

21        A    Yes, that's correct.  And the actual -- on the

22   second row, that first -- that picture, actually, he has the

23   skimming device in his hand that he's removed, the deep

24   insert skimmer.

25        Q    Okay.  And, finally, would you look at Exhibit

1   Nos. 20E and 20F, please?  What do these depict?

2       A    These are still photograph images that were

3   retrieved from the surveillance video imaging where I

4   determined another unrecovered skimmer had been placed on

5   the First Tennessee Bank Parkway Commons Financial Center

6   ATM, and that's located in Franklin, Tennessee.

7       Q    Okay.  And what does 20E show?

8       A    The placement of the deep insert skimmer into the

9   card reader of the ATM and the pinhole camera unit.

10      Q    And what is 20F?

11      A    The removal of the deep insert skimmer from the

12  card reader as well as the pinhole camera unit.

13      Q    And this device was placed on what day?

14      A    January 20th, 2018.

15      Q    And removed on what day?

16      A    January 21st, 2018.

17      Q    So essentially these are, like, one or two days

18  that all of this data is captured?

19      A    That's correct.

20           MS. KRAFT:  Your Honor, I would move into evidence

21  Exhibit Nos. 20E and 20F and also seek to publish.

22           MR. ULLER:  Same objection, Judge.

23           THE COURT:  All right.  Thank you.

24           The objection is overruled.  The Court will

25  receive Exhibits 20E and 20F, and you may publish.

BY MS. KRAFT:

Q    Could you enlarge one of those pictures for us, please?

Is that the same individual that is depicted in the other photographs that we see?

A    Yes, that's correct.

Q    The defendant is here in court today?

A    Yes, that's correct.

Q    And were you able to see in the surveillance video him actually putting the skimmer and pinhole cameras on the ATM machine?

A    Yes.

Q    Now, there's a car in that photograph.  What kind of car is that?

A    A white minivan.

Q    Were there different cars that were used at different times that these skimmers were placed?  Based on your surveillance video, are you able to tell us that?

A    There appear to be multiple vehicles on the surveillance video.

Q    Okay.  And can we see 20F, please?  Can we see the picture that's depicted at the bottom left-hand side?

Can you tell us what is in his hand at this point?

A    Facing it to the left, you'll see the actual deep insert skimmer, and that's a card also in his hand.

1          Q     Okay.  But the item that appears to be grayish --

2          A     Right here, yes (indicating).

3          Q     -- right.  Okay -- is the deep inside skimmer that

4     is being removed that day?

5          A     Correct.

6          Q     And what day was that skimmer removed at that

7     location?

8          A     January 21st, 2018.

9          Q     And at some point -- I believe you maybe answered

10    this already -- did you contact law enforcement about the

11    skimming activity at your ATM machines?

12         A     Yes.  The recovered devices were turned over to

13    the local law enforcement agencies at the time that they

14    were recovered.  The unrecovered skimmers were determined to

15    be the common point of compromise, and law enforcement was

16    notified as well.

17         Q     Can you give us an estimate as to how much money

18    First Horizon has lost as a result of ATM skimming over the

19    past year?

20              MR. ULLER:  Objection.  Relevance.

21              THE COURT:  The objection is overruled.

22              THE WITNESS:  I can tell you that as a result of

23    the unrecovered skimming devices associated that we

24    discovered, First Tennessee incurred a loss of approximately

25    $147,000.

BY MS. KRAFT:

    Q    And is it also correct that when a customer's account is compromised, it's the bank itself that incurs the loss and not the customer?

    A    That's correct. The customer's account is credited, yes, by the bank.

    MS. KRAFT:  Thank you. That's all.

    THE COURT:  Thank you, Ms. Kraft.

    Mr. Uller.

    MR. ULLER:  No questions, Your Honor.

    THE COURT:  Thank you.

    Ms. Woodard, are you able to tell, either from the surveillance videos at the time these devices were installed -- and when I say "devices," I'm talking about the skimmer and the camera -- the methodology by which these devices are actually inserted because it appears there are no tools in anyone's hand. Do they just slip in the card reader and they're left to be reposed until they're removed, and what holds them in place?

    THE WITNESS:  So with the deep insert skimmer, it actually goes deep into the card reader. So you don't actually have to have any type of material that retains it because it goes deep inside the actual card reader. When it is removed, surveillance video determined that there is a card utilized that appears to help capture the deep insert

1    skimmer out of the card reader.

2         The pinhole camera unit, I can tell you that the

3    ones that I did remove, all had a glue residue on the back

4    of them.  But it appears that when they are removed from the

5    vehicle and placed on the ATM, that all parts, including the

6    residue that's utilized for it to stick onto the ATM, are

7    already in place.

8         THE COURT:  But once the deep skimmer is

9    installed, what holds it in place?

10        THE WITNESS:  It's essentially the card reader.

11   So it's inserted so deep inside the card reader that it

12   literally becomes almost a part of the machine.  That's why

13   it's built the way it is.  So it has the two points, and

14   then you have the longer strand at the bottom because when a

15   card is inserted into those card readers, that's exactly how

16   the card reader is built.

17        THE COURT:  All right.  Thank you.

18        MS. KRAFT:  Can I ask a follow-up question?

19        THE COURT:  Certainly.

20   BY MS. KRAFT:

21        Q    Based on your review of the surveillance video,

22   were you able to tell how long it took to place one of these

23   devices with both the reader and the pinhole camera and how

24   long it took to remove one?

25        A    Approximately a minute, up to three minutes at

```
 1    max, if they can get the camera to stick.
 2                MS. KRAFT:  Okay.  Thank you.
 3                THE COURT:  All right.  Thank you, Ms. Woodard.
 4    You're excused.
 5                You may call your next witness.
 6                MS. KRAFT:  The next witness is Detective John
 7    Milotzky.
 8                    JOHN MILOTZKY, WITNESS, SWORN
 9                        DIRECT EXAMINATION
10    BY MS. KRAFT:
11        Q    Good afternoon.
12        A    Good afternoon.
13        Q    Can you please tell the ladies and gentlemen of
14    the jury how you're employed?
15        A    I am a detective with the City of Wawatosa Police
16    Department.
17        Q    And how long have you worked for the City of
18    Milwaukee Police Department?
19        A    City of Wawatosa.
20        Q    I'm sorry.  City of Wawatosa Police Department.
21        A    That's right.  17 years.
22        Q    And how long have you been a detective?
23        A    Eight years.
24        Q    Can you tell us whether or not you have any
25    special assignment as a detective with the Wawatosa Police
```

1    Department?

2         A    I do.  I primarily investigate financial crimes,

3    and for the last four years I've been assigned to the

4    Milwaukee Financial Crimes Task Force with the

5    Secret Service.

6         Q    Okay.  Have you had any particular specialized

7    training to have that specialized position?

8         A    Yes.  I'm a certified fraud examiner, and I also

9    participate in ongoing training and conferences every year

10   through the International Association of Financial Crimes

11   Investigators and the Association of Certified Fraud

12   Examiners.

13        Q    As a result of your training and experience, are

14   you familiar with activity that is, I guess, known as ATM

15   skimming?

16        A    Yes, I am.

17        Q    And although we've had some testimony about this

18   already, can you tell us briefly what your understanding of

19   ATM skimming is?

20        A    With the ATM skimming crimes that we've been

21   involved in, typically a person or persons will place a

22   skimmer overlay over an ATM or a gas pump, or they'll use a

23   deep insert skimmer which actually goes inside the machine.

24   And as it relates to gas pumps, they'll frequently open up

25   the gas pump and put the skimmer right in, and there's

1    usually, like, a pinhole camera associated with it so that

2    if someone is entering a pin number, it will record them

3    entering their pin number.  So they'll have that to use

4    along with the account number at a later date.

5         Q    And how is it that that data is captured by a

6    skimmer when they are installed on ATM machines?  What are

7    the mechanics of that?

8         A    Well, the skimmer is reading the data that's

9    encoded on the magnetic stripe of the card that's inserted.

10   And on that magnetic stripe there's three different tracks

11   of information, kind of like a compact disc has different

12   tracks with songs, and it just records that track data so

13   that they can use it at a later date.

14        Q    So what is the type of data that are recorded on

15   the magnetic stripe then?  You said it has three tracks of

16   data on it.  What kind of data is -- let me back up.

17             On a normal card, a credit card, debit card, a

18   type of card that one might use in order to withdraw money

19   from their account, what information is on the front of the

20   card?

21        A    What information is on the front of the card?

22        Q    Yes.

23        A    We will typically have the EMV chip, the primary

24   account number, the cardholder's name, and expiration date.

25        Q    So the front of the card normally would provide

1  identifying information about the account holder; is that

2  correct?

3       A    Typically.

4       Q    And the number is sometimes printed and sometimes

5  embossed on the front of the card?

6       A    Correct.

7       Q    So, like, if I call up, and I want to order

8  something from Amazon, and I'm talking on the phone, I can

9  give them my card number by just reading the number off of

10 the card; is that correct?

11      A    That's correct.

12      Q    On a legitimate or genuine card, what's on the

13 back of the card then?

14      A    The back will have the magnetic stripe, and it

15 will have information as far as the issuing bank or the

16 issuing financial institution that issued that credit

17 account, usually a contact number; sometimes a

18 three-dimensional hologram.

19      Q    So on a genuine card, does the printed or embossed

20 number on the front of the card, is it the same as the

21 number that's encoded on the back of the card on the

22 magnetic strip?

23      A    Yes, it is.

24      Q    Okay.  And on a typical card, it starts out

25 usually with four or six digits and then goes on to have a

1    number of other digits; is that correct?

2              Can we just put up one example here?  There we go.

3              Okay.  We're looking at -- now, this is a gift

4    card.  And are gift cards basically created in the same way

5    that a debit or credit card would be created?

6         A    Sure.  Yes.  It's a payment card.

7         Q    It has numbers on it, right?

8         A    Yes.

9         Q    What are the first four or six numbers on any

10   given card?

11        A    So the first six numbers are what's called a bank

12   identification number, and they're unique to the issuing

13   financial institution.  So every account number that's on

14   the front of any card that's legitimately issued, those

15   first six numbers will tell you who the issuing financial

16   institution is.  It's kind of almost like address blocks on

17   a physical building.

18        Q    And then the rest of the numbers on the card, what

19   are those?

20        A    The full 16 numbers that you see there is what's

21   called the primary account number, and the numbers -- as I

22   said, the first six identify the financial institution, the

23   remaining 10 numbers are specific for that bank and how they

24   issue it.  I couldn't tell you what each individual number

25   means, but it's issued by the bank, and they use that as a

1    form of tracking.

2         Q    And is that number, the digits that follow the

3    first six, are those the numbers that basically identify a

4    particular account?

5         A    Correct.

6         Q    All right.  So that's identification information

7    of the account holder; is that correct?

8         A    Correct.

9         Q    Okay.  And did you tell us that the two numbers on

10   a genuine card should match?

11        A    They should match with what's encoded on the

12   magnetic strip, yes.

13        Q    So they're going to be the same.  All right.

14             So these are exhibits -- where is the exhibit

15   sticker on this?

16             This is Exhibit No. 1A.  This is, for the record,

17   the cards that Detective Hinke testified she recovered from

18   the defendant.

19             This is Exhibit No. 3A, for the record, the cards

20   that Detective Artus testified that he recovered from

21   Florin.

22             This is Exhibit 2A, for the record, the cards that

23   Detective Artus said that he recovered from the wallet of

24   Florin.

25             And this is Exhibit No. 4A, the six cards that

1    Sergeant Ansell testified that he recovered from the

2    bathroom at the Kwik Trip in Oshkosh on May 16th of 2018.

3         Do you recognize what are located in those

4    exhibits, Detective Milotzky?

5    A    Yes.  These look like the cards that I

6    interrogated for Agent Hoalcraft.

7    Q    Okay.  How did you come to get those cards from

8    Agent Hoalcraft?

9    A    They contacted me because they had recovered these

10   cards and asked that I interrogate all the magnetic stripes

11   of the cards to determine if they were, in fact, counterfeit

12   cards.

13   Q    Okay.  And were you able to do that?

14   A    I was.

15   Q    And how did you do that?

16   A    I used a -- it's a software program that scans the

17   magnetic stripe on the back, and it reads the data similar

18   to any point of sale terminal, but it's incorporated with

19   software that provides you with the account number that's

20   encoded on the magnetic stripe, and then it automatically

21   checks the bin and identifies the issuing financial

22   institution.

23   Q    Okay.  So explain how it is that you do that.  Do

24   you swipe the card?

25   A    Yes.  It's a handheld card reader.  Simply you

1    hook it up with the software, and when you swipe the card,

2    it reads the data that's encoded on the magnetic stripe.

3         Q    Okay.  Are you trying to determine when you get

4    these cards from Agent Hoalcraft whether or not they're

5    legitimate cards or counterfeit cards?

6         A    Correct.

7         Q    Okay.  You swiped each card.  Are there 100 cards

8    there?

9         A    I know I interrogated 100 cards without counting

10   each one individually.  I'm guessing there's 100 there.

11        Q    Okay.  So you swiped each one of those 100 cards.

12             When you swiped the card, what happened with

13   respect to your program?  Did you get a number?

14        A    Yes.  So if I swipe a card, and it shows me the

15   number that's encoded on the mag stripe, and that's

16   different than what is embossed or printed on the front, I

17   immediately know that I have a counterfeit card.

18        Q    Okay.  So you swiped each one of these cards?

19        A    Correct.

20        Q    And then if there's a different number on the

21   front of the card, then the number that the software program

22   shows you to be encoded on the magnetic stripe, what do you

23   do?

24        A    I then enter it as what's called a clone, and I

25   manually input the account number that's on the front of the

1    card.

2         Q    Okay.  So for each card that's in front of you,

3    then, that you swiped, you have a number that was encoded on

4    the back.  Then you manually -- well, let me ask you this:

5    For each card, did you have to manually enter in a printed

6    number?  Was the number encoded on the back of each of these

7    cards different than the number that was printed on the

8    front?

9         A    Yes, it was on all 100 cards.

10        Q    All right.  And when you finished doing that, when

11   you finished swiping each card and then typing in the number

12   that was on the front, did you somehow generate a report

13   that reflected all of that information, what was on the

14   front and what was on the back?

15        A    I did.

16        Q    And did that information also include an

17   identification of the banks that had issued the cards to the

18   account holders whose information was on the magnetic

19   stripes?

20        A    Yes.  It identified the issuing financial

21   institution of both the number that's on the front of the

22   card and then also, since it was a different number, it

23   identified the financial institution of the issuing account

24   that was encoded on the mag stripe.

25        Q    Okay.  In front of you is a folder, and it has a

1    multipage exhibit in it which is marked Exhibit No. 25.  Do

2    you recognize that?

3         A    Yes.

4         Q    And what do you recognize that to be?

5         A    That's a report that I generated based on the

6    interrogation of these cards.

7         Q    Okay.  This was generated by the electronic reader

8    that you're describing, the software program?

9         A    Correct.

10         MS. KRAFT:  Okay.  Your Honor, at this time, I

11    would move into evidence Exhibit No. 25 and ask to publish.

12    And I also have copies -- I don't have copies.  I thought I

13    had copies for each of the jurors.

14         MR. ULLER:  I have an objection on hearsay.

15         THE COURT:  The objection is overruled.  The Court

16    will receive Exhibit 25.

17         You may publish.

18    BY MS. KRAFT:

19         Q    Okay.  I thought I had copies for the jurors, but

20    we'll try to make this large so we can see a little better.

21         So in the left-hand corner in that first column,

22    what is it that is depicted?

23         A    It's the issuing bank.

24         Q    Does that purport to be the issuing bank of the --

25    for the number that's on the front of the card?

1     A     Correct.

2     Q     The printed number?

3     A     Yes.

4     Q     In this case, all of the numbers were printed, is

5     that right, on the front of the cards?

6     A     Yes.

7     Q     None of them were embossed.

8           Okay.  Then in the column that says "card number,"

9     what is that?

10    A     That's the 16-digit account number that was

11    printed on the front of the card.

12    Q     Okay.  And what we see in that column is just the

13    last four digits of that; is that correct?

14    A     Correct.

15    Q     Okay.  So we have, at least for this example that

16    we're looking at, a bank card that was supposedly issued by

17    Bankcorp Bank with the last four digits of 7582.  And it

18    purports to be a prepaid debit card issued by Visa; is that

19    correct?

20    A     Correct.

21    Q     And it was a vanilla Visa card.  Is that what your

22    report says?

23    A     Yes.

24    Q     Okay.  Agent Hoalcraft, could you move the column

25    over?

1          Now, what is this?  Is this the same card?

2     A    Yes.  That's the same card, but that's the

3 information that was encoded on the mag stripe.

4     Q    Okay.  And what bank did the mag stripe reflect

5 actually issued this card?

6     A    It was an account issued by U.S. Bank.

7     Q    Okay.  And the card number, the last four digits

8 of the card, are what?

9     A    4526.

10    Q    They're not the same as the number that was on the

11 front of the card, are they?

12    A    They are not.

13    Q    And it's a debit card issued by Visa; is that

14 correct?

15    A    Correct.

16    Q    Through U.S. National Bank Association?

17    A    Yes.

18    Q    And you did this for each of the 100 cards that

19 were recovered as part of this law enforcement

20 investigation; is that correct?

21    A    Yes, I did.

22    Q    And let me ask you:  Did you divide the cards up

23 as you did your examination of them?

24    A    Yes, if I recall.

25    Q    So the first three pages of your report, were

1    those the 80 cards?

2         A    Yes.

3         Q    Okay.  And that's what you examined from

4    Exhibit A1; is that correct?

5         A    Correct.

6         Q    And did any of those 80 cards have the same

7    information printed on the front that was encoded on the

8    magnetic stripe or strip on the back?

9         A    No, not a single one.

10        Q    And were any of those cards issued by the bank

11   that was reflected on the -- actually issued by the bank

12   that was reflected on the card itself?

13        A    No.

14        Q    Okay.  I would like you to look at the next page

15   of your Exhibit 25.  It lists two cards; is that correct?

16   Or do I not have them in the same order?

17        A    They're not in the same order.

18        Q    Let's take the one that's two cards.  That is your

19   examination of the cards that were recovered in Exhibit

20   No. 2A; is that correct?

21        A    Correct.

22        Q    All right.  Did either of those two cards have the

23   same number printed on the front as was encoded on the

24   magnetic stripe on the back?

25        A    No, they did not.

1       Q    And then let's look at the page -- you have a page

2 here where you have, I believe, 12 cards. Can you turn to

3 that page?

4       A    Okay.

5       Q    Did any of those 12 cards have the same

6 information, bank and account information, printed on the

7 front as what was encoded on the back?

8       A    No, they did not.

9       Q    And then, finally, you have a page that has six

10 cards, examination of six cards. Did any of those six cards

11 have the same information, both bank and account, printed on

12 the front that was the same as what was encoded on the back?

13       A    No, they did not.

14       Q    So what is your opinion about the genuineness of

15 these 100 cards that you examined?

16       A    All 100 of them are counterfeit and had alternate

17 account numbers encoded on the magnetic stripes.

18       Q    Okay. If you look at this debit card -- this is

19 F1. This is the card that, for the record, that Ms. Edwards

20 brought to court today. And can you look at the first page

21 of your report? Probably about five from the bottom on the

22 side that reflects what's reflected on the magnetic strip.

23       A    Okay.

24       Q    Do you see it?

25       A    Yes.

1    Q    Okay.  What bank issued that card?

2    A    JP Morgan Chase.

3    Q    And it's a debit card?

4    A    Yes.

5    Q    And the last numbers are 8856; is that right?

6    A    Correct.

7    Q    Can you tell me what number was on the front of

8    that card, the card that was recovered from the defendant by

9    Agent Hinke?

10    A    Yes.  The account number on the card that was

11    recovered was 4847186346104793.

12    Q    So the last digits are 4793?

13    A    Correct.

14    Q    They're not the same?

15    A    They're not the same.

16    Q    Okay.  Can you look at the very last page of the

17    80 cards that are on your exhibit?  And the very last entry,

18    can you read me the last four digits that are on the

19    magnetic strip on that card?

20    A    1014.

21    Q    For the record, that's the account number that

22    Matt -- what's his last name?

23        MS. MORENO-TAXMAN:  Palmieri.

24    BY MS. KRAFT:

25    Q    -- Palmieri testified was his real number.

1          Can you then move over to the counterfeit cards

2     that were recovered from the defendant and tell me what the

3     last four digits on that particular -- you determined that

4     the last four digits on that particular card were?

5          A     6370.

6          Q     And those are not the same?

7          A     Those are not the same.

8          Q     What bank issued the card that has the last digits

9     1014?

10         A     JP Morgan Chase.

11         Q     Okay.  And it's a debit card; is that correct?

12         A     Yes.

13         Q     And that's what was encoded on the back of that

14    particular card?

15         A     Correct.

16         Q     But the number on the front of that card is not

17    the same?

18         A     That is correct.

19         Q     What bank did the number on the front of the card

20    purport to say had issued that card?

21         A     That account was issued by the bank holder.

22         Q     Then I would like you to look at -- oh, gosh.  Now

23    I've got my pages mixed up.

24               The middle column of -- I believe it's going to be

25    the second page of your report that reflects the examination

1    of the 80 cards.

2            In the middle of the page, do you see on the side

3    that shows the numbers that were encoded -- actually encoded

4    on the magnetic strip, a number that is 1829?

5            And, for the record, that's the number that

6    Erika Borg testified was her card number.

7        A    So that was on the second page?

8        Q    I believe it's on the second page.  About halfway

9    down on the side that's --

10       A    Yes, I see it.

11       Q    Okay.  And if you could then look across and find

12    where it is that the -- I just need the last four digits of

13    the number that was on the card, printed on the card that

14    produced this 1829 number and the encoded portion?

15       A    It was printed account ending in 4424.

16       Q    And what bank issued the account -- or the card

17    that was the actual card -- that was the card that had the

18    decoded information on the magnetic strip?

19       A    Could you repeat?

20       Q    1829.

21       A    Okay.  The account number ending in 1829 was

22    issued by JP Morgan Chase.

23       Q    And what bank does the printed information on that

24    card reflect or purport to be the issuing bank?

25       A    That account was issued by the Bankcorp Bank.

1        Q     So among the 80 cards that you examined as part of

2   Exhibit 1A, none of them had the same information on the

3   front and on the back; is that correct?

4        A     That's correct.

5        Q     Okay.  Now, let's look at the 12.

6              Will you bring that up on the screen,

7   Agent Hoalcraft?

8              For the record, these are the 12 cards that were

9   recovered from Florin's pocket.

10             Would you look about a third of the way down?  Do

11  you see a number that was encoded on the back of the card

12  that ends in 0708?

13       A     Yes.

14       Q     And what are the last four digits of the printed

15  number on that card?

16       A     4255.

17       Q     And do you see on the encoded portion of the card

18  a number that ends in 9973?

19       A     Yes.

20       Q     And what number is printed on the face of the

21  card?

22       A     Account number ending 8849.

23       Q     And then, finally, on the receipt, do you see a

24  number ending with 6891?

25       A     Yes.

1    Q    And do you see on your chart a coded number that

2    ends with that number, 6891?

3    A    6891.  That was on a printed card that ended 7651.

4    Q    And, for the record, these are the receipts that

5    reflect money was withdrawn at various ATMs in Illinois on

6    May 12th of 2018.

7         And then would you look at the two, the two

8    card -- this is Exhibit No. 18B.  Do you see what that is?

9    A    It's a receipt from Neiman Marcus.

10   Q    For?

11   A    A pair of $595 shoes.

12   Q    And what are the last four digits of the account

13   number that are on that receipt?

14   A    1255.

15   Q    Okay.  And when you examined those two cards, did

16   you find a card that had "1255" printed on the front of it?

17   A    No.

18   Q    What was printed on the front of this card?

19   A    An account number ending 8540.

20   Q    And it purported to be an American Express gift

21   card?

22   A    Correct.

23   Q    But, in fact, what bank issued the account that

24   ends in 1255?

25   A    It's an account issued by UMB Bank.

1           MS. KRAFT:  Your Honor, at this point, we would

2    move into evidence 18B and 18B1, which I think the Court

3    said was going to reserve ruling until we had tied it up.

4           THE COURT:  The Court already received it subject

5    to being tied up, and the Court finds there's sufficient

6    predicate to tie the Exhibits 18B and 18B1.  Received.

7    BY MS. KRAFT:

8        Q    And then, finally, this is Exhibit No. 4B, which,

9    for the record, Sergeant Ansell testified he recovered from

10   the bathroom.

11          Do you see the card that is circled on your

12   exhibit that reflects your examination of the six cards?

13       A    Yes.

14       Q    And would you read us the last four digits of the

15   card that Sergeant Ansell found?

16       A    The card ending 3132?

17       Q    Yes.  Okay.  And on your chart, what was the

18   number that was encoded on the back of that card?

19       A    It was an account number ending 3654.

20       Q    And I'm now going to hand you 16.

21          For the record, these are receipts recovered from

22   the Kwik Trip with respect to items that were purchased

23   there.

24          Do you see either of those numbers on these

25   receipts?

1        A    Yes.  The account number ending 3654 is on both of

2   them.

3        Q    And that's on the -- or that number is the one

4   that goes with the legitimate card; is that correct?

5        A    Correct.

6        Q    But that number is not printed on the front of the

7   card?

8        A    That is correct.

9        Q    What are the last digits on the front of the card?

10       A    3132.

11            MS. KRAFT:  With that, Your Honor, my somewhat

12   awkward examination of Detective Milotzky is finished.

13            THE COURT:  All right.  Thank you.  Mr. Uller.

14            MR. ULLER:  Thank you.

15                        CROSS-EXAMINATION

16   BY MR. ULLER:

17       Q    Detective, your report indicates that it was

18   created on May 21st, correct?

19       A    Correct.

20       Q    That's the date that you examined the cards?

21       A    Correct.

22       Q    And that's the date that you had this report

23   prepared?

24       A    Yes.

25       Q    What did you do with this report after you

```
 1    received it?  Did you turn it over to the Government?
 2         A    I turned it over to Agent Hoalcraft.
 3         Q    Now, the report is the product of a few different
 4    factors, right?  There's a hardware that you use, correct?
 5         A    A combination of hardware and software.
 6         Q    There's software as well, right?
 7         A    Yes.
 8         Q    And there's also a human component to it as well,
 9    right?
10         A    Sure.
11         Q    You are the human?
12         A    Yes.
13         Q    And you are swiping the cards?
14         A    Yes.
15         Q    And you're also inputting information into this
16    report; is that correct?
17         A    I'm not putting information solely into this
18    report.  It's more into the software as you interrogate the
19    cards.
20         Q    So you put information into the program?
21         A    Yes.
22         Q    Now, this is a program, both the hardware and
23    software, that you use in your capacity as a detective,
24    right?
25         A    Correct.
```

Q     You obtain those through your work at the Wawatosa

Police Department?

A     Correct.

Q     And you obtain this hardware and this software to

do precisely the type of work that you did in this case,

right?

A     Correct.

Q     What's the software called?

A     Electronic Recovery and Access to Data, which is

also ERAD for short.

Q     And what about the hardware?

A     The hardware is a simple device that reads

magnetic stripes, the same kind of hardware that you would

swipe your card at a gas pump, at a point of sale terminal.

It's just a device that plugs into the computer that reads

the data encoded on the stripe.

Q     What's it called?

A     A magnetic stripe reader.

Q     Is there a brand, or is there --

A     No.  There's multiple different brands that are

available.  The one that I use mostly is the one that is

provided with the ERAD software.

Q     So it actually comes with the software program?

A     Yes.

Q     And the software program is something you use with

1   what kind of frequency?

2        A    Typically once a week, sometimes more.

3        Q    How long have you had it?

4        A    A little over a year.

5        Q    So when you used it in May, you had had it maybe

6   eight months?  Six to eight months?

7        A    I think about 11 months at that point.

8        Q    Okay.  And you used it with some frequency?

9        A    Yes.

10       Q    And do you use it mostly for Wawatosa Police

11  Department business or more so with your role on this task

12  force?

13       A    A combination of both, as well as assisting other

14  agencies in the area.

15       Q    This is an investigation from Oshkosh.  When you

16  say "in the area," what sort of law enforcement agencies do

17  you find yourself assisting?

18       A    Well, currently our agency was one of the first to

19  have it in Milwaukee County.  So I assisted some of the

20  other Milwaukee County agencies as they encountered cloned

21  card cases.

22       Q    So it's a somewhat unique program that you guys

23  have?

24       A    To Milwaukee County it was.

25       Q    What about the region in general?

1     A    Everyone in Waukesha County has it.  Their DA's

2  office runs their program.  It's used all over the country.

3  Milwaukee County was just a little slow in getting it.

4     Q    And do you know the ins and outs of how it works?

5     A    I know how to use it.  It's kind of like I know

6  how to use my TV, but I can't explain how the software

7  works.

8          MR. ULLER:  Thank you.  Nothing further,

9  Your Honor.

10          MS. KRAFT:  No redirect.

11          THE COURT:  All right.  Thank you, Detective.  You

12  may step down.  You are excused.

13          MS. MORENO-TAXMAN:  Would you like us to call our

14  next witness, Your Honor?

15          THE COURT:  I'm sorry?

16          MS. MORENO-TAXMAN:  Do you want us to continue?

17          THE COURT:  Certainly.

18          MR. ULLER:  Judge, can we have a brief sidebar

19  before we continue?

20      (Bench conference.)

21          MR. ULLER:  I raised the hearsay objection when

22  they offered the exhibit.  After hearing from the detective,

23  it's apparent from the detective's testimony that he doesn't

24  know how the software operates.

25          THE COURT:  You made your record; the Court has

 1    made its.  Let's move on.

 2         (In open court.)

 3              MS. KRAFT:  The record should reflect that

 4    Michelle Pribyl from our office is sitting at counsel table

 5    just to operate the computer.

 6              THE COURT:  Thank you.

 7                   ZACHARY HOALCRAFT, WITNESS, SWORN

 8                        DIRECT EXAMINATION

 9    BY MS. MORENO-TAXMAN:

10         Q    Special Agent Hoalcraft, how are you employed?

11         A    I'm employed as a special agent with the United

12    States Secret Service.

13         Q    What are your general duties?

14         A    My general duties here in Milwaukee are

15    investigating financial crimes along with protecting the

16    president, the vice president, and their families.

17         Q    And how long have you been employed by the United

18    States Secret Service?

19         A    I have been employed by the Secret Service for

20    almost four years.

21         Q    And in what capacities?

22         A    I've been an agent for approximately a year, and

23    before that I was an officer in Washington, D.C.

24         Q    What did you do as an officer in Washington, D.C.?

25         A    I protected the embassies located around the city

1    and all the foreign dignitaries as well as the White House

2    and the vice president's residence and general policing in

3    the District of Columbia.

4         Q    Okay.  I'm just going to ask you to speak a little

5    slower.  We're at the end of the day, and our court reporter

6    has to take everything down, so if you can just slow down a

7    little bit.  Thank you.

8              And as part of your duties, have you received

9    training in ATM skimming?

10        A    Yes, I have.

11        Q    And can you explain to us what ATM skimming is?

12             MR. ULLER:  Objection.  This has been asked and

13   answered.

14             THE COURT:  The objection is noted and overruled.

15             Answer the question.

16             THE WITNESS:  ATM skimming is the process where a

17   device is placed inside or over an ATM terminal where you

18   would insert your card.  The device collects the data that's

19   on the mag stripe on the back of the card, and there's a

20   pinhole camera generally placed somewhere on the ATM to be

21   able to collect your pin number that you're putting in after

22   you insert your card.

23   BY MS. MORENO-TAXMAN:

24        Q    And why do people do this?

25        A    From my understanding, people do this to collect

1    information about people using their ATM cards and then

2    will, in turn, re-encode the information onto another card

3    and attempt to perform withdraws on other accounts.

4    Q    So once the information is taken from the magnetic

5    strip through the skimmer and the code, the pin from with

6    the pinhole camera, what happens with that information?

7    A    The information is generally put into a computer

8    where the information collected from the mag stripe reader

9    will be matched up or paired with the information collected

10   in the pinhole camera.  So you can re-encode a gift card,

11   per se, with legitimate account information and also have a

12   pin number associated with the account.

13   Q    Okay.  And in this case, were you involved in the

14   investigation of the defendant?

15   A    Yes, I was.

16   Q    And how did you get involved?

17   A    I was contacted by the Oshkosh Police Department

18   that they were investigating some possible access device

19   fraud occurring in the Oshkosh area, and I responded to

20   Oshkosh afterwards.

21   Q    Okay.  And when you got there, did you go by

22   yourself, or did you go with anybody else?

23   A    I initially went by myself.

24   Q    Okay.  And did anybody else in the Secret Service

25   join you?

1          A     My boss did afterwards, yes.

2          Q     And what's your boss's name?

3          A     Kerry Dyer.

4          Q     And is he in court here today?

5          A     He is.

6          Q     Watching you testify?

7          A     Yes.

8          Q     Okay.  Could you please tell us where he's seated

9     and point him out?

10         A     He's seated in the back of the room.

11               MS. MORENO-TAXMAN:  Let the record reflect the

12    identification of his supervisor.

13    BY MS. MORENO-TAXMAN:

14         Q     You went to Oshkosh; is that right?

15         A     Yes, I did.

16         Q     And what was the first thing you did when you got

17    there?

18         A     I initially went to the hotel to meet with a

19    couple of the detectives, and afterwards I responded over to

20    the police department.

21         Q     And once you went to the police department, which

22    was the first room you went into?

23         A     I went into the detective's bureau, and from there

24    we went into the conference room where the defendant had

25    been placed.

1    Q    Okay.  And when you were in the conference room,

2    did you advise him of his rights?

3    A    I did.

4    Q    I'm going to place in front of you a folder that

5    has several exhibits in it.  It has your name typed on the

6    front.  Do you have that?  I'll hand you that folder.

7    A    Thank you.

8    Q    Could you please look at Exhibit No. 10 and tell

9    us what you see, what it is?

10    A    This is the U.S. Secret Service Miranda warnings

11    form.

12         MS. MORENO-TAXMAN:  Your Honor, I would move to

13    admit Exhibit 10.

14         THE COURT:  All right.  The Court will receive

15    Exhibit 10.

16         MS. MORENO-TAXMAN:  And permission to publish.

17         THE COURT:  You may.

18    BY MS. MORENO-TAXMAN:

19    Q    Okay.  So this was the first thing you did when

20    you talked to him?

21    A    It was.

22    Q    And can you tell us what rights you advised him

23    of?

24    A    "You must understand your rights before we ask you

25    any questions.  You have the right to remain silent.

Anything you say can and will be used against you in a court
of law.  You have the right to talk to a lawyer and have him
present with you while you're being questioned.  If you
cannot afford to hire a lawyer, one will be appointed to
represent you before any questioning, if you wish.  You can
decide at any time to stop the questioning and not answer
any questions or make any statements."

Q    And is that initialed by you or signed by you?

A    It's signed by me and Sergeant Ansell.

Q    Okay.  And what about the defendant?

A    The defendant signed his name himself.

Q    Okay.  When we say the "defendant," do you see
that person in court here today?

A    I do.

Q    Can you tell us where he's seated and what he is
wearing?

A    He's seated at the table directly behind you.
He's wearing a gray suit with a white shirt.

MS. MORENO-TAXMAN:  May the record reflect the
identification of the defendant?

THE COURT:  The record will so reflect.

BY MS. MORENO-TAXMAN:

Q    And how would you describe his demeanor?

A    He was cooperative.

Q    Okay.  And did he talk to you generally about what

1    he had been involved in?

2        A    He did.

3        Q    Okay.  Now, that room did not have a video

4    recorder; is that right?

5        A    It did not.

6        Q    And did you at some point move to a room that had

7    a video recorder?

8        A    Yeah.  Later, when he was writing his written

9    statement, he was moved to a room with video recording.

10       Q    Okay.  And do you know if that statement was audio

11   and video recorded?

12       A    The statement -- in the basement, when he was

13   writing his written statement, it was, yes.

14       Q    Okay.  Was he given a form to write a written

15   statement?

16       A    Yes, he was.

17       Q    Okay.  And I would like you to look at what's

18   marked as Exhibit 11.  Would you please identify that?

19       A    Yep.  It's a statement form.  That's a Secret

20   Service form.

21       Q    Okay.  And what is on that form?

22       A    On the form it has the date, city, the county and

23   the state, along with the defendant's name, the date that we

24   talked to him.  He had been advised by me that he has the

25   same warnings that he had previously, and then his written

1  statement goes on for three pages.

2      Q    Is that the statement of the defendant?

3      A    Yes, it is.

4      Q    And who wrote that?

5      A    The defendant wrote it himself.

6      Q    Okay.  And while he was writing this, was it also

7  videotaped?

8      A    It was.

9      Q    Okay.  Now, you were in court today when

10 Detective Hinke testified at the beginning of Exhibit 12B

11 and 12B1?

12     A    I was.

13     Q    And is it fair to say that she was there at the

14 beginning of that statement but then left?

15     A    She was.

16     Q    And you reviewed Exhibits 12B1 and 12B as well as

17 12C?

18     A    I have.

19          MS. MORENO-TAXMAN:  At this time, Your Honor, I

20 would ask to have the Court admit Exhibits 12B, 12B1, 12C,

21 and 12C1?

22          MR. ULLER:  Objection.  403.  Cumulative.

23          THE COURT:  The objection is overruled.

24          The Court will allow you to proceed with the

25 playing of each of those tapes:  12B, 12B1, 12C, 12C1.

1          MS. MORENO-TAXMAN:  Can we please go to 12B1?

2      (Video played to the jury.)

3   BY MS. MORENO-TAXMAN:

4      Q    I see Detective Hinke.  Who is the person sitting

5   in that chair?

6      A    The chair on the left is the defendant; the chair

7   on the right is me.

8      Q    All right.  Please continue.

9      (Video played to the jury.)

10  BY MS. MORENO-TAXMAN:

11     Q    Can you tell us who is talking there?

12     A    That's my supervisor.

13     Q    What's his name?

14     A    Kerry Dyer.

15     Q    Okay.  All right.  You can continue.

16     (Video played to the jury.)

17  BY MS. MORENO-TAXMAN:

18     Q    Then at this point, did you step out of the room?

19     A    I did.

20          THE COURT:  Ms. Moreno-Taxman, we've reached the

21  end of our trial day, and we'll pick up with the balance of

22  Agent Hoalcraft's testimony tomorrow at 8:30.

23          Members of the jury, I want you to leave this

24  evening again with the admonition that I've given you

25  throughout the day, and that is please do not discuss this

case either among yourselves nor with anyone with whom you might have contact this evening. Similarly, I do not want any of you to conduct any independent investigation of the facts or anyone associated with this case.

As I instructed you during my preliminary introductory instructions this morning, you are called upon to fulfill that most important of civic obligations, to decide the facts in this case from the evidence presented here in this courtroom and from no other source.

And in order to insure that each of you keep the pledge that you took when you took the oath to serve, please keep in mind that you are to decide this case solely on the basis of the evidence presented during the trial and in accordance with the Court's instructions on the applicable law.

I'm now going to excuse you for this evening. I would invite you to be back in the jury room tomorrow morning shortly before 8:30, and we'll be ready to proceed at that time.

The Court stands in recess.

(Trial adjourned to continue the following day.)

1                           C E R T I F I C A T E

2

3               I, Richard D. Ehrlich, a Registered Merit Reporter

4        and Certified Realtime Reporter, certify that the foregoing

5        is a true, complete, and accurate transcript of the

6        proceedings ordered to be transcribed in the above-entitled

7        case before the Honorable J.P. Stadtmueller, and jury, in

8        Milwaukee, WI, on September 10, 2018.

9

10       s/Richard D. Ehrlich  September 21, 2018
         _____
11       Richard D. Ehrlich, Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25