UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


-----------------------------------------------------------

UNITED STATES OF AMERICA,          )
                                   )
     Government,                   )   Case No. 18-CR-129
                                   )
                                   )
     vs.                           )
                                   )
IONEL MURESANU,                    )   September 11, 2018
                                   )
     Defendant.                    )

-----------------------------------------------------------




**VOLUME II OF II**

**TRANSCRIPT OF JURY TRIAL**

BEFORE THE HONORABLE J.P. STADTMUELLER

UNITED STATES DISTRICT JUDGE




Official Court Reporter:
Richard Derrick Ehrlich, RMR, CRR
richard_ehrlich@wied.uscourts.gov
414.290.2642


Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

```
1                          A P P E A R A N C E S

2

3       For the Government:

4                           Carol L. Kraft
                            Karine Moreno-Taxman
5                           United States Department of
                            Justice (ED-WI)
6                           Office of the U.S. Attorney
                            517 E. Wisconsin Avenue
7                           Milwaukee, WI 53202
                            414.297.1775
8                           carol.kraft@usdoj.gov
                            karine.moreno-taxman@usdoj.gov
9

10      For the Defendant:

11
                            Joshua D. Uller
12                          Federal Defender Services
                            of Wisconsin, Inc.
13                          517 E. Wisconsin Avenue
                            Room 182
14                          Milwaukee, WI 53202
                            414.220.9900
15                          joshua_uller@fd.org

16

17      Ionel Muresanu, defendant, present in person.

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

<u>Page</u>

<u>Zachary Hoalcraft</u>

Direct Exam by Ms. Moreno-Taxman ......... 189
Cross-Exam by Mr. Uller .................. 201
Redirect Exam by Ms. Moreno-Taxman ....... 205

<u>Closing Arguments</u>

Ms. Kraft ............................... 239
Mr. Uller ............................... 258
Ms. Moreno-Taxman ....................... 266

<u>Verdict</u> ................................. 280

1    (Jury not present.)

2    THE CLERK:  The Court calls *United States vs.*

3    *Ionel Muresanu*, Case No. 18-CR-129, for a jury trial.

4    May I have appearances beginning with the

5    Government, please?

6    MS. MORENO-TAXMAN:  Karine Moreno-Taxman and Carol

7    Kraft on behalf of the United States.  Also present at the

8    table is United States Secret Service Agent Zachary

9    Hoalcraft and Michelle Pribyl as well, our legal assistant.

10    MR. ULLER:  Good morning, Judge.  Mr. Muresanu

11    appears with Joshua Uller.

12    THE COURT:  Thank you.  Good morning, Counsel, and

13    good morning to our agent, and good morning to you,

14    Mr. Muresanu.

15    Before the jury comes in, since my staff wants to

16    get these jury instructions formed, edited, and prepared,

17    are there any requests that we haven't addressed with regard

18    to jury instructions?

19    MS. KRAFT:  I don't think we do, Judge.  I

20    reviewed them.  They're fine with me.

21    Ms. Moreno-Taxman hasn't had a chance to really

22    look at them in any detail, but at this point, I would say

23    we don't think that we're going have any additional requests

24    or any objection to what's in the pattern.

25    THE COURT:  Mr. Uller?

```
1              MR. ULLER:  No, Your Honor.

2              THE COURT:  All right.

3              MR. ULLER:  In my view, I didn't see anything.

4              There was one other matter I wanted to address

5    before the jury came in.

6              THE COURT:  Certainly.

7              MR. ULLER:  There was an agreement between the

8    parties that the Government would not introduce any evidence

9    and avoid any reference to Mr. Muresanu's immigration

10   status, the time he's been in the country, things of that

11   nature.  And the final exhibit that was introduced yesterday

12   afternoon, 12B1 and 12B, the statement included

13   Mr. Muresanu's -- I guess a statement about having only been

14   in the country for two years.

15             I'm not asking for anything substantial other than

16   an indication from the Government as to whether there is any

17   other additional evidence like that, and if there is, I

18   would ask that it be excluded.

19             MS. MORENO-TAXMAN:  Your Honor, first of all,

20   there was no agreement reached about -- we decided to take

21   out those references, but the Court never ruled on them, and

22   that reference of the fact that he just was in the country

23   for less than a year, the Court has repeatedly told this

24   jury that he is a resident of California.  There is nothing

25   in those statements that come close to going into his
```

immigration status or the fact that he's here illegally.  So
I think just for the record's sake, that is not a valid
claim and that there was no agreement.

Thank you, Your Honor.

THE COURT:  All right.  Well, the comment in
Mr. Muresanu's statement is at best antiseptic.  There's
nothing to suggest that he was not born here.  He may have
legally immigrated to the United States.  There's nothing to
suggest that he's here illegally insofar as the jury is
concerned.

MS. KRAFT:  Just one more housekeeping matter,
Your Honor.  We conferred with your clerk.  It appears that
I neglected to move in Exhibit Nos. 3A and 3B.  Those are
the cards that were recovered from Florin and the photograph
of the cards.  Detective Artus testified about them
yesterday.  I published them.  So I would move to have them
admitted into the record at this point in time.

THE COURT:  All right.  The Court will receive
Exhibits 3A and 3B.

MS. KRAFT:  Then there is Exhibit No. 12A1, which
is the transcript of a recording that we've already heard
that Detective Hinke testified about when she was on the
stand.  We would also move that into evidence.

THE COURT:  All right.  The Court will receive
Exhibit 12A1.

1              MS. KRAFT:  Thank you.

2              THE COURT:  Are there any other witnesses other

3      than Mr. Hoalcraft?

4              MS. MORENO-TAXMAN:  No, Your Honor, not on behalf

5      of the United States.

6              THE COURT:  All right.  Very well.

7              Mr. Hoalcraft, you may resume the witness stand.

8              And, Mr. Shepherd, you may bring the jury in.

9              MR. ULLER:  Judge, just briefly.  In reviewing,

10     again, instructions, I didn't see an expert witness

11     instruction, and the Government has indicated -- just

12     provided Exhibit 27, which is their notice of expert

13     testimony.

14             MS. MORENO-TAXMAN:  Exhibit 27?

15             MR. ULLER:  Exhibit 27 is the -- well, you didn't

16     give it to me.  You said I already had it.

17             MS. MORENO-TAXMAN:  Judge, our position was that

18     he was never an expert.  I did not give a notice of expert

19     at this time.  A notice of expert was given way earlier

20     before the final pretrial, and there was no objection made

21     during any of the testimony of any of the witnesses.

22             THE COURT:  There is reference in the jury

23     instructions to expert.

24             MS. MORENO-TAXMAN:  Okay.

25             MR. ULLER:  Okay.  I have to take a closer look,

1    Judge.  I apologize.

2            MS. KRAFT:  I saw a reference that there was some

3    expert testimony, I thought.

4            On page 8 of 20:  "An exception to the rule exists

5    as to those whom we call "expert witnesses."  Witnesses who,

6    by education and experience, have become expert in some art,

7    science, profession, or calling."

8            MR. ULLER:  Thank you.

9            MS. KRAFT:  Et cetera.

10           MR. ULLER:  I thought I had seen it.

11           THE COURT:  Essentially, the instructions that are

12   before you are the parties' agreed upon.  They've been

13   formatted.  They have been readjusted in terms of sequence,

14   but what the parties requested is what you have.  So we

15   haven't taken anything away or added.

16           Mr. Shepherd, you may invite the jurors in.

17       (Jury present.)

18           THE COURT:  Good morning, members of the jury.

19   We're ready to proceed with the balance of Agent Hoalcraft's

20   testimony.

21           Agent Hoalcraft, you may assume your same oath

22   that you took yesterday when you began your testimony.

23           Ms. Moreno-Taxman, you may continue.

24           MS. MORENO-TAXMAN:  Thank you.

25

ZACHARY HOALCRAFT, WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (continued)

BY MS. MORENO-TAXMAN:

Q    Good morning, Agent Hoalcraft.

A    Good morning, ma'am.

Q    You were here in court yesterday during the testimony of Detective Artus?

A    I was.

Q    And Detective Artus identified some photocopies as the receipts that were found on Florin; is that correct?

A    Yes.

Q    And since that time, have you looked at Exhibit 3C1 and 3C and compare them to see if the two are the same copies of the original?

A    I have.

MS. MORENO-TAXMAN:  Your Honor, I would move in 3C1 at this time.

THE COURT:  All right.  The Court will receive Exhibit 3C1.

MS. MORENO-TAXMAN:  Thank you.

BY MS. MORENO-TAXMAN:

Q    At this time, can we go back to where we were on the statement?

When we left yesterday, we had taken -- you leave the room, correct?  And we saw the defendant sit down, and

1    you gave him some papers, right?  Some paper to look at and

2    fill out for his statement; is that correct?

3        A    Yes.

4        Q    I'm going to show you now what's been marked

5    Exhibit 11.  Can you please identify that for us?

6        A    This is the defendant's written statement.

7             MS. MORENO-TAXMAN:  Your Honor, I would move into

8    evidence Exhibit 11.

9             THE COURT:  All right.  The Court will receive

10   Exhibit 11.

11            MS. MORENO-TAXMAN:  Your Honor, I also ask for

12   permission to publish it to the jury.

13            THE COURT:  You may.

14            MS. MORENO-TAXMAN:  Thank you, Your Honor.

15   BY MS. MORENO-TAXMAN:

16       Q    So as we discussed when we left yesterday, you had

17   filled out the form that we see -- or given him the form

18   that we see in the video; is that correct?  And then he was

19   left alone and given a chance to write; is that correct?

20       A    Yes.

21       Q    Okay.  After a period of time, what happened?  So

22   we're watching him write, correct?

23       A    Yes.

24       Q    Okay.  So can we just -- yeah.

25            (Video played to the jury.)

BY MS. MORENO-TAXMAN:

Q    And about how much time did you give him outside?

A    I don't recall exactly how much, but it was approximately 20, 30 minutes.

Q    Okay.  And then did you return back in the room?

A    Eventually, yes.

Q    Okay.  Could you please play for us -- you've reviewed Exhibit 12C; is that correct?  That's the transcript of -- the partial transcript of when you went back into the room?

A    I have.

MS. MORENO-TAXMAN:  So, Your Honor, at this time, I would move in evidence 12C and 12C1.

THE COURT:  All right.  The Court will receive Exhibits 12C and 12C1.

MS. MORENO-TAXMAN:  Can you please play it for us?

(Video played to the jury.)

BY MS. MORENO-TAXMAN:

Q    Can you just stop it a second?

Okay.  Your supervisor is back in the room talking to the defendant; is that right?

A    That is.

Q    And if we look at that form, we can see there's handwriting on there?

A    Yes.

1    Q    And that was his handwriting; is that correct?

2    A    That was.

3    Q    Okay.

4         Can we please continue?

5         (Video played to the jury.)

6    BY MS. MORENO-TAXMAN:

7    Q    So that signature on the bottom of the card of

8    this statement, who wrote that signature?

9    A    The defendant wrote his own signature.

10   Q    Okay.  And what about your signature?

11   A    I wrote my signature.

12   Q    And what's the other signature on this?

13   A    The other signature is my supervisor, Kerry Dyer.

14   Q    Could you just please put up Exhibit 11?  Could

15   you just go to the last page, please?

16        Is that the signatures you were talking about?

17   A    Yes, they are.

18   Q    And then can we go back to the first page, please?

19        There are some corrections with initials on those

20   in that first page.  Can you explain just what that is?

21   A    Yes.  So if the defendant needed to cross

22   something out, he would have to write his initials over it

23   to say that he crossed them out.

24   Q    So all those cross-outs were his?

25   A    Yes.

1          Q     Did you write any of this other than your

2     signature?

3          A     I did not.

4          Q     Thank you.

5               So as part of your investigation, now that you had

6     these hundred cards, what was the next step that you did?

7          A     After we took possession of the cards, we brought

8     them to Detective Milotzky at Wawatosa to read the magnetic

9     strip back.

10         Q     Okay.  And that is Exhibit 25; is that correct?

11         A     I believe so.  I don't have it in front of me.

12              MS. MORENO-TAXMAN:  Your Honor, I'm going to ask

13    to publish Exhibit 25 to the jury.

14    BY MS. MORENO-TAXMAN:

15         Q     So now what I would like to do, really, is to get

16    to the nitty-gritty of what the Secret Service does to

17    figure out whose magnetic strip is encoded in that card and

18    that they're real people; is that right?

19         A     Uh-huh.

20         Q     So step one was having the detective from Wawatosa

21    run the strips, right, to see where they came from?

22         A     Yes.

23         Q     Okay.  And in addition to him running it, did you,

24    yourself, witness him doing that?

25         A     I did.

1    Q    And that was after he created this report; is that
2    correct?
3    A    It was.
4    Q    And did you verify with your own eyes that
5    everything on this report was correct?
6    A    Yes.
7    Q    And about how long did that process take?
8    A    The process takes about three hours, four hours
9    for the number of cards.
10   Q    Okay.  And if you had not used the software that
11   he had, could this report have been generated?
12   A    It could've been.
13   Q    Okay.  And you, yourself, have used a handheld
14   magnetic strip reader?
15   A    I have.
16   Q    And how long would you estimate it would take to
17   do 100 cards?
18   A    It would probably take several days.
19   Q    Okay.  And you saw him put it through the magnetic
20   strip and see the number come up; is that right?
21   A    I did.
22   Q    Do you have a highlighter next to you?
23        So on the first page of this exhibit, if we go up
24   to the sixth up.
25   A    Sixth from the bottom?

1          Q    Yes, please.  I'm going to show you now what has

2     already been admitted into evidence, which is the vanilla

3     card recovered from the defendant with the numbers ending

4     4793.  Can you use the pointer and show us where the

5     detective manually entered that information?

6          A    It's right here (indicating).

7          Q    Okay.  Can you do it in the big one?  That would

8     help us.

9          A    Here (indicating).

10         Q    So there it is.

11              So right now all we see there is that a card that

12    claims to be a Bankcorp card with the 4793 numbers was what

13    was on the front of the card?

14         A    Yes.

15         Q    And that it claims to be a prepaid Visa card,

16    right?

17         A    Yes.

18         Q    Okay.  Now, if you go down further, what did the

19    magnetic strip show for that particular card?

20         A    The magnetic strip showed the last four ending in

21    8856.

22         Q    If we could show you -- and you've highlighted

23    that line?

24         A    I have.

25         Q    Thank you.

1        A    Those four.

2        Q    So 8856 was the actual account; is that correct?

3        A    Uh-huh.

4        Q    And what bank was it from?

5        A    That was from JP Morgan Chase.

6        Q    If we look on a little bit --

7             MR. ULLER:  Objection, Your Honor.  This is

8   cumulative.  We went through this with the last witness.

9             THE COURT:  Yeah.

10             I'm not sure, Ms. Moreno-Taxman, unless we're all

11   missing something, what the importance of this is at this

12   juncture.

13             MS. MORENO-TAXMAN:  All right.

14   BY MS. MORENO-TAXMAN:

15        Q    Could you, please -- also looking at page 2, could

16   you highlight the 17th card down, the one that ends in 4424?

17             And then, finally, on the third page, the bottom

18   one which ends in 6370, are those the accounts that you

19   ultimately figured out belonged to the victims who

20   testified -- the alleged victims who testified here?

21        A    Yeah, I believe so.

22        Q    Okay.  And can I show you the other cards that end

23   in 4424 and 6370?  Were those the vanilla gift cards that

24   had the information encoded for the three victims?

25        A    Yes, they are.

1    Q    Okay.  Now, at this point, though, you still don't

2  know who the victims are; is that correct?

3    A    Correct.

4    Q    So all you know is that there's 100 counterfeit

5  access devices and no idea whose accounts they are, right?

6    A    Correct.

7    Q    So what's the next step that you do?

8    A    The banks are subpoenaed for the account holder

9  information at which point they return the bank records.

10        MS. MORENO-TAXMAN:  Your Honor, I had given notice

11  pursuant to Rule of Evidence 902(11), that will include all

12  of the different banks that were subpoenaed.  I have now

13  marked that as Exhibit 27 and ask to be able to move it into

14  evidence.

15        THE COURT:  All right.  The Court will receive

16  Exhibit 27.

17  BY MS. MORENO-TAXMAN:

18    Q    Now, how many banks were involved?

19    A    There were numerous; upwards of 50.

20    Q    And did you subpoena all 50 banks?

21    A    No.

22    Q    Okay.  And so when you look at Exhibit 27, does it

23  tell you which banks you did subpoena?

24    A    It does.

25    Q    Okay.  Can you just give us the names of those

1    banks?

2        A    Sure.  JP Morgan Chase, U.S. Bank, MetaBank, Bank

3    of America, Regents, and that was it.

4        Q    Okay.  So although there were 100 cards, you

5    didn't subpoena the records for all 100, right?

6        A    No.

7        Q    Okay.  And when you got back the JP Morgan Chase

8    information, were you able to identify the three account

9    names just on your own of who those people were?

10       A    Yes.

11       Q    And how were you able to do that?

12       A    The bank records returned with their information,

13   the account holder information.

14       Q    Okay.  And then what did you do with that?

15       A    You matched the account holder's account number or

16   their debit card number with the chart that was produced by

17   the detective from Wawatosa to see which vanilla card

18   corresponded to the account that was encoded on the back.

19       Q    And did you create a summary report based on that

20   information?

21       A    I did.

22       Q    I'll show you what's been marked as Exhibit 26.

23   Can you tell us what that is?

24       A    This is the summary report that was produced with

25   all the returned records.

1    Q    All right.  And does that tell you what the actual

2  account was and then who the name of the account holder is

3  and what was the actual account name?

4    A    It does.

5         MS. MORENO-TAXMAN:  Your Honor, at this time, I

6  would move in evidence Exhibit 26 and ask to publish it.

7         THE COURT:  All right.  The Court will receive

8  Exhibit 26, and you may publish.

9  BY MS. MORENO-TAXMAN:

10    Q    So even though you didn't subpoena those 50 banks,

11  those banks gave you enough information to identify the

12  names of victims, of how many victims, alleged victims?

13    A    On the summary chart, there's 42 alleged victims.

14    Q    So does that mean that's all there was?

15    A    No.

16    Q    What does that mean?

17    A    That means that we received subpoena returns for

18  42 account holders' accounts.

19    Q    Okay.  And if you had all the time in the world,

20  you probably could do all 100 cards, right?

21    A    We could.

22    Q    Now, looking at Exhibit 26, can you tell us if you

23  see the name Shawna E., which I believe would represent

24  Shawna Edwards?

25    A    I do.

1    Q  Okay.  And so that was from JP Morgan Chase?

2    A  It was.

3    Q  And the account connected that to her based

4 specifically on what was on the magnetic strip was encoded

5 with what last four digits?

6    A  8856.

7    Q  And for Erika Borg, Erika B. on the chart?

8    A  The last four of her actual account is 1829.

9    Q  And then Matthew Palmieri, Matthew P. on the

10 chart, towards the bottom of the first page?

11    A  The last four are 1014, his actual account.

12    Q  Okay.  And did you actually contact these people?

13    A  I did.

14    Q  And so they were real people?

15    A  They were.

16    Q  And you've met them?

17    A  I have.

18    Q  And they're the same three that showed up here in

19 court?

20    A  They are.

21    MS. MORENO-TAXMAN:  Thank you.  I have no other

22 questions, Your Honor.

23    THE COURT:  All right.  Thank you.

24    Mr. Uller, any cross-examination?

25    MR. ULLER:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. ULLER:

Q    Special Agent Hoalcraft, you spent a fair amount of time with Mr. Muresanu, correct?

A    Correct.

Q    You interviewed him a couple times?

A    Uh-huh.

Q    We've seen portions of the interview you conducted with him.  That's not the extent of your interview with him, is it?

A    No.

Q    But the written statement that you and your supervisor obtained is sort of a summary, right?

A    Yes.

Q    And it was a summary that you intended to be able to use in a proceeding just like this, right?

A    Yes.

Q    The gist of Mr. Muresanu's statements to you is that he possessed these cards, right?

A    Yes.

Q    That he was working for a guy named Vito, right?

A    Yes.

Q    That Vito is older?

A    Yes.

Q    And Vito gave him these devices?

1    A    Yes.

2    Q    And Vito told him where to put them on?

3    A    Yes.

4    Q    And Vito told him when to pick them up?

5    A    Yes.

6    Q    And Vito collected them from Mr. Muresanu?

7    A    Yes.

8    Q    And Vito loaded information from that device onto

9    these other cards, right?

10   A    Yes.

11   Q    And that Vito gave him the cards?

12   A    Yes.

13   Q    And that Mr. Muresanu and others then gave the

14   money obtained from those cards back to Vito?

15   A    Portions of the money, yes.

16   Q    Seventy-five percent?

17   A    Yes.

18   Q    Mr. Muresanu didn't tell you that he knew which

19   cards he was being given, right?

20   A    No.

21   Q    He didn't tell you he knew whether the cards that

22   he possessed came from a skimmer that he had installed or a

23   skimmer that someone else had installed?

24   A    No.

25   Q    He didn't tell you whether he possessed cards that

1    had come from a specific location?

2           A      No.

3           Q      He was just given cards?

4           A      Yes.

5           Q      And the cards had those little stickers on them,

6    right?

7           A      Yes.

8           Q      And that kind of told him how he was supposed to

9    collect money off of those cards, right?

10          A      Yes.

11          Q      He also told you that he was going to be done with

12   this soon, didn't he?

13                 MS. MORENO-TAXMAN:  Objection.  Hearsay.

14                 THE COURT:  That objection is overruled.

15                 What did he tell you, Agent Hoalcraft, if

16   anything?

17                 THE WITNESS:  From what I recall, he stated that,

18   yes, eventually he would like to be done.

19   BY MR. ULLER:

20          Q      He told you he was getting too old for this,

21   right?

22          A      I don't recall that.

23          Q      You don't recall him telling you that he was

24   getting too old?

25          A      I do not.  He could have.  I don't recall.

1        Q    You learned in your investigation that he had

2   turned 18 just a couple weeks before he was arrested?

3        A    Yes.

4        Q    And you took the cards to Detective Milotzky

5   because he's part of this Secret Service task force, right?

6        A    Yes.

7        Q    The Secret Service office relies on his work as

8   part of that task force, right?

9        A    Yes.  His and others, yes.

10       Q    And it's your testimony that you sat in on the

11  entire three-hour process of him loading each of these cards

12  into the reader?

13       A    Yes.

14       Q    And you don't have the same software, right?

15       A    At the time we didn't.

16       Q    Okay.  And that's why you were presumably using

17  him?

18       A    Yes.

19       Q    You received the same report that is in evidence

20  here, Exhibit 25?

21       A    Yes.

22       Q    And when you created Exhibit 26, your summary

23  chart, you were relying on Exhibit 25, right?

24       A    Yes.

25       Q    And the information that his report generated,

```
1    correct?
2         A    Yes.
3              MR. ULLER:  Nothing further.
4              THE COURT:  Anything further?
5                        REDIRECT EXAMINATION
6    BY MS. MORENO-TAXMAN:
7         Q    Did the defendant ever tell you that Vito was in
8    Oshkosh, Wisconsin?
9         A    No.
10        Q    And did you have any indication, any time or place
11   that Vito was in Wisconsin?
12        A    No.
13        Q    With regard to your viewing the detective run all
14   the cards, did you compare the second time when you saw it
15   with your own eyes, with your own chart?
16        A    Yes.
17        Q    Okay.  So it's not just based on what the
18   detective from Wawatosa said, but you did a second run and
19   compared it and verified Exhibit 26 is accurate?
20        A    Yes.
21             MS. MORENO-TAXMAN:  I have no further questions.
22             THE COURT:  Anything further, Mr. Uller?
23             MR. ULLER:  No, Your Honor.
24             THE COURT:  All right.  Thank you,
25   Agent Hoalcraft.  You may step down.
```

1          MS. MORENO-TAXMAN:  Your Honor, at this time, the

2   United States rests subject to rebuttal.

3          THE COURT:  All right.  Thank you.

4          Mr. Uller, does Mr. Muresanu have any evidence to

5   bring to this jury?

6          MR. ULLER:  Your Honor, may we have a brief

7   sidebar?

8          THE COURT:  Certainly.

9      (Bench conference.)

10         MR. ULLER:  We do not have any evidence to

11  present.  I do have a Rule 29 motion to bring.  I think it's

12  probably best if maybe we excuse the jury, take that up and

13  maybe do instructions, and then we can formally rest.

14         THE COURT:  All right.  That's fine.

15     (In open court.)

16         THE COURT:  Members of the jury, the Court has a

17  couple of matters to address with counsel for which your

18  presence is not necessary.  So we're going to take those up

19  now.  And as soon as the Court is ready to proceed, we will

20  invite you back into the courtroom.

21         In the meantime, please leave your notebooks as

22  well as the exhibits that have been circulated for your

23  consideration on your chair.

24         Once again, as I reminded you throughout the day

25  yesterday, please do not discuss this case among yourselves

1    nor with anyone who has anything to do with this case.

2    You're certainly free to talk about lots of other things

3    including the miracle in Green Bay on Monday, the politics,

4    the weather, the Brewers, anything you would like, but,

5    please, do not discuss this case.

6         The Court stands in recess insofar as the jury is

7    concerned.

8       (Jury not present.)

9         THE COURT:  Mr. Uller.

10        MR. ULLER:  Thank you, Your Honor.

11        The Government has just rested, and pursuant to

12   Rule 29 of the Rules of Criminal Procedure, Mr. Muresanu is

13   moving for an acquittal as to all counts.

14        At this point, I would like to focus on Counts 2

15   through 4.  I've submitted to the Court a written motion.  I

16   will shortly docket that on the electronic docket.  The

17   basis of this motion is that the Government has charged in

18   this indictment Mr. Muresanu with knowingly attempting to

19   commit aggravated identity theft in violation of Section 18,

20   U.S.C. § 1028A(a)(1).

21        There is no general federal attempt statute, and

22   the Government's charge here of attempted aggravated

23   identity theft is permissible only if Section 1028A itself

24   prescribes attempt.  1028A does not prescribe attempt.  1029

25   does.  Mr. Muresanu, interestingly, isn't charged with

attempted access device fraud.  In Count 1, he's just
charged with access device fraud, or possessing 15 or more
counterfeit devices.

But it's the Defense's position that because the
evidence in this case cannot support a conviction to the
offense charged in the indictment, that Counts 2 through 4,
attempted aggravated identity theft, should be -- the Court
should enter a judgment of acquittal.

I've provided some case law in the motion for both
the general propositions that there's no general attempt
statute, as well as the general proposition that Rule 29 is
the appropriate avenue to bring this motion.

I can appreciate a response from the Government
that this is a -- more appropriately -- a Rule 12 motion.
Certainly I acknowledge that Rule 12 requires that motions
alleging, indictment failing to state an offense, must be
filed before trial.

Respectfully, presupposing that argument, this
isn't a motion for a failure to state an offense.  The case
law is quite clear that if the indictment fails to state an
offense, either when it fails to charge an essential element
of the crime or that the specific facts alleged in the
indictment fall outside the scope of the relevant criminal
statute.

A common example of when an indictment doesn't

1    include an element of the offense is an interstate commerce

2    requirement, or that a bank -- or the indictment doesn't

3    include as an element that a financial institution was

4    authorized and acting under the laws of the United States.

5    That's *United States vs. Locklear*, Seventh Circuit, 97 F.3d

6    196.

7          As to the other type of -- or other way a motion

8    or an indictment will fail to state offenses where there are

9    undisputed facts that fall outside the scope of a criminal

10    statute, it's sort of akin to a summary judgment motion.

11    But that type of motion presupposes that the offense alleged

12    is an actual offense.

13          The crime charged here, attempted aggravated

14    identity theft, is not a legally cognizable offense, and,

15    therefore, Rule 29, we submit, is the proper avenue to bring

16    this motion.

17          THE COURT:  Thank you.  I think, Mr. Uller, with

18    all due respect, you've answered your own question, and that

19    is if your motion is to be a bona fide motion, it should

20    have been brought under Rule 12.  We are way past that.

21    It's now up to the jury, and whatever the jury does, that's

22    a matter of argument, and then it goes to the Seventh

23    Circuit and for potentially a new trial.

24          So the motion under Rule 29 is denied as being

25    improvidently cast as a Rule 29 motion, which it should have

1    been made under Rule 12.

2            Ms. Moreno-Taxman, Ms. Kraft, if you have anything

3    you want to add to the record, now is your opportunity.

4            MS. MORENO-TAXMAN:  Can we just have a minute,

5    Your Honor?

6            THE COURT:  Certainly.

7            MS. MORENO-TAXMAN:  Judge, our position is that

8    with regard to the indictment, the indictment is a notice

9    document, and, in fact, we have proved in this case not the

10   attempt, but the actual possession of the aggravated

11   identity devices.

12           Even when the Defense and the prosecution gave the

13   Court its summary of the facts to this case to be read to

14   the jury, it never had the word "attempt" in it.  So,

15   really, the word "attempt" is surplusage, and we would ask

16   at this time that the Court strike the word "attempt" from

17   the indictment.

18           THE COURT:  All right.  Thank you.

19           Anything further, Mr. Uller?

20           MR. ULLER:  Well, Judge, that would be a variance

21   of the indictment.  The Government has provided no authority

22   for that; and it's not surplusage, it's a separate crime.

23           THE COURT:  Well, frankly, neither side can have

24   it both ways.  If it's not a crime, then Rule 12 applies; if

25   it is a crime, then it's appropriately alleged.  But if we

1    go with the core evidence in the case, it is not a situation

2    in which a defendant simply possessed one of the victim's

3    cards and never used it.  That theoretically may be cast as

4    an attempt, but we have much more than simply possession of

5    someone else's identity.  It was actually used.  And to that

6    extent, I will leave it to the Seventh Circuit Court of

7    Appeals as to how they wish to construe the word "attempt."

8    The word "attempt" appears nowhere in the jury instructions

9    or the elements of the offense.  So this is not a case in

10   which the defendant was sandbagged by the Government.  If

11   anybody was sandbagged, it was the Court and Government

12   counsel with this being sprung at the 11th hour, 59th

13   minute, 59th second, and I take strong exception to that

14   approach.  So the motion is denied.  The jury instructions

15   will be read as they are given.  The indictment is not

16   before the jury, only the facts and the elements of the

17   offense as cast in the jury instructions.

18              Anything further anybody wishes to raise at this

19   juncture?  Now is your opportunity.

20              MS. MORENO-TAXMAN:  We have nothing further,

21   Your Honor.  Thank you.

22              MR. ULLER:  No, Your Honor.  I guess just so it's

23   not viewed as a waiver, we reserve the right to argue under

24   Rule 29 for an acquittal, under other grounds as well.

25              THE COURT:  Well, for the record, you've made a

1    Rule 29 motion. If you have anything further to submit in

2    terms of other grounds, depending, of course, what the jury

3    does, you have, under the rules, I believe, a period of

4    seven days to renew the motion after jury verdict.

5            MR. ULLER: The Defense does not have any evidence

6    to present. I don't know if it's the Court's practice to

7    conduct a colloquy with the defendant about his right to

8    testify.

9            THE COURT: I assume you have done so just as you

10    will follow the Court's instructions with regard to having

11    an adequate record with your client on the matter of

12    resolution short of trial, the matter of his right to

13    testify and so forth, but I have no interest in pursuing it

14    since it's -- as an officer of the Court, you have an

15    independent obligation to do likewise. So I have no reason

16    to doubt that you haven't discussed it.

17            Anything further, Ms. Moreno-Taxman or Ms. Kraft?

18            MS. MORENO-TAXMAN: No, Your Honor.

19            THE COURT: All right. We'll stand in recess for

20    five minutes.

21      (Break.)

22      (Jury not present.)

23            THE COURT: Before the jury comes in, do counsel

24    wish to make some matters of record?

25            Ms. Moreno-Taxman, did you have something?

1    MS. MORENO-TAXMAN:  I think it's Defense counsel

2    that wants to say something, Your Honor.

3         THE COURT:  All right.  I noticed you have a slide

4    up for Count 1.  Have you taken the word "attempt" out?

5         MS. KRAFT:  We have, Your Honor.

6         THE COURT:  Counts 2, 3, and 4?

7         MS. KRAFT:  Yes, we have.

8         THE COURT:  All right.

9         Mr. Uller.

10        MR. ULLER:  Your Honor, I've reviewed the new

11   instructions that the Court has provided, and, obviously,

12   the Court has removed the words "attempt" from what the

13   grand jury has charged, and the Court has removed the

14   "attempt" definition from the instructions.

15        It's our position that the grand jury in this case

16   charged Mr. Muresanu with three counts of attempting to

17   commit aggravated identity theft.  That's the offense that

18   was charged, and that's the offense that should be presented

19   to the jury.

20        The Court had mentioned earlier that there was

21   ample evidence that Mr. Muresanu had used the devices.  I

22   don't dispute that, but there was no evidence presented that

23   Mr. Muresanu used the devices belonging to the three

24   witnesses who were charged in Counts 2, 3, and 4.

25        THE COURT:  That's a matter of fact.  If that's

1    your position, bring it to the attention of the jury.  If

2    they accept your version of the facts, they'll acquit

3    Mr. Muresanu.  If the facts demonstrate otherwise, well,

4    then it's a different result.  So those are factual matters.

5            The key in all of this is the jury instructions

6    relating to the elements of the offense charged in Counts 2,

7    3, and 4.  And if you look at the elements, there is no

8    reference, nor was there ever a reference, to attempt.  That

9    only came about as a result of that word appearing in the

10   indictment.  What we really have here is the reverse of

11   what, in the parlance of jury instructions, are lesser

12   included offenses.  In other words, if the statute provided

13   for penalties for attempted as well as actual, the lesser

14   included offense would be attempt.  But in this case, we

15   have the reverse.  If the Government is correct, these cards

16   were actually used, not attempted.  And if the evidence

17   doesn't show that they were actually used, then the jury

18   will do the right thing and find Mr. Muresanu not guilty

19   because attempted use does not constitute an offense under

20   1028A.

21           Anything further?

22           MS. MORENO-TAXMAN:  Judge, I just will want to say

23   that we would like to make sure that the record is clear

24   that throughout these last few weeks, we have received

25   numerous motions every time at the last minute from Defense

 1    counsel.

 2         This particular motion should've been brought

 3    pursuant to Rule 12.  The fact that it wasn't even

 4    electronically filed and brought to court, I think, is

 5    further evidence of just trying to get us -- rather than

 6    have a fair trial, the Defense trying to manipulate the

 7    system, and I find that conduct offensive, and it has gone

 8    on throughout the proceedings of this case.

 9         THE COURT:  Well, we could go all the way back and

10    start fresh because, as the Court staff have reminded

11    counsel, this case doesn't belong in the Milwaukee Division.

12    It should've been assigned to Green Bay.  And the only time

13    the Court became aware of the fact that it was in the

14    Milwaukee Division is when we saw the pretrial report, and

15    it's too late to change now.  But this is the second case

16    that's been assigned to this branch of the Court that

17    should've been assigned to Green Bay.  And we are going to,

18    through the Clerk's office, look with greater scrutiny at

19    the designation of these cases being in the Milwaukee

20    Division versus Green Bay.  And so it's unfortunate.

21         All the witnesses, save Mr. Hoalcraft, were from

22    the Oshkosh area.  The conduct occurred in Oshkosh, and it

23    should've been assigned to the Green Bay Division.

24         It's abundantly clear that obviously there were

25    some discussions, although they didn't reach fruition to

1    resolve the case short of trial.  And then there was a

2    further attempt to get Mr. Muresanu out on bond.  Obviously,

3    had that occurred, there's little question that he would've

4    left the jurisdiction.

5              So there's a lot of combinations of permutations

6    here of what went so terribly, terribly wrong, but we do the

7    best we can, and we've now reached the point where the case

8    is ready to conclude.

9              When the jury comes in, I will invite Mr. Uller to

10   make a record with regard to whether he wishes to present

11   any evidence if, as he said earlier, his client chooses not

12   to.  We have prepared to move forward and instruct the jury.

13             Anything further?

14             MS. KRAFT:  Judge, yes.  I wanted to say that the

15   statute requires that we prove that the defendant either

16   transferred, possessed, or used.  So it isn't limited to

17   "used."  I believe that the jury instructions that the Court

18   has prepared are a correct statement of the law, and I want

19   the record to reflect that.

20             THE COURT:  Certainly.

21             Mr. Shepherd, you may invite the jurors.

22        (Jury present.)

23             THE COURT:  The counsel have completed their

24   attention to matters that didn't involve your presence, so

25   we're now ready to resume with the balance of the trial.

1          At this time, I'm going to call upon Mr. Uller for

2     any evidence that Mr. Muresanu wishes to bring to your

3     attention.

4          Mr. Uller.

5          MR. ULLER:  The Defense also rests.

6          THE COURT:  Thank you.

7          Members of the jury, that brings us to the next

8     phase of this case.  The Court now does declare the receipt

9     of evidence in this case closed.

10          Subject to my staff reviewing with counsel to

11    insure that each of the exhibits that have been received are

12    part of the record, and having completed our work on the

13    jury instructions, I'm going to have Mr. Shepherd distribute

14    to each of you a copy of the Court's instructions to follow

15    as I read them aloud.

16          I now invite you to turn to the binder with the

17    instructions beginning with Part I, "General Introduction."

18          Members of the jury, now that you have heard all

19    the evidence in the case, it becomes my duty to instruct you

20    on the law which applies to this case.  These instructions

21    will be in three parts.  First, the instructions on general

22    rules which define and control the jury's duties in a

23    criminal case.  Second, the instructions which relate to the

24    offenses with which the defendant is charged.  And, third,

25    some rules and guidelines for your deliberations and return

1    of your verdict.

2              At the conclusion of my instructions, the

3    attorneys for the parties will deliver their closing

4    arguments followed by the concluding instructions of the

5    Court.  Copies of these instructions will be available in

6    the jury room for each of you to consult should you find it

7    necessary.

8              It is your first duty to find the facts from all

9    the evidence in the case.  To those facts, you must apply

10   the law as I give it to you in these instructions whether

11   you agree with the law or not.  All of the instructions are

12   equally important and should be considered together as a

13   connected series and regarded as the law applicable to the

14   case.  As jurors, you have no right to disregard or give

15   special attention to any one of the instructions or to

16   question the wisdom of any rule of law.

17             As jurors, you should consider and view the

18   evidence in light of your own observations and experiences

19   in the affairs of life.

20             In determining the facts, you should do so from a

21   fair consideration of the evidence.  That means you must not

22   be influenced by prejudice, fear, favor, personal likes or

23   dislikes, opinions, or sympathy.

24             In reaching your verdict, you may consider only

25   the testimony of the witnesses and the exhibits received in

evidence.  Certain things are not evidence, and you may not
consider them in determining what the facts are.  Those
matters and things which are not evidence include the
following:  First, arguments and statements by the lawyers
for the parties are not evidence.  The lawyers are not
witnesses.  What they have said in their opening statements
served to acquaint you with the facts they expected the
evidence to show.  What the attorneys say in their closing
arguments is intended to help you interpret the evidence.
You should consider the closing arguments carefully;
however, if the evidence as you recall it differs from the
way a lawyer has characterized it, keep in mind it is your
recollection that controls during your deliberations.

Second, questions and objections by lawyers are
not evidence.  The lawyers for the parties have a duty to
object to what they feel are improper questions asked of the
witnesses.  You should not draw any conclusions for either
side from the fact that an objection was made to any
question and that the witness may not have been permitted to
answer it.  If I sustained objections to questions the
lawyers asked, you must not speculate on what the answers
might have been.

Third, testimony which has been excluded or
stricken, or that you have been instructed to disregard, is
not evidence and must not be considered.  In addition, if

testimony or exhibits have been received for a limited

purpose, you must follow the limiting instruction given as

to such matters.

Fourth, anything you may have heard or seen about

the case outside the courtroom must be entirely disregarded

by you.  You are to decide this case solely on the basis of

the evidence received during the trial.

If, during the course of this trial, you have

gained any impression that I have a feeling one way or

another about this case, then you should completely

disregard any such impression because you, as jurors, are

the sole judges of the evidence and the credibility of the

witnesses in this case.  My feelings are wholly immaterial.

Neither by these instructions nor by any ruling or remark

which I have made do I mean to indicate any opinion as to

the facts or as to what your verdict should be.  Moreover, I

have a duty to caution or warn an attorney who does

something that I believe is not in keeping with the rules of

evidence or procedure.  You are not to draw any inference

against the side whom I may caution or warn during the

trial.  You are the sole and exclusive judges of the facts.

In determining the facts, you are reminded that

before each member of the jury was accepted and sworn to act

as a juror, you were asked questions regarding your

competency, qualifications, fairness, and freedom from

prejudice or sympathy.  On the faith of those answers, each

of you was accepted by the parties to serve as a juror;

therefore, those answers are as binding on each of you now

as they were then and should remain so until the jury is

discharged from consideration of this case.

The defendant is presumed to be innocent of each

and every one of the charges for which he is on trial.  This

presumption remains with the defendant throughout the stage

of the trial and during your deliberations on the verdict,

and it is not overcome unless from all of the evidence to

the case you are convinced beyond a reasonable doubt that

the defendant is guilty.

The Government has the burden of proving the guilt

of the defendant as to the offenses charged in the

indictment beyond a reasonable doubt, and this burden

remains on the Government throughout the case.  The

defendant is never required to prove his innocence or to

produce any evidence.

The evidence from which you are to determine the

facts in order to reach a verdict consists of, first, the

sworn testimony of witnesses, both on direct and

cross-examination, regardless of who called the witness.

Second, the exhibits which have been received into evidence,

regardless of who may have produced them.  And, third, all

facts and events that may have been stipulated by the

1    parties.  A stipulation is an agreement that certain facts

2    are true.

3         During the course of the trial, I occasionally may

4    have asked questions of a witness in order to bring out

5    facts not then fully covered in the testimony.  Please do

6    not assume that I hold any opinion on the matters to which

7    my questions may have related.  Remember that you, as

8    jurors, are at liberty to disregard all comments of the

9    Court in arriving at your own findings as to the facts.

10        There are two kinds of evidence:  Direct and

11   circumstantial.  Direct evidence is direct proof of a fact

12   such as the testimony of a person who claims to have

13   personal knowledge related to the criminal acts which have

14   been charged, such as an eyewitness.  Circumstantial

15   evidence, on the other hand, is proof of a chain of facts

16   and circumstances which tend to show whether the defendant

17   is guilty or not guilty.  The law makes no distinction

18   between the weight to be given either to direct or

19   circumstantial evidence; therefore, all of the evidence in

20   the case, including circumstantial evidence, should be

21   considered by you in arriving at your verdict.

22        It is for you to decide whether a fact has been

23   proved by circumstantial evidence.  In making that decision,

24   you must consider all the evidence in the light of reason,

25   common sense, and experience.  You are to consider only the

1    evidence in the case.  But in your consideration of the

2    evidence, you are not limited to the balanced statements of

3    the witnesses; in other words, you are not limited to what

4    you see and hear as the witnesses testify.  You are

5    permitted to draw, from facts which you find have been

6    proved, such reasonable inferences as seem justified in the

7    light of your experience.

8            Inferences are deductions or conclusions from

9    which reason and common sense lead the jury to draw from

10   facts which have been established by the evidence in the

11   case.  You are allowed to make reasonable inferences so long

12   as they are based on the evidence.

13           If you have taken notes during the trial, you may

14   use them during deliberations to help you remember what

15   happened during the trial.  You should use your notes only

16   as aids to your memory.  The notes are not evidence.  All of

17   you should rely on your independent recollection of the

18   evidence, and you should not be unduly influenced by the

19   notes of other jurors.  Notes are not entitled to any more

20   weight than the memory or impressions of each juror.

21           You, as jurors, are the sole judges of the

22   credibility of the witnesses and the weight their testimony

23   deserves.  You may be guided by the appearance and conduct

24   of each witness, or by the manner in which each witness

25   testified, or by the character or the testimony given or by

evidence to the contrary of the testimony given; however, you should not be influenced by any person's race, color, religion, national ancestry, or sex.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness's intelligence, motive, and state of mind, and demeanor or manner while on the stand. Consider each witness's ability to have heard, observed, or otherwise have knowledge of the matters as to which he or she has testified, and whether he or she impresses you as having an accurate recollection of these matters. Consider also any relation each witness may bear to either side of the case, including any bias or prejudice held by the witness, the manner in which each witness might be affected by your verdict, the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case, and any difference between a witness's behavior when responding to questions by the party sponsoring the witness's testimony and questions asked when the witness is cross-examined by the other party.

In weighing the testimony of a law enforcement officer, you should apply the same standards as you apply to the testimony of any other witness. The fact that a witness

is a law enforcement officer does not make his or her testimony any more or less credible than the testimony of any other witness. Inconsistencies or discrepancies in the testimony of a witness, or between the testimony or different witnesses, may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently, innocent misrecollection, like failure of recollection, is a common experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from independent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such weight, if any, as you may think it deserves.

You may, in short, accept or reject the testimony of any witness in whole or in part.

A witness may be discredited or impeached by contradictory evidence, or by evidence that at some other time the witness has said or done something, or has failed to say or do something which is inconsistent with the witness's present testimony. If you find that a witness's prior statement is inconsistent with the witness's testimony at trial, you may consider the prior statement only in

deciding the truthfulness and accuracy of such witness's trial testimony.  You may not consider the prior statement as evidence of the matters contained in the prior statement; however, if the prior statement was made under oath, you may also consider it as evidence of the truth of the matters contained in the prior statement.

If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

A defendant has an absolute right not to testify or present evidence.  You may not consider in any way the fact that the defendant did not testify or present evidence. You should not even discuss it in your deliberations.

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions.  An exception to this rule exists as to those whom we call expert witnesses.  Witnesses who, by education and experience, have become expert in some art, science, profession, or calling, may state their opinions as to relevant and material matters in which they profess to be expert and may also state their reasons for the opinion. You should judge these witnesses' opinions and testimony the same way you judge the testimony of any other witness.  In deciding how much weight to give to these opinions and

testimony, you should consider the witness's qualifications,
how he or she reached his or her opinions, and the factors I
have described for determining the believability of
testimony.

You have heard testimony that the defendant made
statements to law enforcement.  You must decide whether the
defendant actually made the statement and, if so, how much
weight to give to the statements.  In making these
decisions, you should consider all of the evidence including
the defendant's personal characteristics and circumstances
under which the statements may have been made.

Certain summaries or charts were admitted in
evidence.  You may use those summaries or charts as evidence
even though the underlying documents are not here.

You have heard a recorded conversation and have
seen video recordings.  This is proper evidence that you
should consider together with and in the same way you
consider the other evidence.

You were also given transcripts of recorded
conversations to help you follow the recording as you
listened to it.  The recording is the evidence of what was
said and who said it.  The transcripts are not evidence.  If
you noticed any differences between what you heard in a
conversation and what you read in the transcripts, your
understanding of the recording is what matters; in other

1    words, you must rely on what you heard, not what you read.

2    And if you could not hear or understand certain parts of a

3    recording, you must ignore the transcripts as far as those

4    parts are concerned.  You may consider a person's actions,

5    facial expressions, and lip movements that you are able to

6    observe on a video recording to help you determine what was

7    said and who said it.

8         You are instructed that it is proper for an

9    attorney to interview any witness in preparation for trial.

10        You are not bound to decide any issue of fact in

11   accordance with the testimony of any number of witnesses

12   which does not produce in your minds belief in the

13   likelihood of truth, as against the testimony of a lesser

14   number of witnesses, or other evidence which does produce

15   such belief in your minds.

16        The test is not which side brings the greater

17   number of witnesses or presents the greater quantity of

18   evidence, but which witness, and which evidence, appeals to

19   your minds as being most accurate and otherwise trustworthy.

20        The law does not require any party to call as

21   witnesses all persons who may have been present at any time

22   or place involved in the case, or who may appear to have

23   some knowledge of the matters in issue at this trial, nor

24   does the law require any party to produce as exhibits all

25   papers and things mentioned in evidence in the case.

1      The jury must always bear in mind that the law

2  never imposes upon a defendant in a criminal case the burden

3  or duty of calling any witness or producing any evidence,

4  and no adverse inference may be drawn from his or her

5  failure to do so.

6      Part two.  The law applicable to the offenses with

7  which the defendant is charged.

8      Members of the jury, the defendant,

9  Ionel Muresanu, is charged in a four-count indictment with

10  possession of multiple access devices with the intent to

11  defraud and aggravated identity theft.  If proven, each of

12  these offenses constitute a violation of federal law.

13      Mr. Muresanu has entered a plea of not guilty to

14  each of the charges and is presumed innocent unless and

15  until proven guilty beyond a reasonable doubt.  The

16  Government has the burden of proving each of the essential

17  elements of each of the crimes charged in the indictment

18  beyond a reasonable doubt.

19      The indictment is simply the formal way of telling

20  the defendant what crimes he is accused of committing.  It

21  is not evidence that the defendant is guilty.  It does not

22  even raise a suspicion of guilt.  The indictment in this

23  case charges as follows:  Count 1, access device fraud.  The

24  grand jury charges that, between on or about May 15, 2018

25  and May 16, 2018, in the State and Eastern District of

Wisconsin and elsewhere, Ionel Muresanu, with the intent to defraud, did knowingly possess 15 or more counterfeit and unauthorized access devices as defined in Title 18, United States Code, Sections 1029E(2) and E(3), and said conduct affected interstate commerce, all in violation of Title 18, United States Code, Sections 1029A(3) and (2).

Count 2.  Aggravated identity theft.  The grand jury further charges that on or about May 16, 2018, in the State and Eastern District of Wisconsin and elsewhere, Ionel Muresanu, during and in relation to a felony violation of Title 18, United States Code, Section 1029A(3), as charged in Count 1, did knowingly transfer, possess, and use without lawful authority a means of identification of individual M.P., knowing that said means of identification belonged to another person, all in violation of Title 18, United States Code, Section 1028A(a)(1) and (2).

Count 3.  Aggravated identity theft.  The grand jury further charges that on or about May 16, 2018, in the State and the Eastern District of Wisconsin and elsewhere, Ionel Muresanu, during and in relation to a felony violation of Title 18, United States Code, Section 1029A(3), as charged in Count 1, did knowingly transfer, possess, and use, without lawful authority a means of identification of individual S.L.E. knowing that said means of identification belonged to another person, all in violation of Title 18,

United States Code, Section 1028A(a)(1) and (2).

Count 4.  Aggravated identity theft.  The grand jury further charges that on or about May 16, 2018, in the State and Eastern District of Wisconsin and elsewhere, Ionel Muresanu, during and in relation to a felony violation of Title 18, United States Code, Section 1029A(3), as charged in Count 1, did knowingly transfer, possess, and use without lawful authority a means of identification of individual E.L.B. knowing that said means of identification belonged to another person, all in violation of Title 18, United States Code, Section 1028A(a)(1) and (2).

Instruction common to all counts.  The indictment charges that the offenses were committed on or about a certain date or between certain dates.  Although the evidence need not establish with certainty the exact date of each offense, it must establish that the offense was committed on a date, or between dates, reasonably near the dates charged in the indictment.

When the word "knowingly" is used in these instructions, it means that the defendant realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident.  In deciding whether the defendant acted knowingly, you may consider all of the evidence including what the defendant did or said.

A person possesses an object if he has the ability and intention to exercise direction or control over the object, either directly or through others. A person may possess an object even if he is not in physical contact with it and even if he does not own it.

More than one person may possess an object. If two or more persons share possession, that is called joint possession. If only one person possesses the object, that is called sole possession. The term "possess" in these instructions includes both joint and sole possession.

Any person who knowingly aids, counsels, commands, induces, or procures the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed.

In deciding your verdict, you should not consider the possible punishment for the defendant who is on trial. If you decide that the Government has proved the defendant guilty beyond a reasonable doubt, then it will be my job to decide on the appropriate punishment.

Count 1. Count 1 of the indictment charges the defendant with possession of multiple access devices with intent to defraud. In order for you to find the defendant guilty of this charge, the Government must prove each of the four following elements beyond a reasonable doubt. One, the defendant knowingly possessed 15 or more access devices,

and, two, those devices were counterfeit, and, three, the
defendant possessed those devices with the intent to defraud
and, four, the defendant's conduct affected interstate or
foreign commerce.

If you find from your consideration of all the
evidence that the Government has proved each of these
elements beyond a reasonable doubt as to the charge you are
considering, then you should find the defendant guilty of
that charge.

If, on the other hand, you find from your
consideration of all the evidence that the Government has
failed to prove any one of these elements beyond a
reasonable doubt as to the charge you are considering, then
you must find the defendant not guilty of that charge.

The term "access device" means any card, plate,
code, account number, electronic serial number, mobile
identification number, personal identification number, or
other telecommunications service equipment, or instrument
identifier, or other means of account access that can be
used alone or in conjunction with another access device to
obtain money, goods, services, or any other thing of value,
or that can be used to initiate a transfer of funds other
than a transfer originated solely by paper instrument.

The term "counterfeit access device" means any
access device that is counterfeit, fictitious, altered, or

forged, or an identifiable component of an access device or

a counterfeit access device.

A person acts with intent to defraud if he acts

knowingly with the intent to deceive or cheat in order to

cause a gain of money or property to the defendant or

another or the potential loss of money or property to

another.

Interstate or foreign commerce involves business,

trade, travel, transportation, or communication between any

place in a state and any place outside that state, or any

two places within a state but through any place outside that

state.  A defendant's conduct affects commerce if the

natural consequences of the defendant's actions had some

effect on commerce, however minimal.

Counts 2, 3, and 4.

Counts 2, 3, and 4 of the indictment charge the

defendant with aggravated identity theft.  In order for you

to find the defendant guilty of this charge, the Government

must prove each of the five following elements beyond a

reasonable doubt:  One, the defendant committed the felony

offense of possession of multiple access devices with intent

to defraud as charged in Count 1, and, two, during and in

relation to that offense, the defendant knowingly possessed

a means of identification, and, three, the defendant did so

without lawful authority, and, four, the means of

1    identification belonged to another person, and, five, the

2    defendant knew that the means of identification belonged to

3    another person.

4         If you find from your consideration of all the

5    evidence that the Government has proved each of these

6    elements beyond a reasonable doubt as to the charge you are

7    considering, then you should find the defendant guilty of

8    that charge.

9         If, on the other hand, you find from your

10   consideration of all the evidence that the Government has

11   failed to prove any one of these elements beyond a

12   reasonable doubt as to the charge you are considering, then

13   you must find the defendant not guilty of that charge.

14        A person possesses a means of identification in

15   relation to a crime if it had a purpose, role, or effect

16   with respect to the felony offense.  It also means that the

17   possession of the means of identification had a connection

18   to or relationship with the felony offense.

19        You are here to determine the guilt or innocence

20   of the defendant as to each count charged in the indictment

21   from the evidence presented in the case.  You are not called

22   upon to return a verdict as to the guilt or innocence of any

23   other person or persons.  So if the evidence in the case

24   convinces you beyond a reasonable doubt of the guilt of the

25   defendant as to the particular count under consideration,

1   you should so find even though you may believe one or more

2   other persons may also be guilty.

3           A defendant's presence at the scene of a crime and

4   knowledge that a crime is being committed is not sufficient

5   by itself to establish the defendant's guilt.

6           The punishment provided by law for each offense

7   charged in the indictment is a matter exclusively within the

8   province of the Court and should never be considered by the

9   jury in any way in arriving at an impartial verdict as to

10  the guilt or innocence of the defendant.

11          Part 3.   Deliberations.

12          Members of the jury, this case will be submitted

13  to you with a verdict form which requires your verdict as to

14  each of the charges against the defendant contained in the

15  indictment.

16          I will now invite your attention to the verdict

17  form which follows your instructions.  A verdict form reads,

18  "United States District Court, Eastern District of

19  Wisconsin.  *United States of America, Plaintiff, vs.*

20  *Ionel Muresanu, Defendant*, 18-CR-129-JPS.  Verdict:  We, the

21  jury, duly impaneled and sworn for our verdict in the

22  above-entitled action find the defendant, Ionel Muresanu" --

23  and a blank line appears with the words "guilty, not guilty"

24  beneath it of the offense charged in Count 1 of the

25  indictment, possession of 15 or more access devices.

1      Based upon the jury's unanimous determination,

2  your foreperson will insert either the word "guilty" or the

3  words "not guilty" as appropriate.

4      Another blank line appears with the words "guilty,

5  not guilty" beneath it of the offense charged in Count 2 of

6  the indictment.

7      Aggravated identity theft as to individual M.P.

8      Once again, based upon the jury's unanimous

9  determination, your foreperson will insert either the word

10 "guilty" or "not guilty" as appropriate.

11     Another blank line appears with the words "guilty,

12 not guilty" beneath it of the offense charged in Count 3 of

13 the indictment.

14     Aggravated identity theft as to individual S.L.E.

15     Once again, based upon the jury's unanimous

16 determination, your foreperson will insert either the word

17 "guilty" or words "not guilty" as appropriate.  Another

18 blank line appears with the words "guilty" or "not guilty"

19 beneath that of the offense charged in Count 4 of the

20 indictment.

21     Aggravated identity theft as to individual E.L.B.

22     Once again, based upon the jury's unanimous

23 determination, your foreperson will insert either the word

24 "guilty" or the words "not guilty" as appropriate, dated at

25 Milwaukee, Wisconsin, this blank day of September, 2018,

1    beneath which appears the blank line followed by foreperson.

2          Once the verdict form has been completed with the

3    answers the jury has unanimously agreed upon, your

4    foreperson will affix the date to the verdict form as well

5    as his or her signature.

6          Your verdict must represent the considered

7    judgment of each juror.  Your verdict, whether it be guilty

8    or not guilty, must be unanimous.

9          You should make every reasonable effort to reach a

10    verdict.  In doing so, you should consult with one another,

11    express your own views, and listen to the opinions of your

12    fellow jurors.  Discuss your differences with an open mind.

13    Do not hesitate to reexamine your own views and change your

14    opinion if you come to believe it is wrong, but you should

15    not surrender your honest beliefs about the weight or effect

16    of evidence solely because of the opinions of your fellow

17    jurors or for the purpose of returning a unanimous verdict.

18          The 12 of you should give fair and equal

19    consideration to all the evidence and deliberate with the

20    goal of reaching an agreement which is consistent with the

21    individual judgment of each juror.

22          You are impartial judges of the facts.  Your sole

23    interest is to determine whether the Government has proved

24    its case as to each offense charged in the indictment beyond

25    a reasonable doubt.

1          Members of the jury, that concludes the Court's

2     core instructions on the law applicable to the case.  I will

3     have some concluding instructions for you following the

4     closing arguments.

5          At this time, we're going to turn to the next

6     phase of the case in which, as I explained to you yesterday,

7     counsel are afforded another opportunity to address you in a

8     final summation of closing argument; that is, each side is

9     given an opportunity to discuss with you what they believe

10    the evidence in the case has shown.

11         So at this time, I'm going to call on you,

12    Ms. Kraft, to deliver your closing argument.

13         MS. KRAFT:  Thank you, Your Honor.

14         May it please the Court, Counsel, ladies and

15    gentlemen of the jury.  This has been a short trial, but

16    it's an important trial.  And as the Court told you when we

17    began, we all have a role in this case.  The Court's role is

18    to oversee the trial.  It's to be the arbiter of the law.

19         Ms. Moreno-Taxman and I represent the Government.

20    It's our job to bring the evidence that comprises the

21    charges against Mr. Muresanu to you, Mr. Uller's job is to

22    represent his interests under the constitution of the United

23    States, and your job is to determine the facts.  And we have

24    now reached the point in this trial where our jobs are

25    almost finished, and the entire responsibility for this case

will be yours, and you will go back to the jury room, and
you will deliberate on the evidence that you've heard over
the last day-and-a-half, or day and maybe an hour, and apply
the instructions that the Court has given you and reach a
determination, reach a verdict as to the four counts that
have been charged against Mr. Muresanu.

Now, at the beginning of the trial, the judge told
you -- and he's told you again in his instructions -- that
the defendant, in a criminal case, is presumed innocent.  He
didn't say he is innocent, and he doesn't say he's innocent
because, of course, a defendant who has done criminal
offenses has done those offenses before he ever comes to
court and sits at that table.  The presumption of innocence
is something that protects a defendant in our system of law
until and unless the Government brings forth the evidence to
convince 12 people, 12 peers that he is, in fact, guilty of
those offenses.

Now, in this case, you might be saying, "Well,
we've heard so much evidence."

Ms. Moreno-Taxman told you in her opening remarks
to you that the evidence would be overwhelming, and I submit
to you that it was overwhelming.  The defendant confessed
multiple times to the offenses that he's charged with.  The
defendant is captured on video surveillance at the Kwik Trip
store in Oshkosh using the counterfeit cards.  The defendant

is captured in video surveillance, and we saw clips of that
at the ATM machines at the First Tennessee banks in
Nashville putting skimmers and pinhole cameras on those
ATMs. So with all this evidence, you might be saying, "But
why are we even here? Why do we have to decide this case
against the defendant?"

You do because it's his constitutional right to
have a trial, and he cannot be held responsible for those
crimes until and unless the Government brings the evidence
to court with a jury like you hears the evidence and makes a
determination. So that's why we're here today, and it's
important that you have that job. It's important that every
person who is charged with a crime in our country has the
right to have the evidence brought to court and decided by a
jury of his peers.

So with that said, let me talk about the evidence.
Now, the defendant is charged with four offenses. The judge
has told you that. You've heard the jury instructions. The
first one is that he's charged with, on or about May 15th
and May 16th, with intent to defraud, knowingly possessing
15 or more counterfeit and unauthorized access devices.

Now, we know that -- I have some little slides
here -- he's also charged in Counts 2, 3, and 4 with
aggravated identity theft. He's charged with during and in
relation to that felony violation of possession of 15 or

1    more access devices, knowingly possessing, using --

2    possessing or using without lawful authority a means of

3    identification of an individual knowing that said means of

4    identification belonged to another person.

5            And there are three victims in those offenses.  We

6    met them all in court.  Matt Palmieri is the victim whose

7    identification was possessed by the defendant in

8    relationship to Count 2.  Shawna Edwards is the victim whose

9    identification was possessed by the defendant in relation to

10   Count 3.  And Erika Borg was the victim whose identification

11   was possessed in relationship to Count 4.

12           Now, the possession of multiple or unauthorized

13   counterfeit access devices has multiple elements as the

14   Court said.  They're in your jury instructions.  When you go

15   back to deliberate, you can go back and refer to them.  The

16   defendant has to knowingly possess 15 or more access

17   devices.

18           Well, in this case, we have 80 access devices, 80

19   access devices on his person at the time that he is arrested

20   in Oshkosh, some of them wrapped with receipts that he has

21   used in relationship to those cards, receipts that he has

22   either used to check balances on the cards or has used to

23   withdraw money from the accounts that are encrypted on the

24   magnetic strip on the back of the cards; that the devices

25   were counterfeit; that the defendant possessed those devices

with intent to defraud; and that the defendant's conduct affected interstate or foreign commerce.

So we know now, and we don't have -- I don't think I have to spend a lot of time saying that an access device is anything that allows someone to get or transfer money. We know that credit cards, debit cards, gift cards are all access devices, and they are access devices because, well, for two reasons:  They have a number imprinted or embossed on the front, and also they have an account number encoded on the back.  These are front and back of one of the gift cards that actually were recovered in this case.  Credit cards and debit cards and gift cards with magnetic strips are all access devices within the meaning of the federal statutes.

Now, a counterfeit access device -- and we know this from Agent Hoalcraft, we know it from Detective Milotzky -- is one in which the access device has been altered to become something other than what it originally was.

Interstate or foreign commerce is the last element of this offense.  It requires any kind of communication or connection between activity in one state or another.  And you're not going to have any trouble finding that the defendant's conduct affected interstate commerce.  We know that he was part of a group that was making these devices,

that he was putting ATM skimmers and pinhole cameras on ATM machines in Nashville, and according to his own statement, in Atlanta and I believe Kansas City. He was going to be on his way to Louisville next. But he was one of the people who, at the, I guess, requirement of Vito, his boss, was doing what he needed to do in order to get the data from other people's accounts so that it could be encoded on the access devices, the counterfeit access devices that time he was going to ultimately use. He brought those cards to Wisconsin.

We had some debit receipts that I think were recovered from both him and his associate Florin that showed that some of these cards had been used at ATMs in Illinois on their trip up to Wisconsin. They had both checked balances and withdrawn money from cards that were in their possession.

So let's talk about the evidence. This investigation, for our purposes, began on May 16th of 2018. It began at the Motel 6 in Oshkosh, Wisconsin. It began when one of the detectives received information that there was a white van with Tennessee plates at the Motel 6, and that individuals there were involved in suspicious activity, suspicious activity that obviously the detectives cared about because they set up a surveillance and were there for quite some time. If you remember, I think they

started about 5-ish, and they surveilled the group of people

that were at that motel until almost 8:00 that night when

they followed that white van, the white van with Tennessee

plates began to move.

Now, we also know that this conduct didn't begin

on May 16th of 2018, it began in January, at least as far

as we know with respect to this defendant when he was

putting those ATM skimmers on the banks at First Tennessee.

And we know that because Brandi Woodard, who is the risk

manager for Tennessee banks, came to court, and she told you

that she had discovered that multiple ATM skimmers with

pinhole cameras had been placed on devices that were --

placed on ATMs that were part of the banking community that

she was responsible for.  And she recovered several of those

and video surveillance pictures of the defendant putting

them on, and that was in January.  I think the first date

that she testified was January 13th, putting them on,

removing them January 15th.  Putting them on

January 24th, removing them January 25th.  Something

like those dates.  The dates are on the pictures, but you

should use your own recollection if you remember the dates

different than I.  But I guess my point is that this conduct

goes way back to January of this year, and the defendant

talked about the conduct in his statements to law

enforcement.  He said, you know, "In Nashville.  I started

in Nashville.  I was putting the skimmers on.  I was taking

them off.  I was giving them to Vito.  He created the cards.

He took the data.  I knew it was other people's information.

I knew it was other people's accounts because when he gave

me the cards back, I knew that my job was to go and get

money out of those other people's accounts.  It was to go

and use the cards that I had helped create in order to get

money from other people's accounts."

            And we know there were numerous -- there's the

Kwik Trip.  There were numerous receipts that were recovered

in this.

            I'm going too fast, and I'm getting a little cold,

so I guess I'm not articulating as well as I might.

            Detective Hinke testified that in the receipts

that she recovered, if you'll recall, and they were from the

defendant, there was one account where he checked an account

balance that had something like $8,000 in it and another one

that had something like $6,000 in it.

            We also saw some receipts that were used -- that

were the result of the use of cards that Florin had at ATM

machines in Illinois, and those showed a balance check and

then a withdraw, and a balance check and then a withdraw.

            So we know that these cards were actively being

used by the defendant and his associate and that he well

knew that the information on the back of the card, the

1    information that had been encoded on the magnetic strip was,

2    indeed, the information that related to other people's bank

3    accounts.

4         Now, this is the Kwik Trip that the detectives

5    testified that they followed the white van to on May 16th,

6    and there in the left-hand side you see the defendant and an

7    ATM machine, and then you see the defendant and his other

8    two -- or one of his other two associates, I believe that's

9    Florin, and Detective Hinke at those ATMs.

10        If you recall, Detective Hinke stated that when

11   they got to the Kwik Trip, her partner, Detective Artus and

12   her supervisor, Sergeant Ansell, were parked across the

13   street.  And they told you that, too, doing just

14   observation.

15        And she took off her gun, her cuffs, her badge,

16   and went in just to see what these guys were doing because

17   she was suspicious based on the information that she had.

18   At first she didn't see them, but then after a few minutes,

19   she saw these two men and a third juvenile come out of the

20   bathroom and approach the ATM machines and surround the ATM

21   machines, and she saw the defendant.  He had a little

22   satchel, and he looked like he was putting multiple cards in

23   doing a transaction, putting another card in doing another

24   transaction, putting another card in.  That certainly was

25   suspicious to her.  So she went to get a little closer look.

She got out her own ATM card.  I think she told you she was
a little afraid to put it in because she wasn't sure what
would happen when she did what was on that machine, but she
got close enough to see exactly what they were doing.  Then
she called her partner, Detective Artus, and said, "I think
I have enough information that I can stop and ask them what
they're doing."

So she went back out, put her gun on, badge on,
cuffs back on.  And they came across the street -- "they"
being Sergeant Ansell and Detective Artus -- to assist or
whatever might happen next.  And as she approached these
three young men coming out of the Kwik Trip, they all ran.
Well, that certainly was even more suspicious behavior.  And
she followed the defendant.  And Detective Artus and
Detective Ansell were able to take into custody the other
two young men, Florin and the other juvenile.  And she
arrested Mr. Muresanu behind the Kwik Trip after he tried to
scale the wrought iron fence there.  She was assisted by a
citizen, a good citizen, a Good Samaritan, and
Sergeant Ansell went to help.  And he had, when they
searched Mr. Muresanu, these 80 access device cards on them.
And his associate, Florin, had an additional 12 access
device cards and two more in his wallet.

Now, the defendant is responsible not only for the
access devices that were on his person but also for those

that were on Florin.  Florin was -- they came together, as
you recall, in a van that the defendant claims was purchased
by Florin in Nashville.  They were traveling together
through Illinois to come to Wisconsin, and the defendant is
charged under, not just the specific statutory language that
constitutes the offenses, he's charged with 18 U.S.C.,
Section 2, which provides that any person who knowingly
aids, counsels, commands, induces, or procures the
commission of an offense may be found guilty of the offense
if he knowingly participated in the activity and tried to
make it succeed.

These two guys were working together.  This was
joint activity.  He's also responsible for Florin's part.
And he told us himself in his statement that he and Florin
were essentially one in the same in this activity.  This is
just some citation or quotations from one of the interviews.

Law enforcement:  "Okay.  And who else tonight was
involved with the skimming and collecting the money and
using the cards?

Mr. Muresanu:  "Me and Florin.

Law enforcement:  "You and Florin.  Anybody else?

Mr. Muresanu:  "No, nobody else."

Later on, law enforcement:  "Okay.  Florin has
done other cities as well as you have?

Mr. Muresanu:  "He has done other cities like I

have.  The first time when I came to Nashville, it was just

me, myself.

Law enforcement:  "Okay.  Okay.

Mr. Muresanu:  "I just did a few devices.

Law enforcement:  "Okay.  Okay.

Mr. Muresanu:  "Then Florin and I came, but I

don't think Florin -- Florin had set anything in Nashville

when he came first.  The second time we came back to

Nashville, he placed his own ATM devices too.

Law enforcement:  "Okay.  So he placed devices,

Florin did, and yourself?  So you and Florin placed them the

second time?

Mr. Muresanu:  "Yes, I helped him.  Yes."

I submit to you that Mr. Muresanu was grooming his

cousin Florin to get into this business.  He is responsible

also for the 14 cards that were found on Florin.

And then there were six more access devices in the

bathroom.  And if you recall Mr. Muresanu's statement during

one of the interviews, he said, "I had maybe 30 or 40 over

that.  Maybe I had 100.  Some of them I got rid of because

they didn't work anymore.  They didn't work anymore."

Well, this card that I have on this slide here is

one of the cards that was recovered from the bathroom.  And

if you remember when Sergeant Ansell was on the stand, I had

him circle this card.  And so the exhibit -- I don't recall

the exhibit.  I think it was 4B -- number that is the
photograph of that, and you'll see Sergeant Ansell's circles
on that card.

        This card -- and we learned this from
Detective Milotzky's analysis of the cards, his comparison
of the cards -- this card, with the numbers that end in
3132, is really a debit card that ends in 3654.  It's a
debit card that was issued by the Bank of America National
Association, and it's the card that the defendant used to
purchase the items that he purchased at the Kwik Trip at
midnight, shortly after midnight on May 16th.

        Remember the video of him putting all of those
things on the counter going back several times?  And he made
the Kwik Trip receipts -- or the transaction records that we
obtained from Kwik Trip showed that this is the card.  You
can see at the bottom there.  The last four digits are 3654
that he used to make all those purchases until the card was
declined.  And after the card was declined, he ditched it in
the bathroom along with the other cards that he felt didn't
work anymore.

        So how did we figure out where all of these cards
belonged, all of these 100 cards, the 80 on the defendant,
the 14 on Mr. Florin, the 6 in the bathroom?  We did that
because Detective Milotzky is trained in the investigation
of various kinds of white collar crime, including ATM

skimming. And he has a software program that he used to create the chart that is Exhibit No. 25.

He testified that he ran each of these cards. He swiped each one through the device that's connected to his computer, and it gave him the number that was actually encoded on the back of each of these cards. And Agent Hoalcraft testified that he went and sat with Detective Milotzky when he did this, and it takes about three hours to do this, to scan each card and then to look at the number on the front and determine whether or not that's the same number that's encoded on the back and then type in that other number, and what he discovered was for all 100 cards, there wasn't a single one that wasn't counterfeit. Every single card that was recovered from the defendant, the 80 from his person, every single card that was recovered from Florin, the 14, and every single card that was recovered from the bathroom were all counterfeit cards. Each card had a different number encoded on it than the card that the number that was written on the front of the card. So all 100 were counterfeit.

And we know that the defendant was involved in the creation of these cards by placing the skimmer and the pinhole cameras on the Parkway Commons on Columbia Avenue and removing them and giving them to his boss, I guess. And we know that because he confesses, because he tells us

1    multiple times, "I did this.  Vito directed me to do this.

2    There were other groups that were doing it too."

3           And why did he do it?  Did he do it because Vito

4    forced him to?  I don't think so.

5           He told us that he got 25% of everything that he

6    took out of other people's bank accounts by going around

7    with these counterfeit access cards and putting them in ATMs

8    and using the pin numbers that had been captured by the

9    pinhole cameras and matched with the data that was collected

10   each time the ATM skimmer was capturing data.

11          He went around, and he collected money from ATMs.

12   And he told you that the best he ever did, the best that he

13   had, the batch that he had netted $30,000.  And what's a

14   quarter of $30,000?  What?  7, $8,000?  Pretty good work for

15   just putting cards in a machine.

16          He knew exactly what he was doing, and he was

17   doing it in order to make money.

18          Now, this is an example, and this probably wasn't

19   my best, I guess, performance during this trial when I was

20   trying to have Detective Milotzky show us what was on real

21   receipts so that we could compare them with what was on the

22   cards that he had recovered.  This example was from an ATM

23   machine in O'Fallon, Illinois, and it shows that there was a

24   balance check showing that these people had $332.74

25   available in their bank account and then a withdraw of 300

1    plus a terminal fee of $303, the same day.  This is one of

2    the receipts actually that was in Florin's pocket at the

3    time he was arrested.  They were using these cards to get

4    money from other people's accounts.

5           And this is -- what is this?  This is another --

6    this is the same card.  Here we have the card number -- the

7    actual card number that came up when it was swiped ended

8    with 0708.  Okay?  That's not the card that they had in

9    their pocket at the time that they were at the station.  The

10   card that they had in their pocket ended in 4255, but we

11   know that it's the same card because Detective Milotzky ran

12   that card through a software program, saw what the actual

13   number on the back of that card was and saw that it was a

14   counterfeit card.

15          So the final element with respect to Count 1 is

16   whether or not this affected interstate commerce.

17          This activity started in Nashville.  It came

18   through Illinois.  It came to Wisconsin.  We know that he

19   didn't make these cards in Wisconsin.  He told us in his

20   statement that, "We were done with the skimmers a long time

21   ago.  We did the skimming four, five months ago, and now

22   we're using the cards that were produced from the skimming."

23          The cards were brought from another state.  All of

24   the cards were used to access accounts of account holders

25   at, essentially, most of them nationally known banks:  JP

1    Morgan Chase, Bank of America, U.S. Bank.  Certainly there's

2    no question that this activity affected interstate commerce.

3            So the other charges, the three remaining charges

4    are the aggravated identity theft.  And in order to prove

5    that, the Government was required to show that the defendant

6    committed the felony offense of possession of 15 or more

7    access devices with intent to defraud as charged in Count 1.

8    And I submit to you, ladies and gentlemen, that the evidence

9    that he did is overwhelming.

10           The second element is that during and in relation

11   to that offense, the defendant knowingly possessed a means

12   of identification.  He possessed 80 means of identification,

13   but 3 of those were from the victims that you've heard from

14   in court.  That the defendant did so without authority; that

15   the means of identification belonged to another person; and

16   that the defendant knew the means of identification belonged

17   to another person.

18           The magnetic strip on the back of a debit card or

19   a credit card is a means of identification within the

20   meaning of federal law because it provides bank account

21   information for a real person, for an actual person.

22           One of the access devices that was recovered from

23   the 80 that the defendant had in his possession on

24   May 16th was an access device that had encoded on the back

25   the real bank information of Matthew Palmieri.  And you

1    heard from Matthew in court.  He came here.  He told you

2    that he had been notified by his bank, notified that there

3    was something wrong, that his card had been used, or there

4    was something going on with his card, and so he had to

5    cancel it.  That is the vanilla card that appears to end

6    with the digits 6370.  The real numbers on his bank account

7    were 1014.  That's Count 2 of the indictment.

8         He also had on his possession, in his possession,

9    a card which was encoded with the account number of

10   Shawna Edwards.  She too came to court and told you that she

11   had not given permission, didn't know Mr. Muresanu, she had

12   not given him permission to take her bank account

13   information and use it, to have it encoded on another card

14   and use it.  In fact, she brought with her the real

15   card that had -- she still had in her possession that she

16   had to cancel because this offense had occurred.  And,

17   you know, that's one of the real problems with these kinds

18   of crimes, ladies and gentlemen.  People don't even know or

19   may not even know that their account information has been

20   stolen until the money is gone.

21        Ms. Edwards still had her card in her purse at the

22   time that money -- I can't recall if she said that money had

23   been withdrawn, but certainly the defendant had her card and

24   the possibility of using her card at the time he was

25   arrested, and that's Count 3.

1          And Count 4 relates to the account information up

2     here on the board.  And she also came here and told you that

3     she didn't know the defendant, and she had not given him

4     permission to use the encoded information that would allow

5     him to access her bank account, and the card that the

6     defendant had was 4424, but her actual bank account ended in

7     1829.

8          That's Count 4.

9          Now, we could have charged, I guess, 42 counts of

10    aggravated identity theft because, as Agent Hoalcraft told

11    you, we subpoenaed bank records based on the chart that

12    Agent Milotzky, Detective Milotzky, had prepared that reveal

13    the real account information that was encoded on the 100

14    cards.  And Agent Hoalcraft subpoenaed banks that produced

15    account information for 42 of those cards.  All 42 of those

16    cards were cards that had -- all 42 of the encoded

17    information on those cards was information that belonged to

18    real people, that belonged to real people who had real bank

19    accounts that had been compromised by the defendant's

20    conduct.  He's not charged with 42.  He's charged with 3.

21         But, ladies and gentlemen, when Ms. Moreno-Taxman

22    said at the beginning of this trial that the evidence was

23    overwhelming, she was right.

24         I think that after having heard everything that

25    you've heard during the course of the trial, you can't help

1    but believe that the defendant is guilty of each of these

2    accounts, that not only is there not a reasonable doubt

3    about his guilt, there's no doubt.  And so your verdict in

4    this case should be guilty as to Count 1, the knowing

5    possession of 15 or more access devices with intent to

6    defraud and affecting interstate commerce.

7         Count 2, guilty of aggravated identity theft

8    involving the information that belongs to Matthew Palmieri.

9         Guilty of Count 3, aggravated identity theft

10   involving the bank information that belongs to

11   Shawna Edwards.

12        And guilty of Count 4, aggravated identity theft

13   as a result of the information that belongs to Erika Borg.

14        So when you go back to the jury room, and you look

15   at the instructions that the Court has given you, and you

16   think about the evidence -- I know that some of you have

17   taken notes, and I know that you also have been a very

18   attentive jury -- I submit that the only verdicts that you

19   can come to are guilty as to all four of these offenses, and

20   those are the verdicts that I ask you to return today.

21        Thank you.

22        THE COURT:  Thank you, Ms. Kraft.

23        Mr. Uller.

24        MR. ULLER:  I understand that at various points

25   over the last couple days you sat there and wondered to

yourself what you're doing here.  I can't blame you for
that.  Undeniable truth here is that Mr. Muresanu is not an
innocent person.  You watched the same trial I did.  You saw
him on video using the cards.  You heard him confess to
using the cards.  You saw him down in Tennessee putting the
devices onto the ATM machines.  You saw him run from
Detective Hinke.

I don't expect you to like Mr. Muresanu;
unfortunately, that's what the vast majority of this trial
has been about, an attempt to distract you from the real
issues in this case to try to make you dislike Mr. Muresanu.

I'm a federal public defender.  I represent people
who have been charged with crimes, usually pretty serious
federal crimes who can't afford a lawyer.  I think I have
one of the best jobs in the world.  I get to help people,
people who a lot of other people don't think even deserve to
be helped, and I get to help them in the most trying of
times in their lives when the weight of the United States of
America is imposing its will against a single individual.
There's no nobility in those forces I go up against.
Prosecutors, police officers, special agents, these are
people who have devoted their lives to public service.
There's nobility.  I often disagree with them, but the
overwhelming majority of them do what they do because they
think what they're doing is the right thing to do.  At the

same time, that belief that they're doing the right thing
can create a sense of cynicism. Everything can become
either black or white, good or bad, right or wrong, guilty
or innocent. The reality is oftentimes in the middle.
Sometimes being wrong or being bad isn't being guilty.

Again, the majority of the evidence presented in
this case was not at issue. It wasn't in dispute. You
didn't hear me aggressively cross-examining witnesses,
trying to discredit people or undermine the credibility of
witnesses. This was an attempt to make Mr. Muresanu look
bad. Why else would the Government introduce the same
statement he made four separate times to four separate
individuals where he repeats the same statement he gave over
and over again?

Why would they have multiple witnesses telling you
what they observed Mr. Muresanu doing in the gas station
when you saw on video clear as day what he was doing?

Why else would they introduce evidence of a pair
of sneakers either him or his cousin bought, an expensive
pair of probably really ugly, really gaudy sneakers?

Why would they repeat the testimony over and over
again of what ATM skimming is?

Why would they continue to refer to the other two
individuals as juveniles?

Focus and highlight the receipts where one of

them, presumably Florin, checked a balance and had just over
$300 in the account and then a few minutes thereafter made a
$300 withdraw?

It looks bad.  I agree.  But those are
distractions from the issues in this case that you really
have to answer.  And there are two issues in this case that
really matter:  The first one is whether those cards, that
stack of cards there, are counterfeit.

Now, I know you may assume that they're
counterfeit.  We don't convict people of crimes based on
assumptions.  We convict them based on proof.  It's the
Government's job to prove that those cards are not real, to
prove that the information on the back of those cards is
different than the information on the front of those cards.
And, yeah, for some of them they did.  The cards that they
have receipts for where either Mr. Muresanu or his cousin
checked the balance, did a withdraw, the information on that
receipt reveals that the contents of that card on that
magnetic stripe are different than the contents on the front
of the card.  But the way the Government is trying to prove
this overall case, to prove that those cards are
counterfeit, is through the testimony of Detective Milotzky
from the Wawatosa Police Department.  And Judge Stadtmueller
told you in the instructions that there's some witnesses who
are -- we call them expert witnesses, and those are

witnesses -- this is on page 8 of your instructions --
witnesses who, by education and experience, have become
expert in some art, science, profession, or calling, may
state opinions as to the matters which they profess to be an
expert.

Detective Milotzky was offering an expert opinion
that those devices are counterfeit.  Call me crazy, but if
we're going to determine whether someone is guilty based on
what's in a report, an expert witness's report, shouldn't
the person who generates that report and using the devices
understand how it works?

Detective Milotzky gave us a really good analogy.
He compared it to the television, and he knows how his TV
works because he can use his remote control to turn it on.

I want the person who fixes my TV to know how my
TV works.  I don't expect Detective Milotzky to know how my
TV works, but I expect Detective Milotzky to know how this
card reader works and the software program works.

During the trial, we had some technical
difficulties.  I recall Judge Stadtmueller telling you that
technology is a great thing when it works.  We all know
things don't always work.  I would expect Detective Milotzky
to be able to stand up here and tell you why the cards -- or
the information that his report generated is the actual
information contained on the back of these cards.  That's

why he was here.  That's why he is one of the few people in
the area who is qualified to use this device.

Now, the Secret Service is not some podunk, small
town law enforcement agency.  The Secret Service is one of
the most significant and powerful law enforcement agencies
in the country.  They protect our president.  They oversee
the financial -- insure the financial integrity of our
systems, and they're using this device through
Detective Milotzky, and he doesn't know how it works, why it
works.

I want you to ask yourself:  Are you comfortable
convicting someone and finding someone guilty based on the
assumption that that device works properly?  I'm not.

So we have to rely on those receipts.  And I agree
that there are receipts that reveal that some of those
devices that Mr. Muresanu and the other individual possessed
were counterfeit.  But there's not 15 of them, and the
Government has to demonstrate that there are 15 or more of
those devices.

Now, if they haven't proven Count 1, the
possession of 15 or more access devices, then you don't even
have to answer questions -- the verdicts as to Counts 2, 3,
and 4.  The Government has to prove Count 1 in order for you
to be convinced that he's guilty of the remaining counts,
which leads me to the second question in this case, which

1    is:  Did Mr. Muresanu knowingly use, possess, or transfer

2    those 80 cards that were in his satchel, in his bag?

3         And we have the same problems with those three

4    cards that we have with the 80 or 100 other cards, at least

5    the vast majority of them.  There's been no evidence

6    presented in this case that those three cards were ever used

7    by Mr. Muresanu.  There are no receipts bearing either

8    Ms. Edwards, Ms. Borg, or Mr. Palmieri's account

9    information.

10         There's other problems, too.  Mr. Muresanu gave

11   this statement over and over again.  Why they felt the need

12   to interview him four times and obtain the same statement is

13   beyond me, but he was pretty clear.  He had a boss, right?

14   He's a young guy.  He turned 18 a couple weeks before this

15   arrest.  That doesn't negate his responsibility for what he

16   was doing.  I think you might infer that his boss was maybe

17   preying on younger people.  That doesn't matter in this

18   case.  But this boss of his, Vito, told him where to go,

19   gave him the devices, told him which ATMs to put them on.

20         Mr. Muresanu isn't the person who loaded the

21   information onto the actual cards.  He didn't know which

22   cards he was getting.  The evidence is pretty clear that

23   Vito just would give Mr. Muresanu a stack of cards and tell

24   him to go -- you know, "Go withdraw money.  Get me the money

25   that you withdraw."

The Government has presented no evidence in this case that Mr. Muresanu knew in his collection of cards that Vito gave him were the three cards at issue in Counts 2, 3, and 4.

The law doesn't prohibit all possession.  The law prohibits the knowing possession of things of items that are contraband, and Mr. Muresanu, there's no evidence here he actually used those cards.

So you can ask yourself:  How did he know that those cards were in this stack that he received if he didn't use them?

So those are really the two questions in this case.  And if you think that the Government has proven, again, proven with proof beyond a reasonable doubt that Mr. Muresanu committed those crimes, then you should find him guilty.

If, on the other hand, you're of the belief that the Government hasn't proven -- even if you believe that he's probably guilty, even if you believe he's more than likely guilty, even if you're convinced that he is guilty, but the Government hasn't proven it, then you must find him not guilty.

I'm not going to stand here and ask you to find him not guilty.  I'm not going to stand here and tell you you should find him not guilty.  I'm going to tell you to do

what the judge has instructed you to do, which is follow the
law, follow these instructions, put your understandable
contempt, dislike, anger about Mr. Muresanu aside and answer
those two questions:  Did the Government prove that these
cards are counterfeit, and did they prove that Mr. Muresanu
knew those cards were in that bag?

       Thank you very much for your time.

       THE COURT:  Thank you, Mr. Uller.

       Ms. Moreno-Taxman.

       MS. MORENO-TAXMAN:  Thank you, Your Honor.

       Good afternoon.  I think it's afternoon.

       Thank you, Your Honor, Defense counsel, Counsel.

       The answer to the Defense attorney's questions are
"yes" and "yes."  Of course he knew that he was possessing
those counterfeit cards.  That's what he was there for.  He
didn't come to Wisconsin to go and get a Packer hat.  He
didn't come to Wisconsin to go and visit the Brewers
stadium.  He didn't even come to Wisconsin to watch a game.
He came here for the sole, exclusive purpose of using those
cards, which belonged to other people, to make money for
himself and others.  Not money that he worked for, not money
that he earned, but numbers that he stole and then used in
Wisconsin.

       You heard in his own words that he had just gotten
to Wisconsin, and he was going through to the next stop,

going to a different state. This was just a cha-ching,
cha-ching, cha-ching for him. This was the place where he
could get money in and out quickly. And, really, when you
think about it in this case, if it wasn't for the Oshkosh
Police Department and their determination sitting for four
hours in a Motel 6 parking lot waiting, right? I mean,
that's good law enforcement. This is not overexaggerated
law enforcement. This is not law enforcement that is taking
things out of proportion. They're doing exactly what we
want them to do. They went, they looked, they followed the
car.

You heard that they went in and saw what he was
doing and from that started to -- start an arrest which he
not only was trying to leave Wisconsin, he was planning to
leave that scene, right? He wasn't going to stay around
because he knew he was in a car with Tennessee plates,
right?

Who was ever going to find this guy? His best bet
was to run, and running is evidence of guilt. Okay? So
that was what he did. That's how he handled the situation.

And then what happened is law enforcement took
this seriously, the same way all of us take identity theft
seriously, and they went through and figured out exactly
what he was doing. And they have the right to interview
him. Defense attorney is telling you they didn't ask him

this or he didn't say that.  He has said in his statements
in so many words over and over again that "I knew" --
remember, he even corrects.  He says, "No, no.  They're not
credit cards, they're gift cards, and it's other people's
information that's on this."

Those are his words.  And he goes on and on and
talked about how this worked.  And each statement gave you a
little bit more information about what happened and how it
worked, what states they went to, which one he put the
devices in.

So I think what the Defense attorney wants you to
believe is that people should just say "I did it," and then
law enforcement should stop.

Well, the Oshkosh Police Department and the United
States Secret Service are better than that.  They want to
make sure they've got the right person and the right
information, and so they got more information from them.

They would've never been able to figure out that
he was the guy in Tennessee if they hadn't followed up,
right?  That didn't fall on their lap.  It's just
coincidence that two of the three victims are from
Tennessee, and he was in Tennessee putting in the skimmers?

Do you remember, those witnesses, those victims
had never even been to Wisconsin, just their identification,
and their identification taken in one of the most invasive

kinds of ways because you don't know that it happened to
you.  Your identity is taken, and you think you've protected
yourself.  It's kind of like a burglary of yourself, your
identity.

MR. ULLER:  Objection, Your Honor.

THE COURT:  This is closing argument.  The jury is
entitled to draw on all inferences from the facts.

The objection is overruled.

MS. MORENO-TAXMAN:  You saw that one of the
victims didn't even know that her account had been taken
except for law enforcement letting her know, and I think
that's true of most people.  Most people find out from their
banks that their identity has been stolen.  It's not as if
Mr. Muresanu comes to them and says, "Hey, by the way, all
80 or 100 of you, I've stolen your identity."

It's only when they're caught in the act, like he
was here, that we can identify them or when they use them.
That's how we know that people's identities are stolen.
It's exactly like what happened in this case; police doing
their job as they should.

Now, somehow the Defense wants you to think that
there's some mystery to this magnetic reader of cards.  I
submit to you that none of us know what is said in our
magnetic strip, right?  What's in our magnetic strip is
written in a magnetic strip.  The only thing that could read

that is a magnetic strip reader, but we all know that when

it goes in the machine, and we put in our pin, we get our

money out.  The same way this defendant knew that when he

took people's codes, their magnetic strip he would put them

in and put in the pin, he got their money out.

So there is no mystery here.  If you want to call

it a mystery, let's solve this mystery.  The defendant did

it.  He did it again in front of a Secret Service agent, and

guess what?  They totally matched, right?  Twice.  Is that

coincidence?  The exact same numbers coming up.

Then what happens?  The law enforcement officer

takes those accounts which we now believe are counterfeit,

right?  They don't match the front or the back.  Guess what?

Of the banks he subpoenaed, he gets back 42 banks saying,

"Yep, there's a real person with that account number that's

on that magnetic strip."

There's no mystery here.

And then the defendant himself told you -- we

would not have even had to show you all that, but, you know,

who can take his word alone?  We did the investigation to

prove up every element of this crime because that's our

burden.

I don't think anyone here is trying to make the

defendant look bad.  I don't even know where that comes

from.  And the Defense attorney says to us that reality is

1    somewhere in the middle of this case.  It is nowhere in the

2    middle.  The scales of justice are like this (indicating).

3    He is guilty.  The evidence has proven him guilty of each

4    count beyond a reasonable doubt.

5             I don't know if you've noticed, but every time you

6    come into this courtroom, the bailiff says, "All rise," and

7    all of us in this courtroom, we all stand up for you.  And

8    we don't stand up for you because we have a relationship

9    with you or that we know you, we stand up for you because

10   you represent justice, you represent the truth, and we honor

11   you by standing for you because you represent the truth.

12   And with that comes the responsibility, comes a

13   responsibility of being fact finders and finding out what

14   happened here.

15            We have provided you with the evidence and the

16   facts, and we respect your verdict, and we expect your

17   verdict to be guilty on every count.

18            Thank you for your service.

19            THE COURT:  Thank you, Ms. Moreno-Taxman.

20            Members of the jury, I now invite you to return to

21   your instruction materials for the concluding instructions

22   of the Court found on page 19.

23            Members of the jury, this case is ready to be

24   formally submitted to you for your serious deliberation.

25   You will consider the case fairly, honestly, impartially,

and in light of reason and common sense. Give the verdict your careful and conscientious consideration. In answering each question, free your minds of all feelings of sympathy, bias, or prejudice.

This case has taken a great deal of time and effort to prepare and try. There is no reason to think that it could be better tried or that another jury is better qualified to decide it. It is important, therefore, that you reach a verdict if you can do so conscientiously.

Nothing said in these instructions and nothing in the verdict form, prepared for your convenience, is meant to suggest or convey in any way or manner any intimation as to what verdict the Court thinks you should find. What the verdict shall be is your sole and exclusive duty and responsibility. Let your verdict speak the truth, whatever the truth may be.

If it becomes necessary during your deliberations to communicate with the Court, you may send a note through the bailiff, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with the Court by any means other than a signed writing, and the Court will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing or orally here in open court.

You will note from the oath about to be taken by the bailiff that he, too, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, on the question of the defendant's guilt or innocence until after you have reached a unanimous verdict.

Upon retiring to your jury room, your first duty will be to select one of your number as foreperson who will preside over your deliberations, complete the verdict form with the answers you have agreed upon, and serve as your spokesperson here in court. His or her vote, however, is entitled to no greater weight than the vote of any other juror.

During your deliberations, you are not permitted to communicate about the case or your deliberations with anyone except your fellow jurors and then only in the jury room. This means you may not communicate with others either about the case or your deliberations by any means. This includes oral or written communication as well as any electronic means of communication, including a cell phone, a Smart Phone, computer, the Internet, blogs, websites, or

social network services such as Facebook, Facetime, LinkedIn, MySpace, Skype, Snapchat, YouTube, Twitter, or any other similar method of communication.

During the course of your deliberations, you should assume the attitude of judges of the facts rather than that of partisans or advocates. Your highest contribution to the administration of justice is to ascertain the true facts in this case and return a verdict accordingly.

When your deliberations are concluded and your answers inserted in the verdict form, the foreperson will sign and date the verdict, and all of you will return with your verdict here in open court.

Members of the jury, that concludes the Court's instructions, and I would now invite Mr. Shepherd to step forward and receive the oath.

COURT SECURITY OFFICER, SWORN

THE COURT: Members of the jury, momentarily I will excuse you to retire to the jury room to begin your deliberations; however, there is one additional matter that the Court needs to address. As you are aware, yesterday when we selected a jury in this case, we selected 13 individuals. Fortunately all 13 of you have been present throughout the trial, but most regrettably, the Rules of Criminal Procedure in our federal courts and, indeed, in

most states, preclude more than 12 citizens participating in

deliberations in any civil or criminal case. So at this

time, I'm going to call upon Ms. Maternowski, who will

present to Mr. Muresanu a box with all of your names in it,

and he will randomly draw one of the jurors names, and the

individual whose name is drawn will be designated the

alternative and excused.

THE CLERK: Panel member No. 30, Anthony Le Donne.

THE COURT: Mr. Le Donne, on behalf of everyone

associated with this case, it now falls upon the Court to

excuse you. I have little doubt, after 31 years, that

there's probably a little bit of frustration on your part

about having fulfilled that most important of civic

obligations but now being unable to participate with your

fellow jurors in deliberations. But as you just heard the

Court state, we only select alternates in the event that one

of you could not participate throughout the trial.

Fortunately, everyone was here, and given that only 12 can

deliberate, I'm now going to excuse you.

Mr. Shepherd will escort you back to the jury

room, and I would invite you to go around to the other side

of our facility to Room 471, and my staff has certificates

for you for your employer or for payment of your fees. So

you need to pick those up before you leave the building.

In the meantime, until the jury completes its

deliberations, I would ask that you simply keep to yourself

because in the unlikely event that one of the jurors is

unable to complete his role or her role as part of the jury

deliberations, it may become necessary for the Court to

summon you back. So given that status, I would simply ask

that you maintain your silence about the case and everyone

who has anything to do with it, and Mr. Shepherd will get a

number from you. And if it becomes necessary for the Court

to contact you to return, we will. And at the same time,

when the jury does return its verdict, we will also notify

you, so however you would like to proceed. In some cases,

jurors like to remain here in the courthouse to see how the

case turns out. You're free to do that as well, but you

can't discuss the case with anyone, including the Court

staff or the lawyers or Mr. Shepherd. You're still viewed

as a juror, but you can't deliberate.

      With that understanding, Mr. Shepherd, I invite

you to have Mr. Le Donne secure his personal belongings and

go to the other side of our chambers to pick up his

certificates.

      Momentarily for the balance of the jurors, you

will be directed to report to the jury room as soon as

Mr. Le Donne leaves. And as you are aware, we've made

arrangements for lunch for you. That should be here in a

few minutes. And now that the case is going to be in your

1    hands, you are free, as I explained yesterday, to deliberate

2    as long as you deem appropriate to arrive at a complete,

3    fair, just, unanimous verdict.

4         You will also be free to take your jury

5    instructions with you as well as any notes that you took.

6    And momentarily all of the paper exhibits and physical

7    exhibits that have been received will be collected and

8    similarly made available to you.

9         If, during your deliberations, it becomes

10   necessary for you, for whatever reason, to want to view the

11   videotapes or listen to the audiotapes, you may simply

12   advise the Court of that fact, and all of us will gather to

13   have those materials re-played for you if it becomes

14   necessary.  So the Court staff and Mr. Muresanu and counsel

15   will all be present should the jury wish to have any of

16   those types of materials that were played on the screen made

17   available for your consideration during your deliberations.

18        All right.  Members of the jury, I'm going to

19   direct that you retire to your jury room.

20        Mr. Shepherd will collect all of your cell phones

21   and electronic communication devices.  As I explained

22   yesterday, he will maintain custody of them, and in the

23   unlikely event any one of you received any form of emergency

24   call or notification, he will alert you.

25        The Court stands in recess directing that the jury

1    begin its deliberations.

2        (Jury not present.)

3            THE COURT:  To the extent anybody wishes to make

4    anything for the record, now is your opportunity.

5            Ms. Moreno-Taxman.

6            MS. MORENO-TAXMAN:  Nothing, sir.  Nothing,

7    Your Honor.

8            THE COURT:  Thank you.

9            Mr. Uller?

10           MR. ULLER:  No, Your Honor.

11           THE COURT:  Very well.

12           Given the hour, I would simply ask that counsel

13   and Mr. Muresanu be available on 15 minutes' notice, again,

14   at 2:00 this afternoon, meaning between now and 2:00.

15   Everyone is at liberty for lunch or other matters that you

16   may have to attend to, but beginning at 2:00, you should be

17   available on 15 minutes' notice.

18           Please provide Ms. Maternowski a number where she

19   may reach you in the event the jury has a question or wishes

20   to have any video material re-played or they have reached a

21   verdict.

22           The Court stands in recess.

23       (Break.)

24       (Jury not present.)

25           THE COURT:  Let the record reflect that we

1    reconvened in the matter of *United States of America vs.*

2    *Ionel Muresanu.*

3            The bailiff advised the Court that the jury has

4    reached a verdict in the case.

5            Everyone is present.

6            Before the jurors come in the courtroom, does

7    anyone wish to make anything of record?

8            MS. MORENO-TAXMAN:  Not on behalf of the

9    United States, Your Honor.

10           MR. ULLER:  No, Your Honor.  Thank you.

11           THE COURT:  Thank you.

12           Mr. Shepherd, you may invite the jury in.

13        (Jury present.)

14           THE COURT:  Good afternoon, members of the jury.

15           Ms. Stearns, Mr. Shepherd has informed the Court

16    that the jury has reached a verdict in the case; is that

17    correct?

18           FOREPERSON:  That's correct.

19           THE COURT:  Very well.  Would you tender your

20    verdict to Mr. Shepherd, and he, in turn, will pass it up to

21    the Court?

22           Members of the jury, I'm now going to have

23    Ms. Maternowski publish your verdict.  As the verdict is

24    read, I would ask that you listen very attentively because

25    at the conclusion of the publication of your verdict, I will

ask you was this and is this your verdict as to each of the

four counts, so say you one, so say you all.

If it is, please respond accordingly; if not,

please tell me.

Ms. Maternowski, would you publish the jury's

verdict?

THE CLERK:  United States District Court, Eastern

District of Wisconsin.  *United States of America, Plaintiff,*

*vs. Ionel Muresanu, Defendant*, Case No. 18-CR-129-JPS.

Verdict:  We, the jury, duly impaneled and sworn, for our

verdict in the above-entitled action, find the defendant,

Ionel Muresanu, guilty of the offense charged in Count 1 of

the indictment, possession of 15 or more access devices.

Guilty of the offense charged in Count 2 of the

indictment, aggravated identity theft as to individual M.P.

Guilty as to the offense charged in Count 3 of the

indictment, aggravated identity theft as to individual

S.L.E.

Guilty of the offense charged in Count 4 of the

indictment, aggravated identity theft as to individual

E.L.B.

Dated at Milwaukee, Wisconsin, this 11th day of

September, 2008, signed the foreperson, Kristin B. Sterns.

THE COURT:  Members of the jury, having heard

Ms. Maternowski publish your verdict, was this and is this

1    your verdict, so say you one, so say you all?

2              JURY:  It is.

3              THE COURT:  Thank you.

4              Ms. Moreno-Taxman, Ms. Kraft, does the Government

5    wish to have the juror's polled?

6              MS. MORENO-TAXMAN:  No, Your Honor.

7              THE COURT:  Thank you.

8              Mr. Uller, on behalf of Mr. Muresanu, do you wish

9    to have the jurors polled?

10             MR. ULLER:  Yes, Your Honor.

11             THE COURT:  Very well.

12             Ms. Maternowski, would you pole the jury?

13             THE CLERK:  Ms. Linda Zukowski, panel member

14   number 3, was this is and is this your verdict with regard

15   to each of the questions that you were required to answer?

16             JUROR:  It was.

17             THE CLERK:  Ms. Linda Buteyn, panel member number

18   7, was this and is this your verdict with regard to each of

19   the questions that you were required to answer?

20             JUROR:  Yes.

21             THE CLERK:  Ms. Susan Horning, panel member number

22   19, was this and is this your verdict with regard to each of

23   the questions that you were required to answer?

24             JUROR:  Yes.

25             THE CLERK:  Kristin Blanchard Stearns, panel

1    member number 20, was this and is this your verdict with

2    regard to each of the questions that you were required to

3    answer?

4            JUROR:  Yes.

5            THE CLERK:  Grace Staudt, panel member number 18,

6    was this and is this your verdict with regard to each of the

7    questions that you were required to answer?

8            JUROR:  Yes.

9            THE CLERK:  Jennifer Sleight, panel member number

10   16, was this and is this your verdict with regard to each of

11   the questions that you were required to answer?

12           JUROR:  Yes.

13           THE CLERK:  Janine Davis, panel member number 33,

14   was this and is this your verdict with regard to each of the

15   questions that you were required to answer?

16           JUROR:  Yes.

17           THE CLERK:  Lisa Ungrodt, panel member number 11,

18   was this and is this your verdict with regard to each of the

19   questions that you were required to answer?

20           JUROR:  Yes.

21           THE CLERK:  Reyes Santos, panel member number 21,

22   was this and is this your verdict with regard to each of the

23   questions that you were required to answer?

24           JUROR:  Yes.

25           THE CLERK:  Elias Adams, panel member number 27,

was this and is this your verdict with regard to each of the
questions that you were required to answer?

JUROR:  Yes.

THE CLERK:  Jacob Skrober, panel member number 25,
was this and is this your verdict with regard to each of the
questions that you were required to answer?

JUROR:  Yes.

THE CLERK:  Tracy Buczek, panel member number 32,
was this and is this your verdict with regard to each of the
questions that you were required to answer?

JUROR:  Yes.

THE COURT:  Thank you.

Members of the jury, with the return of your
verdict in this case, your work has now come to an end, and
I'm certain that each of you will leave this experience with
a much deeper appreciation and a renewed understanding of
just how it is our third branch of government works.

Obviously, we are all exposed to Hollywood
productions or TV series that relate to legal-related
matters both in the context of civil cases as well as
criminal cases.  But, obviously, you cannot compress in a
half-hour segment or even a two-hour movie all of the
interplay between the lawyers, the Court, your role as
jurors, the witnesses, without first-hand experience of
fulfilling that most important of civic obligations.  And so

while to be sure a bit of inconvenience for each of you this
week, as I explained to the panel who were excused
yesterday, it is a very, very, very small price that each of
us pay from time to time to have the benefit of the
wonderful freedoms that we enjoy in these United States.

We have a rule of our Court that precludes any
lawyer or agent for a lawyer or a party contacting you with
regard to your service as a member of this jury.  That rule
does not preclude any one or more of you from initiating any
contact whether with the Court or third parties or family or
friends with regard to your experience as a member of this
jury.

From the Court's perspective, even though I've
been on the bench for over 31 years, we are always looking
for new and better ways to accommodate citizen participation
in the work of the Court.  And so if there is anything about
this experience that would lead you to suggest, "Judge
Stadtmueller, there's a better way to deal with parking,"
or, "There's a better way to deal with summoning jurors," as
Ross Perot would say, Judge Stadtmueller is all ears.  So
don't hold back if you have some thoughts about this
experience.

By the same token, the Court has a certificate for
each of you in recognition of your service as well as a form
for your respective employers to demonstrate where you had

1   been for the last couple of days.

2            Momentarily, the Court will make those

3   certificates available in the jury room.  I would ask that

4   you remain there for a bit, and as soon as we're ready to

5   present them, we will convene with you in the jury room.

6            In the meantime, based upon the jury's verdict in

7   the case, the Court is now, on the record, constrained to

8   enter a judgment of conviction for each of the offenses

9   charged in the four-count indictment, and the Court will

10  commensurate with having entered a judgment of conviction,

11  direct that the probation department complete a presentence

12  report in Mr. Muresanu's case with a disclosure date of on

13  or before Thursday, November 1st of this year.

14           If either the Defense or the Government have any

15  objection to any of the content of the presentence report,

16  those objections must be submitted directly to the probation

17  department not later than Thursday, November 15th of this

18  year.

19           If there be objections, whether from the

20  Government or the Defense, opposing counsel will be granted

21  until Monday, November 26th, to file a response.

22           Finally, the Court will schedule a formal

23  sentencing hearing for Mr. Muresanu for Thursday,

24  December 13th at 8:30.

25           In the meantime, Mr. Uller, if you wish to renew

1   any of the motions that were made during the course of trial

2   and wish to expand upon them, I would invite you to do so

3   within 10 days of today's date.  I will give the Government

4   7 days to respond.  And, Mr. Uller, following receipt of the

5   Government's response, you will have 3 days to submit any

6   reply.

7              Are there any other matters we need to address

8   before adjourning?

9              MS. MORENO-TAXMAN:  Judge, we would just ask to

10  withdraw the actual cards from the evidence and just leave

11  the copies and have them be taken into the possession of

12  Agent Hoalcraft since they do have identifying information

13  on them.

14             MS. KRAFT:  We would present a receipt to the

15  Court similarly to the way we do with a firearm.

16             THE COURT:  All right.  That request will be

17  granted.

18             MS. MORENO-TAXMAN:  Thank you.

19             THE COURT:  Mr. Uller, anything further?

20             MR. ULLER:  No, Your Honor.  Thank you.

21             THE COURT:  Very well.  The Court stands

22  adjourned.

23        (Jury trial concluded.)

24

25

1                       C E R T I F I C A T E

2

3          I, Richard D. Ehrlich, a Registered Merit Reporter

4    and Certified Realtime Reporter, certify that the foregoing

5    is a true, complete, and accurate transcript of the

6    proceedings ordered to be transcribed in the above-entitled

7    case before the Honorable J.P. Stadtmueller, and jury, in

8    Milwaukee, WI, on September 11, 2018.

9

10   s/Richard D. Ehrlich  September 21, 2018
     _____
11   Richard D. Ehrlich, Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25