UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,     )      Case No. CR 18-129
                               )      Milwaukee, Wisconsin
    vs.                    )
                               )      December 19, 2018
IONEL MURESANU,           )      11:30 a.m.
                               )
              Defendant.     )

---------------------------------------------------------------

### TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE J.P. STADTMUELLER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        U.S. Department of Justice
                              Office of the US Attorney
                              By: CAROL KRAFT
                              517 E Wisconsin Ave - Rm 530
                              Milwaukee, WI 53202
                              Ph: 414-297-1706
                              Fax: 414-297-1738
                              carol.kraft@usdoj.gov
For the Defendant
IONEL MURESANU:           Federal Defender Services of
(Present)               Wisconsin, Inc.
                              By: JOSHUA D. ULLER
                              517 E Wisconsin Ave - Rm 182
                              Milwaukee, WI 53202
                              Ph: 414-220-9900
                              Fax: 414-220-9901
                              joshua_uller@fd.org

U.S. Probation Office:     DANIEL DRAGOLOVICH 414-297-1955

U.S. Official Reporter:    JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:       WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1

1    P R O C E E D I N G S  (11:30 a.m.)

2        THE CLERK:  The Court calls *United States vs. Ionel*

3  *Muresanu*, Case No. 18-CR-129, for the imposition of sentence.

4        May I have the appearances beginning with the

11:31  5  government?

6        MS. KRAFT:  Good morning, Your Honor.  Carol Kraft,

7  assistant United States attorney, appears for the United States.

8        With me at counsel table is Special Agent Zach

9  Hoalcraft.  He was the agent in charge of this investigation,

11:31  10  from the Secret Service.

11        PROBATION OFFICER:  Good morning.  Daniel Dragolovich

12  with U.S. Probation.

13        MR. ULLER:  Good morning, Judge.  Mr. Muresanu appears

14  with Joshua Uller.

11:31  15        THE COURT:  Thank you.  Good morning, Ms. Kraft, and

16  good morning to you, Agent Hoalcraft, and good morning to you,

17  Mr. Dragolovich, good morning to you, Mr. Uller, and good

18  morning to you, Mr. Muresanu.

19        Ionel Muresanu, back on September 11th of this year

11:31  20  you were found guilty following a jury trial as to the offenses

21  charged in Count 1 of the underlying indictment, namely,

22  possession of 15 or more counterfeit and unauthorized access

23  devices, constituting a violation of Title 18 of the U.S. Code,

24  Section 1029(a)(3) and 2, and Counts 2 through 4 of the same

11:32  25  indictment which charge aggravated identity theft in violation

2

1    of Title 18, Section 1028A(a)(1).

2         We have now reached that stage of these proceedings

3    where it becomes the duty of the Court to address several

4    questions to both you and counsel.

11:32  5         First of all, Mr. Muresanu, have you had sufficient

6    opportunity to review the revised presentence report prepared in

7    your case under date of December 6th of this year, as well as

8    the addendum to that report which bears the same date, namely,

9    December 6?

11:33  10        THE DEFENDANT:  Yes, Your Honor.

11        THE COURT:  Thank you.  Similarly, Mr. Uller, have you

12   had the opportunity to review both documents?

13        MR. ULLER:  Yes, Judge.

14        THE COURT:  And are there any facts disclosed in the

11:33  15   numbered paragraphs of the revised presentence report that

16   either you or your client take issue with or otherwise seek

17   clarification on?

18        MR. ULLER:  Well, Judge, there are -- paragraphs 21

19   through 29 were added to the revised presentence report.  And

11:33  20   they're based on the transcript of jail calls that the

21   government filed on November 30th.  I've requested those jail

22   calls.  Ms. Moreno-Taxman has been -- I guess out of the

23   country.  I had conversations with Ms. Kraft, and yesterday the

24   government provided the actual copies of those calls to me.

11:34  25   I've provided, when they came, the transcripts to Mr. Muresanu.

3

1    The calls are in Romanian.  I don't speak Romanian.  And so

2    Mr. Muresanu hasn't had a chance to review the calls.

3         I don't know the extent to which the Court finds them

4    relevant to the sentencing process, but I'm not really in a

5    position to I guess address those paragraphs of the report.

6         Aside from that, beyond the -- I know the Court was

7    asking about factual disputes.  Beyond what underlies the

8    objections that the defense has submitted, we don't.

9         THE COURT:  All right, thank you.

10         Ms. Kraft, have you had an opportunity to review the

11    revised presentence report?

12         MS. KRAFT:  I have, Your Honor.  I have also discussed

13    it with AUSA Moreno-Taxman, who is presently in Malaysia on a

14    detail, and we don't have any objection or quarrel with any of

15    the facts that are set forth.

16         THE COURT:  All right, thank you.

17         Well, as to Mr. Uller's concern, if any, with regard

18    to these calls from the jail, what it really plays into is more

19    of a parent I guess trying to ensure that his child is in

20    keeping with the parent's desire.

21         I don't find anything of note that would implicate any

22    sentencing determination.  Frankly, it really goes more toward

23    speaking of the character of the parent as opposed to the

24    character of the defendant.  And at some point, whether it's in

25    the context of asylum or other considerations, I think what it

4

1   speaks to is Mr. Muresanu's father's view of the law and the

2   view of truthfulness as opposed to anything else.  And that's

3   unfortunate for Mr. Muresanu's father, not for Mr. Muresanu who

4   is before the Court today.

11:36   5   The Court, having no other concern with the facts, it

6   will adopt all of the facts as they are detailed in the numbered

7   paragraphs and will rely on them first in determining the

8   advisory sentencing guidelines applicable in Mr. Muresanu's

9   case, together with the terms of the ultimate sentence,

11:37   10   particularly as to the guideline count which is captured in

11   Count 1.

12   Now, as to those advisory guidelines, the probation

13   department has submitted the following metric.  It includes a

14   total offense level of 24; criminal history category I, which in

11:37   15   combination with the offense level carries a guideline term of

16   imprisonment of 51 to 63 months as to Count 1; followed by a

17   statutory mandatory consecutive sentence as to the offenses

18   charged in Counts 2 through 4; any term of imprisonment to be

19   followed by a term of at least 1 but not more than 3 years of

11:38   20   supervised release as to Count 1; and a 1-year term of

21   supervised release applicable to the offense charged in Counts 2

22   through 4; $146,721.80 in restitution; fine of not less than

23   $20,000 nor more than $200,000; and finally, a $100 special

24   assessment on each count, or a total special assessment of $400.

11:38   25   Mr. Uller, I appreciate you've interposed a number of

1  objections to the probation department's guideline metric

2  applicable to Count 1.  Those objections have been addressed in

3  the December 6th addendum to the presentence report.  And to the

4  extent that you wish to further comment on either your position

11:39  5  or the government's, or ultimately the probation department with

6  regard to the objections, now is your opportunity.

7  MR. ULLER:  Thank you, Judge.  I did submit a

8  sentencing memorandum earlier this week that addressed -- kind

9  of I guess addressed those in a little bit more detail.  There's

11:39  10  one additional point I wanted to make as to the -- I guess what

11  would be paragraph 35 of the presentence report, which is

12  determining the applicable loss amount.

13  And the commentary to the guidelines indicate that in

14  determining the loss amount, that the loss amount shown not be

11:40  15  less than $500 per card or per access device.  It doesn't call

16  for a $500 amount per card.  It just says that in determining

17  the loss amount that the -- that the loss amount shouldn't be

18  less than $500 per card.

19  And as indicated, the bank here was able to determine

11:40  20  a loss amount independent of the -- you know, using a per-card

21  amount.  That loss amount includes I believe most if not all of

22  the cards that Mr. Muresanu had in his possession, and that loss

23  amount is greater than $500 per card.  It comes out to about

24  1500 -- just under $1500 per card.

11:41  25  So we submit that there's really no basis to calculate

1    the loss amount based on the actual loss amount, and then also

2    adding on a $500 per card loss amount to get to the 196,721

3    level.

4         So we believe that the correct enhancement would be an

11:41  5    eight-level enhancement and that's what we're asking the Court

6    to do.

7         As to the other objections, I don't have more to add

8    beyond what was in the sentencing memo and the objections.

9         THE COURT:  All right, thank you.

11:42  10    Ms. Kraft, anything more on the matter of the loss

11    amount?

12         MS. KRAFT:  I believe that Mr. Dragolovich has relied

13    upon the correct guideline calculations to determine this.  And

14    I have not looked at the case that he cited, but I believe that

11:42  15    the way that he has done this is correct.

16         I would note that we are able to definitively show

17    that First Tennessee Bank lost 146,000 and some dollars as a

18    result of the defendant's conduct.  But we don't know how much

19    additional loss was incurred by other banks that had to

11:42  20    reimburse their accountholders for cards that Mr. Muresanu

21    either had on his person or had otherwise used.

22         And as the Court knows, we were able to identify some

23    of the victims who were the actual accountholder of the hundred

24    cards that Mr. Muresanu had on him, not all of which came from

11:43  25    his use of the skimmers at First Tennessee Bank.  Some of which

7

1    clearly, based on his own confessions, came from skimmers that

2    he had placed on other banks in other communities.

3         We had some difficulty getting some of the account

4    information partly I think because of the Bank Secrecy Act.  As

11:43   5    the Court knows, with grand jury subpoenas we can get a lot of

6    banking information.  With another type of -- or trial

7    subpoenas, we're not able to get bank account information who

8    are not targets or subjects of a case without the consent of the

9    accountholder.  So it becomes sort of a circular process.  If

11:43   10   you don't know the name of the actual accountholder, it's hard

11   to get the consent to get that information.

12        Agent Hoalcraft did the very best he could to identify

13   the various people who were affected by Mr. Muresanu's crimes.

14   But I think that calculating the total loss based on the

11:44   15   combination of what we know from First Tennessee and the $500

16   per card that was -- that were in the possession of Mr. Muresanu

17   and also his accomplice that day, is more than a reasonable way

18   to determine guideline calculation and I would submit to the

19   Court that it's correct.

11:44   20        THE COURT:  All right.  Here's the question that the

21   Court has.  I think we're trying to mix a little bit of apple

22   and orange.  On the one hand, we have a defined loss of

23   $146,721.80.  That's clear.  What the difficulty that Mr. Uller

24   has is that at the time of Mr. Muresanu's arrest it would

11:45   25   appear, for sake of our discussion, he had 100 access cards that

1    were recovered.

2         If I read Mr. Uller's argument correctly, what he is

3    suggesting -- and both of you and Mr. Dragolovich can correct

4    the Court if we're in the wrong -- is that some -- perhaps 10,

11:45  5    12, 15, maybe 25 of those particular cards have been already

6    accounted for in the $146,000 figure.  Or are these cards that

7    were not used therefore they were not counted.  That's the

8    question that the Court has.

9         MS. KRAFT:  I don't know that we can definitively

11:46  10   answer that.  If the Court can instruct us on how we might go

11   about doing that --

12        THE COURT:  Well, you mentioned minutes ago you had

13   not read the case.

14        MS. KRAFT:  I haven't.

11:46  15        THE COURT:  All right.  We can start, I think Judge

16   Manion's opinion in the *Moore* case that's cited by

17   Mr. Dragolovich is dispositive.  And that is, you start with the

18   actual loss and if there are additional cards, but what the

19   opinion doesn't address is are these cards that may have been

11:46  20   partially used or are they sort of in futuro, if you will, going

21   to be used because he had them on his person.  I don't know what

22   the answer to that is because it's not detailed.

23        Mr. Dragolovich, do you have any thought on that?

24        PROBATION OFFICER:  Well, Judge, I asked

11:47  25   Ms. Moreno-Taxman this exact question and I was told these cards

9

1    were completely separate from that.  But other than that, I

2    don't have any additional information.  So that's the

3    information I was relying on in making that recommendation.

4         THE COURT:  Your recommendation, as I read the *Moore*

11:47   5    case, is spot on.  Of the issues that Mr. Uller raised in his

6    objections, if that's the set of facts, this is the easiest of

7    the objections to deal with because the Seventh Circuit has

8    ruled on it very definitively.

9         PROBATION OFFICER:  And again, that is the information

11:47   10   I was told, but I don't have anything beyond that.  So if that's

11   incorrect that would change my recommendation.

12        THE COURT:  Well, then it gets down to the real fine

13   point of maybe 10 of the cards were.  But, you know, the

14   threshold that we have to meet is not 250,000, it's 150, and

11:48   15   we're pretty close to 150 at 146.

16        PROBATION OFFICER:  Correct.

17        MS. KRAFT:  Well, we do know -- I think that we do

18   know that the 80 cards that he had in his possession,

19   Mr. Muresanu, personally had not been used yet.  Because what he

11:48   20   was doing at the ATM machines in Oshkosh, was checking them for

21   the balance.  And he would always do that before he would -- at

22   least according to the investigation -- before he would attempt

23   to take money out.

24        There were receipts that we had for other cards that

11:48   25   had been used at various gas stations and filling stations along

10

1    the route from wherever he had come from to Oshkosh.  I can't

2    remember if it came from Tennessee or St. Louis.

3              THE COURT:  Are those amounts in the 146,000?

4              MS. KRAFT:  Pardon?

11:48   5         THE COURT:  Are those amounts captured in the 146,000?

6              MS. KRAFT:  I don't believe so.  I believe that those

7    are additional to; that those cards that were on his person were

8    cards that had not yet been used to access money from the

9    accountholders who's information had been encoded on the back.

11:49  10   That's my understanding.

11              There were the six cards in the bathroom that were

12   recovered, that one of the detectives recovered that had been

13   used, and that's why they were discarded.  But I believe that

14   the -- all of the 80 on his person had not been used.  And I

11:49  15   think that if we go back and look at the evidence, that we would

16   be able to establish that.

17              Am I correct, Agent Hoalcraft?

18              AGENT HOALCRAFT:  You're correct, yeah.

19              THE COURT:  All right.  Mr. Uller, anything more?

11:49  20         MR. ULLER:  Just that my understanding is that the

21   reason the representative from First Tennessee Bank was

22   testifying in this trial is because the vast majority of the

23   cards that were possessed in this case were cards that were --

24   the information was obtained from the skimming devices that were

11:50  25   placed on the ATMs at First Tennessee Bank.

1      I don't have -- and I agree with the Court that it's

2  close to the $150,000 threshold.

3      The -- I also agree that the Court's reading of *Moore*

4  is spot on.

11:50   5      What we don't have and what the government hasn't done

6  in this case, is demonstrated that there are cards -- and it's

7  their burden -- that there are cards that were in my client's

8  possession that are not used to reach that $146,000 calculation.

9  It would be complete speculation to guess 10, 20.  Even, you

11:51  10  know, 89 of them would be speculation.

11      So, you know, it's for that reason that we think that

12  the objection should be sustained.

13      THE COURT:  All right.  Anything else on any of your

14  other objections?

11:51  15      MR. ULLER:  No, Your Honor.

16      THE COURT:  Ms. Kraft, anything more you'd like to add

17  on any of the balance of the objections?

18      MS. KRAFT:  I don't.  I believe that the objections

19  that the -- that Ms. Moreno-Taxman's response to the objections

11:51  20  and Mr. Dragolovich's ultimate conclusion are correctly

21  determined.

22      THE COURT:  All right.  Well, as I am obliged to find,

23  I believe that in the matter before the Court the actual loss,

24  as submitted in the presentence report of $146,721.80, is based

11:52  25  on actual loss.

1    That leaves the matter of how the Court ought to view

2    the balance of the cards in ascribing a loss for purposes of the

3    sentencing guidelines.

4    The guidelines suggest, per access device, $500.  Even

11:53  5    if out of the 80 or 100 cards only 20 of them had not been used

6    and, therefore, score lower, that would bring us above the

7    $150,000 threshold.  It defies reality.  Keeping in mind at the

8    sentencing hearing we're not dealing with proof beyond a

9    reasonable doubt but, rather, the preponderance of the evidence.

11:53  10   And looking at the scheme as a whole, it defies

11   reality that Mr. Muresanu would not have had in his possession

12   cards that had not been previously used.  Whether the number is

13   all 100 that Mr. Dragolovich used, or 20, or some number

14   in-between, whatever that number is triggers the 10-level

11:54  15   increase.  Because as the Court noted earlier, pursuant to U.S.

16   Sentencing Guideline 2B1.1(b)(1)(F), if the loss falls between

17   150 and 250, there is a 10-level increase.  And I find, based on

18   the credible evidence, that that threshold has been met and,

19   accordingly, the Court overrules the objection.

11:54  20   As to the balance of the objections with respect to

21   the matter of sophisticated means and role in the offense, we

22   can begin that analysis by simply capturing that which appears

23   in paragraph 19 of the presentence report as against the

24   totality of the evidence in the case.  And it is abundantly

11:55  25   clear to any reasonable viewer of the underlying facts that this

13

1    entire scheme was indeed quite sophisticated.  Whether it be how

2    Mr. Muresanu traveled across the country, the selection of

3    facilities to hoist these skimmers on, the time of day, how they

4    were secreted, the list just goes on and on.  And here, too,

11:56   5    there can be no doubt about the fact that this is a far, far

6    deeply involved scheme that Mr. Muresanu and his confederates

7    participated in.  And there, too, the Court is constrained to

8    reject the suggestion that the offense conduct did not leave out

9    sophisticated means.

11:56   10    With respect to the matter of role in the offense and

11    the use of a minor, it is equally clear to this court, based

12    upon the evidence received during the trial, together with the

13    analysis addressed in the December 6 addendum, that the

14    Probation Department in each instance got it correct and there,

11:57   15    too, the Court is constrained to reject the suggestion that

16    Mr. Muresanu played a minor role and did not use a minor in

17    connection with the commission of the conduct that underlies

18    this case.

19    So on the state of the record the Court is constrained

11:57   20    to adopt the guideline score applicable to the conduct charged

21    in Count 1, namely:  A total offense level of 24; criminal

22    history category I, which in combination with the offense level

23    carries a guideline term of imprisonment of 51 to 63 months;

24    followed by a 24-month consecutive sentence as to the conduct

11:58   25    charged in Counts 2 through 4; term of at least 1 but not more

than 3 years of supervised release as to Count 1; a 1-year term

of supervised release as to each of Counts 2 through 4;

$16,720.80 in restitution; fine of not less than $20,000 nor no

more than $200,000; finally, a $100 special assessment on each

11:58  count of conviction, or a total special assessment of $400.

Having made those determinations, Ms. Kraft, does the

government have any independent objection as to the guidelines?

MS. KRAFT:  The government does not.  I think they're

correctly calculated, Your Honor.

11:59  THE COURT:  Thank you.  Having made those

determinations, Mr. Uller, do you or your client have any reason

to advance this morning as to why the Court ought not proceed

today with the imposition of sentence in this case?

MR. ULLER:  No, Judge.

11:59  THE COURT:  Are there some further comments that you

would like to make on the matter of an appropriate sentence

beyond those addressed in your December 17 sentencing memo?

MR. ULLER:  Just briefly, Judge.

You know, I've long thought it was a fine line between

11:59  crediting a defendant for accepting responsibility and punishing

a defendant for going to trial.  In June and July, the

government was of the view that a two-year sentence was an

appropriate disposition in this case.  I don't yet know what the

government's going to ask for, whether it's a guideline

12:00  sentence, whether it's something above that.  But the variance

1    in the government's view on what an appropriate outcome in this

2    case is, is not just not crediting someone for accepting

3    responsibility.  It's a clear punishment for exercising a

4    constitutional right to go to trial.

12:00    5    I understand in some cases why a trial penalty might

6    be appropriate.  I don't think those circumstances are present

7    here.  There are a lot of factors that go into this, Judge, and

8    I've touched on them briefly in the sentencing memorandum.

9    I can't reiterate enough the fact that Mr. Muresanu

12:01    10   came into this as a freshly-turned 18-year-old kid who had never

11   been in jail before; had not been in the country very long;

12   didn't know how things worked, and here he is in a faraway place

13   from his family and quite immature.

14   And in this building I don't represent a lot of

12:01    15   18-year-olds.  Prior to being in the Federal Defender's office I

16   represented countless, both juveniles and people in their 17-,

17   18-, 19-year-old range.  And Mr. Muresanu isn't a lot different

18   from those individuals.  When they're in custody they have a

19   one-track mind.  The only thing that they can think about and

12:02    20   talk to their lawyer about is getting out of jail.

21   And Mr. Muresanu's immaturity and unfamiliarity with

22   our system played a role in this case.  And, you know, he never

23   denied his involvement in the offense conduct.  He was highly

24   cooperative.  The Court saw all of I think four of his

12:02    25   confessions.  And certainly with the benefit of hindsight

1    Mr. Muresanu would have -- given the opportunity given to him

2    today, he would have jumped on that.

3         And, you know, there's obviously a role that counsel

4    plays in that process and -- and, you know, decisions were made.

12:03    5    I probably should have been more insistent that Mr. Muresanu

6    focus on the outcome of the case rather than pretrial release.

7    But it's not a situation where he was being obstinate or

8    defiant.

9         You know, his lawyer told him about a possible

12:03    10    strategy to the case.  And, you know, the Court -- I understand

11    how the Court feels about that and I understand how the

12    government feels about that.  And again, with the benefit of

13    hindsight Mr. Muresanu would have probably gone a different

14    route.

12:03    15         But, you know, if two years was a sufficient

16    punishment in the government's eyes before trial, there's

17    nothing new to suggest -- that the government has learned to

18    suggest that's not appropriate now.  The government hasn't

19    learned anything new about Mr. Muresanu.  He was an open book.

12:04    20    Anything that was obtained was information that he provided to

21    them.

22         I understand that in society when you see something it

23    has a different impact on the viewer than just hearing about it.

24    Maybe seeing him actually place a skimming device on a ATM

12:04    25    machine may have made him look worse, but the government knew

1    that he was placing those on the devices.  Mr. Muresanu admitted

2    that he was placing them on the devices.

3         You know, there's another matter here with 1028A and

4    its corresponding relationship to the offense charged in

12:05    5    Count 1.  And I can't come up with a scenario where someone can

6    commit the offense that Mr. Muresanu committed in Count 1

7    without also committing aggravated identity theft.  If you

8    possess 15 or more unauthorized access devices, 15 or more

9    fraudulent cards, that's 15 or more counts that could be charged

12:05    10   with aggravated identity theft.

11        And so, you know, the decision to charge 1028A and the

12   number of charges to bring is, in many respects, a function of

13   the government's exercise of discretion.  Here the government

14   elected to pursue three 1028A charges.  As I think

12:06    15   Ms. Moreno-Taxman indicated in the government's closing

16   argument, they could have brought 80.

17        And, you know, the question really is, so we have this

18   two-year minimum, how much more than that is necessary?  And,

19   you know, the Court's made its ruling on the guidelines.  I

12:06    20   think whether the Court wants to look at it as a guideline issue

21   or a issue about the nature and circumstances of the offense.

22   You know, Mr. Muresanu was a worker for this person named Vidu.

23   And I think the record clearly reflects that this Vidu, V-i-d-u,

24   was an older, more sophisticated person who preyed upon a either

12:07    25   16- or 17-year-old kid who was new to this country, not in

18

school, and took advantage of him.

And Mr. Muresanu, you know, helped this person. You know, there's no dispute that he did what he did. But it's quite clear that the offense in this case was driven by Vidu, and Vidu used Mr. Muresanu to do the dirty work so that he wouldn't get caught.

In many respects the nature and circumstances of the offense kind of bleeds into the history and characteristics of the defendant because in this case I think one of the mitigating circumstances of the offense is Mr. Muresanu's age. And I've submitted in the sentencing memorandum some studies and views of our Supreme Court on adolescents who engage in criminal behavior.

What can't really be disputed is that as an adolescent, new to this country, Mr. Muresanu knew right from wrong. Not in dispute. What he didn't necessarily fully appreciate was the other considerations that this court has like, you know, respect for the rule of law, things like deterrence, just punishment.

The realty is that his immaturity and lack of familiarity with the norms of this country slanted his judgment. It led him and impacted him to do things that he might not otherwise have done.

I think the Court does need to consider the need to avoid unwarranted sentencing disparities. I've provided the

19

1    Court with some quite recent examples of other very similar

2    instances, very similar cases.  The offense -- or the sentences

3    imposed in those cases are in line with the type of sentence I'm

4    asking the Court to impose in this case.

12:09    5    I understand that's different than what the

6    guidelines -- where the Court has calculated the guidelines.

7    It's my view that the calculation of the guidelines that the

8    Court has adopted don't accurately reflect either the history

9    and characteristics of this offense or the nature and

12:10    10    circumstances of this defendant.

11    So we're asking the Court to impose a sentence

12    obviously of two years on the 1028A counts.  And then, to the

13    extent the Court feels that additional punishment is necessary

14    beyond that -- of course, Mr. Muresanu, I know the Court has

12:10    15    provided conditions of supervised release.  The presentence

16    report reflects that Mr. Muresanu will be deported.  That's my

17    understanding.  That's a drastic consequence.  Not an

18    inappropriate consequence, but a very severe consequence for an

19    18-year-old who has basically no life left in Romania.  He does

12:10    20    have a sibling there, but one that he's not particularly close

21    to.  His family will be left behind.

22    And so that's a very significant penalty that the

23    guidelines don't contemplate, and we believe that it's an

24    appropriate sentence.

12:11    25    THE COURT:  All right, thank you.

20

1          Mr. Muresanu, do you have some comments you'd like to

2     make this afternoon?

3          MR. ULLER:  Yes, Your Honor.  I am truly sorry for

4     what I've done.  I know what I've done is wrong.  And I want to

12:11   5     say sorry to the victims.

6          I also think the time I've sat in jail the past seven

7     months, I had enough time to think about what I've done, and I

8     think I also had enough time to grow up.

9          That's all I have to say.

12:12  10          THE COURT:  All right, thank you.

11          Ms. Kraft?

12          MS. KRAFT:  Well, Judge, as the Court can probably

13     imagine, the government has a different view of Mr. Muresanu and

14     the offense that he committed and the -- him as an

12:12  15     unsophisticated defendant than Mr. Uller has advanced.

16          The government's recommending that the Court sentence

17     the defendant within the guideline range, at the high end of the

18     guideline range on Count 1, to a sentence of 60 months, and a

19     consecutive sentence of 24 months on Counts 2, 3, and 4,

12:12  20     concurrent to each other but consecutive to Count 1, for a total

21     of 84 months.

22          And the reason is this.  This was, as the Court has

23     already determined in examining the sophistication of this

24     crime, a very sophisticated offense.  It was an offense that is

12:13  25     of the type that's ongoing today in the United States that's

1    very hard to detect and very hard to stop and very hard to bring

2    people to justice.

3          And in the defendant's own words, he traveled about

4    the country putting these skimming devices on various ATM

12:13   5    machines, taking the skimming devices off of ATM machines,

6    turning them over to another person who used the information

7    that was captured to create these gift cards.

8          Some of the people who were victims in this case, some

9    of the people whose account information was compromised, whose

12:13  10    identity was stolen and put onto those gift cards, don't even

11    know today that they have been victims of this offense.  We have

12    the hundred cards that were introduced at trial, and when this

13    case is totally finished we will destroy them.  But there's no

14    way for us to know that Vidu, or Vidu, or whoever Mr. Muresanu

12:14  15    was working with, will not use the information that was captured

16    by the skimming devices to re-encode other cards and to continue

17    to attempt to access accounts of individuals who to this day

18    don't even know that they've been victims of these offenses.

19          Mr. Muresanu, I would suggest, is not the innocent,

12:14  20    despite his young age that Mr. Uller suggests.  He flew across

21    the country to various cities.  He purchased vehicles.  He drove

22    from city to city to effect this scheme.  He was in so many ways

23    so much more sophisticated than what you might think an average

24    17-, 18-, 19-year-old would be.

12:14  25          And he did it willingly.  Mr. Uller would have us

1   believe that he was only used by this much older person.  My

2   recollection is that he told the detectives that, in fact, Vidu

3   was much older, he was in his 30s.  So certainly that's older

4   than Mr. Muresanu, but by my view not such an old man.

12:15   5        But he profited from it.  He told the detectives that

6   he, in fact, would get a cut from the batch of cards.  Each

7   batch of cards, 75 to 150 or 175 that he got, in one batch he

8   made $30,000.

9        This isn't an individual who was just preyed upon by

12:15   10   someone else.  It's someone who actually agreed to participate

11   in a scheme for the purpose of greed, I believe.  And I think

12   that that's what we saw during the course of the trial.

13        Now, I do want to say that it is I believe a fact that

14   when Ms. Moreno-Taxman first got this case she offered to

12:15   15   resolve it for a recommendation of 24 months.  I believe that

16   sometime before trial she increased that recommendation to 36

17   months.  But I don't think it's fair to say that Mr. Muresanu is

18   being punished now for going to trial, that the government's

19   recommendation is inappropriate.  Because as the Court well

12:16   20   knows, and I know that the Court was a practicing prosecutor at

21   one point in time, when a case goes to trial we see a different

22   landscape of the evidence than we saw when we are just reading

23   reports and seeing, you know, different things that may have

24   been brought in as pieces of evidence.  The Court sees a

12:16   25   different landscape and the prosecution sees a different

23

1    landscape.

2         And I think prior to the time that we started to

3    prepare for trial -- in fact, I'm sure -- we didn't know the

4    extent to which Mr. Muresanu had actually been placing the

12:16    5    skimming devices.  We didn't have the evidence that

6    Ms. Woodard -- if the Court recalls, Ms. Woodard brought a

7    number of photographs that she had taken from her ATM machines

8    of the defendant placing and removing skimmers.  We didn't have

9    any of that prior to the time that we actually started to prep

12:16    10    for trial.

11         So when a case goes to trial there's always more

12    information that lends a different picture, if you will, to what

13    an actual offense is.  And so I would suggest that the Court not

14    read the government's recommendation as something that -- as

12:17    15    Mr., I think, Uller said in his sentencing memorandum --

16    insincere, but is one that's appropriate to the facts that we

17    have learned during the course of the trial.

18         And so I am recommending that the Court sentence the

19    defendant to:

12:17    20         60 months on Count 1;

21         to 24 months on Counts 2, 3, and 4, concurrent to each

22    other and consecutive to Count 1;

23         that the Court impose $146,721.80 in restitution;

24         that the Court not impose a fine because I don't

12:17    25    believe that the defendant is going to have the wherewithal to

24

1  pay one.

2       I don't know what to say about the supervised release.

3  I assume that when he completes his prison sentence Mr. Muresanu

4  will be deported, as is appropriate.

12:17  5       And I think that's one of the other things that's so

6  tragic about this case.  Because, you know, as we know with all

7  these immigration fights that are going on, there are so many

8  people who want to be here, who are fleeing from persecution in

9  various countries, and who also want to come here and work hard,

12:18  10  and Mr. Muresanu pretended that he was here fleeing persecution

11  in his home country.  But he didn't want to work hard.  He

12  wanted to travel across the United States breaking the law and

13  making money in any way that he could.  He deserves to be

14  sentenced to a substantial prison sentence, and I would ask the

12:18  15  Court to do that.

16       Thank you.

17       THE COURT:  All right, thank you.  Mr. Uller, anything

18  more you'd like to add by way of rejoinder?

19       MR. ULLER:  Just very briefly, Your Honor.

12:18  20       This suggestion that Mr. Muresanu came to the country

21  without any -- that he wasn't fleeing persecution and that he

22  came here to commit crimes, is not tethered to the facts or

23  reality.  He was a 15-year-old kid.  His family took him here.

24  He had no choice in the matter.  And they brought him here

12:18  25  because his people are the most persecuted people in all of

25

1   Europe.  And they are appropriately coming to this country

2   because they have -- our country provides the benefit of --

3   while there is still discrimination and still, you know,

4   realities of racism and persecution, it's not as bad here as it

12:19  5   is in other parts of the world.

6          And, you know, he didn't come here with the intent to

7   commit a crime, he came here with the intent of living a better

8   life and he ended up committing a crime.  And, you know, I don't

9   think the Court should be able to read anything more into that.

12:19  10          MS. KRAFT:  I didn't say that it wasn't appropriate

11   for him to come, I said it was inappropriate for him to commit

12   the crimes.  Nobody ends up committing crimes.  A decision to

13   commit crimes is a choice.

14          THE COURT:  All right, thank you.

12:20  15          Anything further, Mr. Uller?

16          MR. ULLER:  The government did -- in-between the time

17   we were originally scheduled for trial and the second trial, the

18   parties discussed a resolution.  Mr. Muresanu indicated he would

19   agree to the 24-month deal, and the government at that point

12:20  20   indicated that it would agree to recommend a joint

21   recommendation of 36 months.  And at this point their

22   recommendation is almost three times higher than that, as I

23   calculate it.

24          THE COURT:  All right, thank you.

12:20  25          Well, we can begin this afternoon, and I'm sure,

1  Mr. Uller, you have heard this from Mr. Gansner because we had

2  this come up last week.  Judge Stadtmueller is among the

3  probably top 1 percent of judges who are very reasonable when it

4  comes to sentencing.  But when it comes to identity theft and a

12:21  5  case such as this, I believe both the Sentencing Commission and

6  indeed Congress got it wrong.

7      And the reason that I suggest that is, other than

8  domestic abuse and sexual abuse, there is no offense more

9  devastating on society than the theft of one's identity.  It is

12:21  10  long-term lasting.  And the victims in this case are the best

11  exemplification of that fact.

12      And fortunately, Mr. Muresanu, Judge Stadtmueller

13  today is not cast in the role of being a legislator.  But I'm

14  here to tell you on the basis of the cases that I have seen just

12:22  15  like yours, if I were a member of Congress the statutory

16  mandatory minimum sentence for identity theft: 60 months in

17  prison, no if, ands or buts, because of just how devastating it

18  is.  And fortunately, I'm not in the legislature and I do not

19  have the authority to sentence you to what I truly believe to be

12:22  20  an appropriate sentence for identity theft because Congress has

21  set the maximum at 24 months.

22      Now, quite apart from the identity theft, of course,

23  we're dealing with the substantive offenses of using counterfeit

24  unauthorized access devices.  Here, too, Congress has made a

12:23  25  distinction in the statute.  Because under the recent Supreme

1   Court decision, particularly as related to firearms, the Court

2   is indeed encouraged to take into account the mandatory

3   component of sentencing in deciding the discretionary component

4   that is the guideline sentence. But if you haven't read it, it

12:23  5   appears precisely in 1028(b)(3). The Court is prohibited, in

6   determining the sentence imposed as to the guideline counts, the

7   sentence that is mandated under the mandatory minimum. And so

8   we have to keep everything in perspective.

9         The guidelines in your case call for a sentence of 51

12:24  10   to 63 months as to the offense of conviction in Count 1.

11   Ms. Kraft is suggesting 60 months followed by 24 months, for an

12   84-month sentence.

13         To be sure, this case requires a sentence of more than

14   24 months for a couple of very, very significant reasons.

12:24  15   Despite your age, you are pretty sophisticated. Sophisticated

16   enough to want to leave your own country to find opportunities

17   that were not otherwise available to you in your home. But that

18   does not give one the right to set aside, whether you call it

19   benchmarks, moral compass, whatever, and go about the ways of

12:25  20   the world committing crime, that is, acquiring money or wealth

21   other than the old fashioned way, and that is to earn it. And

22   it ill behooves anyone who is seeking a better life in a new

23   country, whether under the aegis of asylum or just coming as an

24   immigrant, to take that step and set aside everything else and

12:26  25   take advantage and put in jeopardy, as I have already put on the

28

1    record, the identities of other individuals. If you think you

2    were persecuted, how do you think these victims feel?

3    Seriously. It's beyond the pale. And you are certainly

4    sophisticated enough to appreciate in full Kodak color the

12:26   5    seriousness of the activities that you participated in. And

6    they require an appropriate sentence, make no mistake about it.

7    I take no personal pride out of having to send anyone

8    to prison. Again, seriously. But as they say, it comes with

9    the job. And I've been a judge for more than 31 1/2 years and

12:27   10    I've sentenced well over 2100 defendants. And as you know from

11    your own presentence report, it's expensive, $99.45 per day per

12    inmate.

13    We have about 181,000 federal prisoners, down about 38

14    to 39,000 from the all-time high in June of 2015, when we had

12:27   15    219,586. But back then the cost per inmate per day was $80.25.

16    And in spite of having a significant decline of something close

17    to 15 percent in the prison population, the cost per day per

18    inmate has eclipsed that. And so as a society, we are still

19    spending well over $17 million a day, just to house prisoners.

12:28   20    At the same time, I also appreciate the fact that as a

21    non-U.S. citizen you're not going to be entitled to much of the

22    programming that might otherwise be available to U.S. citizens

23    who find themselves incarcerated in the United States. And

24    that's a matter for Congress and the Bureau of Prisons to

12:28   25    address. The Court does not have any control over who gets what

29

1    programming and under what circumstance.

2         What the Court does have control over in terms of the

3    discretion is what ought to be the appropriate, fair, just, and

4    reasonable sentence for the conduct charged in Count 1.  As you

12:29   5    might have already gleaned from my earlier comments, this is a

6    deadly, deadly serious matter.  And perhaps no one lost life or

7    limb, the hard reality is it is significant conduct that

8    threatens the very vibrance of the economy of which we are

9    blessed with here in these United States.  And perhaps not

12:29   10   because of the criminal conduct per se, but that may have been a

11   driving force in your attempting to relocate.  And I appreciate

12   that and I get that.  But that doesn't give you the right to

13   come to this country and set aside every moral principle in

14   terms of how you relate and interrelate with those who are

12:30   15   native born or who are here lawfully.

16        Because this conduct is serious and because it has

17   become so pervasive, it requires appropriate intervention.  You

18   couldn't get away with this conduct in your home country, and

19   you shouldn't be able to get away with it here in these United

12:30   20   States.  And as a consequence, we need to keep in mind, in the

21   forefront, the whole genre of how serious this conduct has

22   become; as well as deterrence to those who, like yourself, will

23   follow the same footsteps and engage in the same sort of

24   conduct.

12:30   25        And the entire process requires a balancing of all of

1  these competing interests.  And when I go through the rubric of

2  taking into account the costs associated with incarceration; the

3  relevant conduct that underlies this case; the fact that you are

4  not a U.S. citizen; and in order to ensure that those like you

12:31  5  do not prey upon American citizens in engaging in this sort of

6  conduct, I have concluded that the only fair, just and

7  reasonable sentence in this case is a sentence of 34 months

8  custody of the Bureau of Prisons as to the offense charged in

9  Count 1, followed by a 24-month consecutive sentence as to the

12:31  10  offense of conviction in Counts 2 through 4.

11  Make no mistake about it, this sentence has nothing to

12  do with the fact that you elected to go to trial.  Because as

13  you may recall from Ms. Leija sitting with you at the last

14  pretrial conference, I made it very clear to both you and she

12:32  15  that you are certainly free to exercise your right to go to

16  trial, but unfortunately under the U.S. Sentencing Guidelines

17  you do not receive credit for acceptance of responsibility.  And

18  I assume that Ms. Leija, and perhaps Mr. Uller would as well,

19  took the time to explain those consequences to you.

12:32  20  Fortunately there is no enhancement under U.S.

21  Sentencing Guideline 3C1.1 because you did not testify, and

22  therefore there's no basis for the Court to apply that

23  enhancement which, standing alone, would have added three levels

24  to the offense conduct, assuming the Court were obliged to make

12:33  25  the finding on the basis of the trial record that you obstructed

1    justice.  But you're actually spared of that enhancement because

2    you did not testify, therefore, there was no basis for the Court

3    to impose that enhancement.

4         When it comes to the matter of whether you will or

12:33    5    will not be deported, as you know the Immigration and Customs

6    Enforcement even as of today's date has not filed a detainer.

7    Whether they elect to at some point in the future, I have no way

8    of knowing.

9         And so the Court, on the basis of the record before me

12:34   10    today, is obliged to impose conditions of supervised release in

11    the event at some point you are released from the custodial

12    portion of the Court's sentence.

13         The Court earlier circulated a set of 17 conditions.

14    Mr. Uller made brief mention of those in his comments.

12:34   15         Ms. Kraft, have you had an opportunity to consider

16    those?

17         MS. KRAFT:  Briefly, but, yes, they're fine.

18         THE COURT:  Mr. Uller, do you have any problem with

19    any of them?

12:34   20         MR. ULLER:  No, Your Honor.

21         THE COURT:  I'm not going to impose any fine because

22    of the large amount of restitution that the Court is obliged to

23    impose which is mandatory.

24         So for all of these reasons this now becomes the

12:35   25    formal sentence of the Court:

32

1           Ionel Muresanu, on September 11th of this year you

2 were found guilty following a jury trial and were adjudged

3 guilty as to Count 1 of the underlying indictment charging you

4 with possession of 15 or more counterfeit and unauthorized

12:35   5 access devices, in violation of Title 18 of the U.S. Code,

6 Section 1029(a)(3) and 2, as well as Count 2 through 4 of the

7 same indictment charging you with an aggravated identity theft

8 in violation of Title 18, Section 1028A(a)(1).

9           The Court having asked the defendant why judgment

12:35   10 should not now be pronounced and pursuant to the Sentencing

11 Reform Act of 1984, it is the judgment of the Court that you,

12 Ionel Muresanu, be committed to the custody of the Bureau of

13 Prisons to be imprisoned for a term of 34 months as to the

14 offense of conviction in Count 1, and a term of 24 months as to

12:36   15 the offenses of conviction separately in Counts 2 through 4,

16 which are to be served consecutive to the sentence imposed as to

17 Count 1, but concurrent with one another for a total term of 58

18 months of imprisonment.

19           The Court, as the Court noted earlier, determines that

12:36   20 you do not have the financial ability to pay a fine and

21 accordingly waives any fine in your case.  However, pursuant to

22 the Mandatory Victims Restitution Act of 1996, you are to pay

23 restitution in the aggregate amount of $146,721.80.  That amount

24 is due and payable immediately to the First Tennessee Bank,

12:37   25 Corporate Security, to the attention of Ms. Brandi, B-r-a-n-d-i,

33

1    Woodard, W-o-o-d-a-r-d, 1214 Murfreesboro Road, Franklin,

2    Tennessee, 37064.  Any interest on the restitution will be

3    waived.  Payments are to apply first toward the special

4    assessment that I will momentarily impose, and then to the

12:37    5    restitution until both are paid in full.

6         Following release from imprisonment the defendant

7    shall be placed on supervised release for a term of 1 year as to

8    each count of conviction, to be served concurrent with one

9    another for a total term of 1 year of supervised release.

12:38    10         While on supervised release Mr. Muresanu will be

11    subject to each of the 17 conditions addressed in the Court's

12    submittal to counsel to which there was no objection or other

13    clarification sought.  Noting parenthetically, of course,

14    pursuant to the Seventh Circuit's decision in *Siegel* and its

12:38    15    progeny, it may be appropriate at the time of Mr. Muresanu's

16    release from the custodial portion of the Court's sentence to

17    revisit the conditions that the Court has today adopted, either

18    adding or amending conditions.

19         In accordance with the Mandatory Victims Restitution

12:38    20    Act found in 18 U.S.C. § 3013, the defendant is ordered to pay a

21    special assessment in the amount of $100 as to each count of

22    conviction, for a total special assessment of $400.  That

23    special assessment is due and payable immediately at the Office

24    of the Clerk of the Court, which is located in Room 362 of this

12:39    25    building.

34

1    Mr. Uller, if you have any recommendation as to a

2 place of confinement I'll be happy to include it in the judgment

3 and commitment order, noting, of course, that the matter of

4 inmate classification, as well as placement remains a executive

12:39 5 branch function within the discretion of the Bureau of Prisons.

6 But, nonetheless, the Court is happy to include a recommendation

7 should you or your client have one.

8    MR. ULLER:  We don't, Your Honor.

9    THE COURT:  Thank you.

12:39 10    Having been found guilty of each of the offenses

11 charged in the underlying indictment and the Court having

12 imposed what it believed to be an appropriate, fair, just, and

13 reasonable sentence, I now advise Mr. Muresanu that if he

14 believes that the guilty findings and/or the sentence that the

12:40 15 Court has imposed to be contrary to law, I now advise him of his

16 right of appeal.

17    Should you elect to appeal, Mr. Muresanu, Mr. Uller is

18 obliged to file a notice of appeal on your behalf within 14 days

19 of the docketing of the judgment and commitment order, otherwise

12:40 20 you will have effectively waived any right of appeal.  If you

21 are unable to pay the cost of an appeal, you do have the right

22 to seek relief to appeal in forma pauperis.

23    Mr. Uller, as you are aware pursuant to the teachings

24 of the U.S. Supreme Court in *Rowe vs. Flores-Ortega*, decided in

12:40 25 February of 2000, you have an obligation to confer with

1   Mr. Muresanu as to the merit of any appeal and be guided by any

2   request that he may make of the you in that regard.  In the

3   event that he elects to forego an appeal, I would invite you, as

4   his counsel, to formally notify the Court, whether by pleading

12:41  5   or letter, indicating that you have discussed with your client

6   his right of appeal and that he has elected to forego an appeal.

7   In the event he elects to forego an appeal, I would invite you

8   to include as part of any submission the signature of your

9   client acknowledging having been advised of his right of appeal

12:41  10   and that he elected to forego.

11          Anything further, Ms. Kraft or Mr. Uller?

12          MS. KRAFT:  Nothing further from the United States,

13   Your Honor.

14          MR. ULLER:  No, Your Honor.

12:41  15          THE COURT:  Court stands in recess until 1:00.

16          THE BAILIFF:  All rise.

17          (Proceedings concluded at 12:41 p.m.)

18                *   *   *

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, JOHN T. SCHINDHELM, RMR, CRR, Official Court
Reporter for the United States District Court for the Eastern
District of Wisconsin, do hereby certify that the foregoing
pages are a true and accurate transcription of my original
machine shorthand notes taken in the aforementioned matter to
the best of my skill and ability.


Signed and Certified January 11, 2019.

/s/John T. Schindhelm

John T. Schindhelm


                    John T. Schindhelm, RPR, RMR, CRR
                    United States Official Reporter
                    517 E Wisconsin Ave., Rm 236,
                          Milwaukee, WI 53202
                    Website: WWW.JOHNSCHINDHELM.COM

